1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  CHERYL ADAMS, State Bar #164194
   Chief Trial Deputy
3  MARGARET W. BAUMGARTNER, State Bar #151762
   REBECCA BERS, State Bar #287111
4  Deputy City Attorneys
   Fox Plaza
5  1390 Market Street, 6th Floor
   San Francisco, California 94102-5408
6  Telephone:      (415) 554-3859 [Baumgartner]
   Telephone:      (415) 554-4224 [Bers]
7  Facsimile:      (415) 554-3837
   E-Mail:         margaret.baumgartner@sfgov.org
8  E-Mail:         rebecca.bers@sfgov.org

9
   Attorneys for Defendants
10 CITY AND COUNTY OF SAN FRANCISCO et al.

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14
   REFUGIO NIETO and ELVIRA NIETO          Case No. C14-03823-NC
15 individually and as the Co-Successors in
   Interest to ALEJANDRO NIETO,            **MEMORANDUM OF POINTS AND**
16                                         **AUTHORITIES IN SUPPORT OF MOTION**
                                           **FOR SUMMARY JUDGMENT**
17         Plaintiffs,

           vs.                             Hearing Date:      Nov. 4, 2015
18                                         Time:              1:00 p.m.
   CITY AND COUNTY OF SAN                  Place:             San Jose Courthouse,
19 FRANCISCO, Police Chief GREG SUHR in                       4th Floor, Courtroom 7
   his individual capacity, OFFICER JASON
20 SAWYER, OFFICER RICHARD SCHIFF,         Trial Date:        February 22, 2016
   OFFICER ROGER MORSE AND OFFICER
21 NATE CHEW, DOES 5-50, individually and
   in their official capacities as Police Officer for
22 the City and County of San Francisco,
   inclusive.
23
           Defendants.
24

25

26

27

28

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 1

    I.       THE ENCOUNTER BETWEEN THE DECEDENT AND THE OFFICERS ON
           BERNAL HILL ......................................................................................................... 1

    II.      THE PHYSICAL AND MEDICAL EVIDENCE CORROBORATES THE
           OFFICERS' TESTIMONY THAT NIETO PULLED OUT HIS GUN AND
           POINTED IT AT THEM ........................................................................................... 6

           A.      Nieto was Diagnosed as a Paranoid Schizophrenic who had Visions and
                  Hallucinations ............................................................................................... 6

           B.      Three Independent Witness Observed the Decedent's Erratic Behavior
                  While on Bernal Hill ..................................................................................... 6

           C.      Nieto's Taser Had a Red Laser Sight, Emitted Flashes of Light, and
                  Nieto Pulled the Taser Trigger Three Times During His Encounter With
                  the Police ...................................................................................................... 7

                  1.      The Physical Examination of the Taser Corroborates the
                        Officers' Testimony That They Saw a Red Laser and Muzzle
                        Flashes, and That the Taser Did not Have Yellow Markings on
                        the Front ........................................................................................... 7

                  2.      The Taser's Stored Data Confirms That Nieto Pulled the Taser
                        Trigger Three Times During his Encounter with the Police ............ 8

           D.      The Medical Examiner Report and Bullet Trajectories Corroborate the
                    Officers' Testimony That They Shot at Nieto From Down the Hill When
                    He was Both Standing and Prone ................................................................. 11

ARGUMENT ....................................................................................................................... 12

    I.       STANDARD FOR SUMMARY JUDGMENT .................................................... 12

    II.      PLAINTIFFS' CLAIMS ARISE UNDER THE 14TH AMENDMENT, AND
           THEY THEREFORE MUST PROVE THAT THE OFFICERS USED FORCE
           FOR A NON-LAW ENFORCEMENT PURPOSE AND WITH SUBJECTIVE
           MALICE TO PROVE THEIR CONSTITUTIONAL CLAIM ............................. 13

    III.    UNDER THE FOURTH AMENDMENT STANDARDS, THE OFFICERS
           USED REASONABLE FORCE AS A MATTER OF LAW WHEN THEY
           SHOT NIETO ......................................................................................................... 15

           A.      It is Reasonable as a Matter of Law for an Officer to Use Deadly Force
                  When the Officer Reasonably Believes a Suspect is About to Shoot the
                  Officers ....................................................................................................... 15

           B.      The Officers Used Reasonable Force Because the Decedent Pointed
                  What Reasonably Appeared to be a Gun at the Officers ........................... 16

MPA in supp. of MSJ
Case No. **C14-03823-NC**
         i
         n:\lit\li2014\141079\01046452.doc

Case 3:14-cv-03823-NC   Document 45   Filed 09/30/15   Page 3 of 28

IV.    QUALIFIED IMMUNITY PRECLUDES INDIVIDUAL LIABILITY
BECAUSE NO CASE LAW SUGGESTS THAT THE FOURTH
AMENDMENT PROHIBITS OFFICERS FROM SHOOTING A MAN
POINTING A GUN AT THEM ..........................................................................19

V.    NO CITY POLICY RESULTED IN ANY DEPRIVATION OF PLAINTIFFS'
CONSTITUTIONAL RIGHTS ........................................................................21

VI.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON
PLAINTIFF'S STATE LAW CLAIMS BECAUSE DEFENDANTS HAVE A
PRIVILEGE TO USE EXCESSIVE FORCE UNDER STATE LAW,
PRECLUDING LIABILITY HERE ....................................................................21

CONCLUSION..................................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Acosta v. Hill*
   504 F.3d 1323 (9th Cir. 2007) ........................................................................17

*Aipperspach v. McInerney*
   963 F.Supp.3d 901 (W.D. Mi. 2013) .............................................................18

*Ali v. City of Louisville*
   395 F.Supp.2d 527 (W.D. Kent. 2005) ..........................................................18

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) .......................................................................................12

*Ashcroft v. Al-Kidd*
   563 U.S. 731 (2011) .......................................................................................20

*Bhan v. NME Hosps., Inc.*
   929 F.2d 1404 (9th Cir. 1991) .......................................................................12

*Bingue v. Prunchak*
   512 F.3d 1169 (9th Cir. 2008) .......................................................................13

*Blanford v. Sacramento County*
   406 F.3d 1110 (9th Cir. 2005) .......................................................................20

*Bryan v. MacPherson*
   630 F.3d 805 (9th Cir. 2010) .........................................................................16

*Buruca v. District of Columbia*
   902 F.Supp.2d 75 (D.D.C. 2012) ..................................................................16

*Byrd v. Guess*
   137 F.3d 1126 (9th Cir. 1998) .......................................................................13

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) .......................................................................................12

*County of Sacramento v. Lewis*
   523 U.S. 833 (1998) .......................................................................................13

*Curnow v. Ridgecrest Police*
   952 F.2d 321 (9th Cir. 1991) .........................................................................13

*Graham v. Conner*
   490 U.S. 386 (1989) .......................................................................................15

*Lal v. California*
   610 F.3d 518 (9th Cir. 2010) .........................................................................17

*Livermore ex rel Rohm v. Lubelan*
  476 F.3d 397 (6th Cir. 2007) ...............................................................16

*Monell v. Dept. of Social Services*
  436 U.S. 658 (1978) ...........................................................................21

*Monroe v. City of Phoenix, Ariz.*
  248 F.3d 851 (9th Cir. 2001) ...............................................................17

*Moreland v. Las Vegas Metropolitan Police Dept.*
  159 F.3d 365 (9th Cir. 1998) ...............................................................13

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*
  210 F.3d 1099 (9th Cir. 2000) .............................................................12

*Pearson v. Callahan*
  555 U.S. 223 (2009) ...........................................................................19

*Penley v. Eslinger*
  605 F.3d 843 (11th Cir. 2010) .......................................................16, 18

*Porter v. Osborn*
  546 F.3d 1131 (9th Cir. 2008) .............................................................13

*Price v. Sery*
  513 F.3d 962 (9th Cir. 2008) ...............................................................15

*Ryburn v. Huff*
  132 S.Ct. 987 (2012) ..........................................................................16

*Saucier v. Katz*
  533 U.S. 194 (2001) ...........................................................................19

*Scott v. Harris*
  550 U.S. 372 (2007) ...........................................................................12

*Scott v. Henrich*
  39 F.3d 912 (9th Cir. 1994) .............................................................6, 13

*Smith v. City of Hemet*
  394 F.3d 689 (9th Cir. 2005) ...............................................................16

*Stanton v. Sims*
  134 S.Ct. 3 (2013) ..............................................................................20

*Tennessee v. Garner*
  471 U.S. 1 (1985) ...............................................................................15

*Troxel v. Granville*
  530 U.S. 57 (2000) .............................................................................13

*Walker v. City of Atlanta*
    2014 WL 1224458 (D.Ga. 2014) ..............................................................16

**State Cases**
*Brown v. Ransweiler*
    171 Cal.App.4th 516 (2009) ..................................................................22

*Gilmore v. Superior Court*
    230 Cal.App.3d 416 (1991) ................................................................21, 22

*Horwich v. Superior Court*
    21 Cal. 4th 272 (1999) .........................................................................21

*Martinez v. County of Los Angeles*
    47 Cal. App. 4th 334 (1996) .............................................................17, 22

**State Statutes & Codes**
California Penal Code § 196 ......................................................................22

California Penal Code § 835a ....................................................................21

**Federal Rules**
Federal Rules Civil Procedure 56 ..............................................................12

### INTRODUCTION

No circumstances more justify an officer's use of deadly force than when an armed suspect marches directly toward uniformed police officers, indicates he heard their commands but will not obey them, then pulls out a gun, aims it at the officers, targets the officers with a red laser sight, and extends his arms.  On March 21, 2014, on Bernal Hill in San Francisco, Alejandro Nieto did just that.  The four Defendant officers Sergeant Jason Sawyer and Officers Richard Schiff, Nathan Chew and Roger Morse shot Nieto because all of the objective facts indicated that he was about to shoot them.  These facts preclude liability under any legal theory.

Plaintiffs Elvira and Refugio Nieto are the parents of decedent Nieto.  They sued the City and the four shooting officers following Nieto's death.  Plaintiffs sued under the 14th Amendment and the 4th Amendment, and made state tort claims for wrongful death, negligence and battery.  Plaintiffs cannot prove their 14th Amendment claims because the officers did not act with a subjective intent to harm unrelated to a legitimate law enforcement purpose.  They cannot prove their 4th Amendment claims because the officers' testimony and corroborating circumstantial evidence show that the officers responded reasonably when Nieto pointed a gun at them.  Additionally, even if the officers violated Plaintiffs' constitutional rights, the officers are entitled to qualified immunity.  Also, the City is not liable because Plaintiffs have no evidence that a constitutionally deficient policy or practice caused them harm.

Under state law the officers have a privilege to use reasonable force.  For the same reasons that Plaintiffs cannot succeed on their constitutional claims, Plaintiffs cannot recover under any of their state tort claims.

The Court should therefore grant summary judgment for all defendants on all of Plaintiffs' claims.

### STATEMENT OF FACTS

### I.    THE ENCOUNTER BETWEEN THE DECEDENT AND THE OFFICERS ON BERNAL HILL

On March 21, 2014, Defendant Richard Schiff, a recruit San Francisco Police Officer, reported for duty at Ingleside Station in San Francisco.  (Transcript of Deposition of Officer Richard Schiff,

hereinafter "Schiff Depo." 12:13-14, 99:19, attached as Exhibit C to Baumgartner Dec.)  Officer Schiff had been a sworn member of the police department for just over two months.  (Schiff Depo. 10:13-16.)  He reported to his training Sergeant, Defendant Jason Sawyer, for a "Sergeant ride along" that day, which is part of a recruit's normal training.  (Schiff Depo. 11:20-12:7; Transcript of Deposition of Lt. Jason Sawyer, hereinafter "Sawyer Depo." 8:17-9:5, attached as Exhibit D to Baumgartner Dec.)

At about 7:00 p.m., just as Officer Schiff and Sgt. (now Lieutenant) Sawyer were discussing a just-concluded traffic stop, they heard dispatch report a call with a man with a gun on Bernal Hill. (Schiff Depo. 12:19-13:25.)  Specifically, the officers heard "Breaking 221.  Bernal Heights Park. One car.  Latin male in a bright red jacket.  6'1.  200 pounds.  Black pants.  Has a gun on his hip, black in color."  (Baumgartner Dec. Ex. N, dispatch recording transcript pg. 1:3-6.)  A "221" means a person with a gun.  (Sawyer Depo. 12:19-20.)

Officer Schiff and Sgt. Sawyer reported to dispatch that they would respond to the call. (Sawyer Depo. 15:5-12; Baumgartner Dec. Ex. N, dispatch recording transcript pg. 3:3-4.)  Other officers told dispatch that they would respond.  (Sawyer Depo. 14:10-21.)  Officers Roger Morse and Nathan Chew also responded.  (Deposition of Roger Morse, hereinafter "Morse Depo." 19:15-19; 21:17-21; 23:23-24:1, attached as Exhibit C to Baumgartner Dec.)  Officer Schiff and Sgt. Sawyer drove up the south side of Bernal Hill.  Dispatch reported "He is still 97.  He is eating chips or sunflower seeds."  (Baumgartner Dec. Ex. N, dispatch recording transcript pg. 3:3-4.)  "97" means still at the scene.  (Baumgartner Dec. Ex. R (Radio Code Sheet).)  When Sgt. Sawyer and Officer Schiff arrived at the barrier on the south side of the hill, they did not see any suspect matching the description.  (Schiff Depo. 26:7-10; Sawyer Depo. 24:24-25:5; Baumgartner Dec. Ex. N, dispatch recording transcript pg. 3:5-7.)  (It remained light outside, although it was approaching dusk.  (Schiff Depo. 34:21-23.))

The officers then drove around toward the north entrance of the park, where Folsom Street meets Bernal Heights Boulevard.  (Sawyer Depo. 25:23-26:9; 29:19:21.)  Because they still did not see anyone matching the suspect's description, they asked dispatch whether the suspect was inside the park, or outside.  (Schiff Depo. 26:7-10; Baumgartner Dec. Ex. N, dispatch recording transcript pg.

4:1-3.)  Dispatch reported "The subject is a little further into the park by the entrance at Alabama. . . . he is walking inside the park per the call taker."  (Baumgartner Dec. Ex. N, dispatch recording transcript pgs. 4:5-9; 4:13-14.)  In addition, an officer reported over the air that he observed a man matching the suspect's description walking down the hill toward Officer Schiff and Sgt. Sawyer's police car.  (Baumgartner Dec. Ex. N, dispatch recording transcript pg. 4:15-16.)

Officer Schiff drove around the barrier blocking the road leading into the park, and began driving up the access road.  (Schiff Depo. 30:8-24.)  Officer Schiff and Sgt. Sawyer first observed a walker who did not meet the description, who moved over to the dirt path as they continued to drive up the access road into the park.  (Schiff Depo. 32:4-8; Sawyer Depo. 38:12-15.)  Officer Schiff then saw a man matching the suspect's description "marching" toward them "briskly" and "with purpose." (Schiff Depo. 36:24-37:6.)  The suspect did not move to the side of the path as the police car approached, but continued to walk toward the officers.  (Schiff Depo. 37:17-19; Sawyer Depo. 32:3-9.)  Sgt. Sawyer told Officer Schiff to get a little closer, and then to stop the car.  (Schiff Depo. 43:1-12; Sawyer Depo. 33:17-33.)  They stopped the police car about 25 to 30 yards away from the suspect, in order to give the suspect enough time to respond and for the officers to assess the situation before he got too close.  (Schiff Depo. 44:9-11; Sawyer Depo. 34:25-35:3, 68:3-11.)  Both officers got out, but stayed within the protection of the car doors.  (Schiff Depo. 46:10-47:20; Sawyer Depo. 35:8-20.)

The suspect continued to march towards the officers, and both officers said "show me your hands!"  (Schiff Depo. 47:21-48:2, Sawyer Depo. 36:1-4, 37:20-38:4, 45:13-17.)  Instead of raising his arms into the sky, the suspect issued a command back to the officer, saying "show me *your* hands!" (Schiff Depo. 52:11-24, Sawyer Depo. 51:3-6.)  But he did not comply, or raise his hands.  (Sawyer Depo. 41:23-24.)  Instead, the suspect reached down and pulled a gun out of a holster, and pointed it at the officers, with both hands on or near the gun.  (Schiff Depo. 52:11-15; Sawyer Depo. 37:20-38:4.) Both Officer Schiff and Sgt. Sawyer saw a black gun that looked like a semi-automatic pistol, and a red light, which they believed to be a laser sight, pointed directly at them.  (Sawyer Depo. 40:18-41:2, Schiff Depo. 55:21-56:1.)  Officer Schiff also saw a flash of light from the muzzle.  (Schiff Depo. 58:16-19.)

Both officers thought that the suspect was shooting at or about to shoot them.  (Schiff Depo. 58:12-25; 66:23-67:5; Baumgartner Dec. Ex. J (Schiff interview) pg. 11:16-22; Baumgartner Dec. Ex. K (Sawyer interview) pg. 12:11-18.)  To protect themselves, they shot at the suspect.  (Baumgartner Dec. Ex. K (Sawyer interview) pg. 12:11-18)  He did not go down immediately.  (Schiff Depo. 59:21-60:2; Baumgartner Dec. Ex. J (Schiff interview) pg. 14:22-15:5.)  After some shots, the suspect got down into what Officer Schiff described as a "tactical position," prone on the ground with his head raised towards the officers, arms extended, both hands on or near the gun.  (Schiff Depo. 70:6-23, 71:4-6; Sawyer Depo. 52:17-21.)  The suspect pointed the gun in their direction again.  (*Id.*)  Officer Schiff thought that the suspect got down into the prone position to make himself a smaller target.  (Schiff Depo. 70:6-23, 71:4-6.)  Again, the officers saw a red laser coming from the gun, and thought he was continuing to shoot at them.  (Schiff Depo. 71:16-24; 74:9-20; Baumgartner Dec. Ex. K (Sawyer interview) pg. 13:11-15.)

Defendant Officers Roger Morse and Nathan Chew heard shots while they drove towards Officers Schiff and Sgt. Sawyer.  (Morse Depo. 34:7-10; Chew Depo. 25:1-4.)  Officer Chew pulled out his gun because it appeared to him that the suspect, who was prone on the ground holding a gun with his arms extended towards Officer Schiff and Sgt. Sawyer, was shooting or getting ready to shoot at his fellow officers.  (Chew Depo. 34:4-6.)  When they arrived, Officer Morse, the driver, stopped his car to the right and a few feet back from the other police car.  (Morse Depo. 49:9-19.)  Both the officers got out.  Officer Chew saw a gun with a red laser sight point in his direction.  (Chew Depo. 32:21-33:2.)  He believed that the suspect was turning the gun on him in order to shoot at him, so he took an evasive maneuver to the right, and then back behind his door.  (Chew Depo. 36:8-12.)  He shot at the suspect six or seven times until he saw the suspect's head go down and his hands loosen on the gun.  (Chew Depo. 38:20-21- 41:5-7.)

Officer Morse believed that the suspect was shooting at the other officers.  (Morse Depo. 44:8-23.)  After looking at Sgt. Sawyer on the passenger side, Officer Morse ran around behind the back of the other police car to the driver's side.  (Morse Depo. 56:11-57:1.)  He saw Officer Schiff partly inside the police car, shooting at the suspect.  (Morse Depo. 56:11-57:1.)  He did not see a red laser, but he saw what appeared to be a muzzle flash coming from the suspect's gun.  (Morse Depo. 44:16-

1   45:2; Baumgartner Dec. Ex. I (Morse interview) pg. 6, 11-21.)  Officer Morse then also began

2   shooting at the suspect.  (Morse Depo. 50:25-51:2.)

3        Sgt. Sawyer stopped shooting and yelled "cease fire" or "stop firing" when he saw the

4   suspect's head droop and his hands go limp.  (Sawyer Depo. 53:22-54:1, 49:25-50:5.)  Officer Chew

5   also stopped firing when he saw the suspect's head drop down to the pavement.  (Chew Depo. 41:5-

6   41:7.)  Officers Schiff and Morse stopped firing because they heard Sgt. Sawyer's direction.  (Schiff

7   Depo. 76:21-77:8, Morse Depo. 53:15-19.)

8        Upon Sgt. Sawyer's orders, the officers then formed a skirmish line and approached the

9   suspect with their guns drawn.  (Sawyer Depo. 55:10-15.)  Officer Morse reached the suspect first, and

10  kicked the gun out of the suspect's hands.  (Morse Depo. 61:24-62:1.)  None of the officers realized

11  until they got within a few feet of the suspect that he had a Taser, which looks like a gun.  (Schiff

12  Depo. 78:25-79:16; Sawyer Depo. 59:11-24; Morse Depo. 43:25-44:23, 61:20-62:10; Chew Depo.

13  43:1-8, 43:25-44:7; Chiles Depo. Ex. 12.)

14       Officers Chew and Schiff handcuffed the suspect, and then turned him over to search him for

15  weapons and check his pulse.  (Schiff Depo. 95:23-96:23.)  The officers pulled various items out of

16  the suspects' pockets, including two cans of pepper spray.  (Schiff Depo. 93:20-94:7.)  Officer Schiff

17  felt for a pulse, but could not feel one.  (Schiff Depo. 96:22-97:3.)

18       As Officer Schiff readied to provide CPR, other officers arrived, and removed the four

19  defendant officers and transferred their duties to others.  (Schiff Depo. 99:19-100:16; Sawyer Depo.

20  65:9-11, 66:1-10, 67:6-22.)  Paramedics then provided medical care to the suspect.  (Sawyer Depo.

21  64:9-14; Declaration of Dr. Amy P. Hart, M.D., Ex. B pg. 3-4.)  The Medical Examiner personnel

22  pronounced him dead at the scene.  (Hart Dec., Ex. B pg. 3.)

23       Other officers transported the four defendant officers separately back to the station.  (Schiff

24  Depo. 99:3-24; Sawyer Depo. 65:6-11, 66:1-10, 67:6-22.)  Within a few hours, homicide inspectors

25  interviewed the officers.  (Baumgartner Dec. Exs. J-M.)  The officers all reported seeing Nieto

26  pointing a gun at them, including when he lay prone on the ground.  All but Officer Morse reported

27  seeing a red laser sight pointed at them.  (Baumgartner Dec. ¶ 13, Ex. L (Chew interview); Ex. J

28  (Schiff interview) pg. 13:5-8; Ex. K (Sawyer interview) pg. 11:18-19; Schiff Depo. 54:14-20, 55:21-

56:1; Sawyer Depo. 41:23; Chew Depo. 33:1-2, 36:9-12.)  Officer Morse the evening of the shooting reported seeing muzzle flashes.  (Morse Depo. 44:16-45:2; 54:17-19; Baumgartner Dec. Ex. I (Morse interview) pg. 6:12-21, 8:1-10.)

## II.   THE PHYSICAL AND MEDICAL EVIDENCE CORROBORATES THE OFFICERS' TESTIMONY THAT NIETO PULLED OUT HIS GUN AND POINTED IT AT THEM

The court must examine the reasonableness of the officers' conduct in light of the facts known to them.  However, Defendants provide additional evidence that the Defendant Officers did not know at the time of the shooting but that corroborate their testimony.  See *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (courts should examine physical and medical evidence in addition to officers' testimony).

### A.   Nieto was Diagnosed as a Paranoid Schizophrenic who had Visions and Hallucinations

Nieto previously had been placed on involuntary psychiatric holds, and been diagnosed with paranoid schizophrenia in 2011.  (Baumgartner Dec. Ex. O.)  In 2011, he had a 30 day hospital visit for psychiatric issues.  (Baumgartner Dec. ¶ 14.)  He exhibited paranoid behavior while in the hospital. (Baumgartner Dec. ¶ 14.)  The medical records report Nieto hearing voices and having hallucinations, as well as reporting violent behavior while in the hospital.  (Baumgartner Dec. Ex. O.)  On the date of the incident, he was not taking anti-psychotic medications.  (Hart Dec. Ex. B, pg. 24.)

### B.   Three Independent Witness Observed the Decedent's Erratic Behavior While on Bernal Hill

Three witnesses observed Nieto on Bernal Hill shortly before the shooting.  Evan Snow observed Nieto come up a dirt path to the access road to the park.  (Snow Depo. 17:7-12, 17:23-18:1.) Snow immediately became concerned about Nieto's behavior, because he was acting "nervous" and "disturbed in some way, upset or manic."  (Snow Depo. 18:2-11.)  Snow observed Nieto acting strangely even before Snow's dog went up to Nieto, at which time Nieto jumped up on a bench and pulled a gun out of a holster.  (Snow Depo. 26:20-24.)  Nieto pointed the gun at Snow and Snow's dog.  (Snow Depo. 26:20-24, 28:24-29:3.)  Snow did not initially observe that the gun had any yellow markings on it, and thought it was a real gun.  (Snow Depo. 27:21-28:8.)  Only when he saw it in profile from about 10 feet away did Snow realize that the gun was a Taser.  (Snow Depo. 28:24-29:8,

45:10-22.)  Snow immediately left the scene to avoid further contact with Nieto, and tried, unsuccessfully, to call the police.  (Snow Depo. 22:19-23:1.)  He warned others to stay away from Bernal Hill.  (Snow Depo. 34:13-20, 31:19-25.)

Shortly after Snow's encounter with Nieto, Timothy Isgitt walked with his partner Justin Fritz past where Nieto stood near a bench facing away from the road.  (Isgitt Depo. 9:7-13.)  Isgitt saw Nieto acting strangely.  (Isgitt Depo.10:3-11.)  He saw Nieto acting as though he was having a conversation with someone who was not there.  (Isgitt Depo. 10:18-22.)  Nieto also kept moving his hand near the gun that Isgitt saw in his waistband.  (Isgitt Depo. 9:14-22, 8:18-20.)  Isgitt became sufficiently concerned that he asked Fritz to call 911 and report Nieto's behavior.  (Fritz Depo. 10:18-11:22.)  While on the phone with dispatch, and from a distance away, Fritz observed Nieto walk down the pathway, towards where Nieto encountered the officers.  (Fritz Depo. 20:14-23.)  Just afterwards, while still on the phone with dispatch, shots were fired  (Baumgartner Dec. Ex. M, 911 call.)

### C.  Nieto's Taser Had a Red Laser Sight, Emitted Flashes of Light, and Nieto Pulled the Taser Trigger Three Times During His Encounter With the Police

As part of the homicide investigation, the District Attorney's office requested that an engineer from taser International, Brian Chiles, examine the taser carried by the suspect.  (Chiles Depo. Ex. 2, attached as Exhibit E to Baumgartner Dec.)  Chiles physically examined the taser, along with the electronic data recorded by the taser's microprocessor, which records the time of the trigger pulls of the taser.  (Chiles Dec. Ex. 1 (Report).)

### 1.  The Physical Examination of the Taser Corroborates the Officers' Testimony That They Saw a Red Laser and Muzzle Flashes, and That the Taser Did not Have Yellow Markings on the Front

During his examination, Chiles confirmed that Nieto's taser had an operable red laser sight.  (Chiles Depo. 51:8-11.)  The red laser sight goes on when the user "arms" the gun, which is done by turning off the safety, a small sliding switch on the side of the gun.  (Chiles Depo. 21:15-21, Ex. 4.)  Nieto's taser showed a mark indicating that the safety had at least at some point been moved to the on position.  (Chiles Depo. 48:15-49:1, Ex. 8.)  Chiles confirmed after replacing the depleted batteries that the red laser sight on Nieto's gun emitted a red laser beam.  (Chiles Depo. 51:8-11.)

A taser has two modes, a dart mode and a drive stun mode.  (Chiles Depo. 61:16-62:6.)  When a cartridge is attached to the front of the gun, it shoots the darts due to the ignition of a substance that then causes a pin to pierce a gas chamber, thrusting the darts out.  (Chiles Depo. 65:24-66:11.)  Whether or not it has a cartridge, if the gun is placed on skin, and it is armed, it will give an electrical charge.  (Chiles Depo. 47:25-48:6.)  This is the "drive stun" mode.  (Chiles Depo. 47:25-48:6.)  When the police found Nieto's gun, it has a cartridge attached, with the darts deployed.  (Schiff Depo. 79:6-16; Sawyer Depo. 60:7-14.)  Chiles also confirmed that when a gunman pulls the trigger after the darts have been deployed, if the darts are not touching a conductive material, like a body or wet grass, the gun creates a pulsing electrical arc across its front, diagonally across the cartridge.  (Chiles Depo. 45:30-8; 49:25-50:24, Ex. 10.)  That distance is about an inch.  The flashes occur about 20 times per second.  (Chiles Depo. 64:9-15.)  Chiles' examination confirmed that the gun was in good working order.  (Chiles Depo. 24:17-25:3, Ex. 1.)  Therefore the taser would have created electrical flashes when Nieto pulled the trigger after deploying the darts.

At the scene, the taser was missing its "blast doors," the small yellow pieces of plastic that the manufacturer attaches to the front of the cartridge that shoots the darts out of the taser.  (Chiles Depo. 15:16-16:8, Ex. 4.)  The consumer can remove those "blast doors" easily, without otherwise damaging the gun.  (Chiles Depo. 17:1-12.)  When a person shoots a taser, the blast doors come off.  (Chiles Depo. 15:16-16:8.)  Chiles could not determine if the blast doors were removed from the gun by a person, or as a result of the shooting of the gun.  (Chiles Depo. 49:15-17.)

Chiles confirmed that when the blast doors are removed, the wires, but not the darts, can possibly be shaken loose out of the gun.  (Chiles Depo. 22:20-23:3.)  Also, when the blast doors are removed, it is less likely but by no means impossible that when pulling the trigger that the darts will not deploy.  (Chiles Depo. 68:17-69:17.)  Chiles gave the chance of 10%, but indicated that he had not done any particular study.  (Chiles Depo. 105:8-11.)

### 2.   The Taser's Stored Data Confirms That Nieto Pulled the Taser Trigger Three Times During his Encounter with the Police

Taser's records show that it sold Nieto's taser to a company in Texas on February 25, 2014, just a month before the shooting.  (Chiles Depo. 36:2-7.)  Although there is no evidence specifically

1  identifying when Nieto obtained the taser, he submitted a statement to the police stating that he shot

2  the taser at Arthur Vega on March 5, 2014.  (Baumgartner Dec. ¶ 11, Ex. P (incident report).)[1]

3         Tasers have a microprocessor, a computer chip that holds data recorded each time the trigger is

4  pulled.  (Chiles Depo. 5:15-21.)  Chiles downloaded the data from the taser's microprocessor.  (Chiles

5  Depo. 29:19-30:23, Ex. 1 pg. 9.)  Chiles also confirmed that the gun and its microprocessor functioned

6  properly.  (Chiles Depo. 6:4-6.)

7         When the taser is manufactured, the company syncs the time on the taser to Greenwich Mean

8  Time (GMT).  (Chiles Depo. 30:24-31:1.)  First, the company test fires the taser (which the

9  microprocessor records).  (Chiles Depo. 36:19-37:1, 86:13-21, Ex. 1 pg. 8-9.)  Then, it attaches the

10  handle and welds it together.  (Chiles Depo. 101:18-102:13.)  taser International's records show that

11  Nieto's taser was tested on November 26, 2013[2] and "manufactured" on November 27, 2013.  (Chiles

12  Depo. 11:23-12:9.)  Therefore, the taser's time synchronization occurred sometime within that period.

13  (Chiles Depo. 86:13-21, 101:18-102:13.)

14         Although the time stamp on the taser has the capability of being reset or synched, that would

15  require the possession of a "download kit," which taser does not sell to anyone other than law

16  enforcement.  (Chiles Depo. 33:16-24; 72:4-20.)  No evidence suggest that Nieto had possession of

17  such equipment.  Moreover, the time on the microprocessor would be reset to the same time as the

18  computer to which it was synched.  (Chiles Depo. 33:19-22.)  In this case, the microprocessor

19  continued to record Greenwich Mean Time.  (Chiles Depo. Ex. 1, p. 8-9.)  It therefore does not appear

20  as though anyone reset the clock from the time the gun was sold to Texas and it arrived in Nieto's

21  possession in California.  (Chiles Depo. 109:17-20.)

22         In addition, the clock on the microprocessor exhibits "clock drift," meaning that it runs slow or

23  fast.  (Chiles Depo. 72:24-73:9.)  In this case, when Chiles tested the clock on June 11, 2014, it

24

25         [1] The taser recorded numerous trigger pulls on that day.  (Chiles Dec. Ex. 1, pg. 9.)
   Subtracting 8 hours (daily savings time started on March 9, 2014) and adjusting for clock drift, the
26  nine trigger pulls in the afternoon on March 5, 2014 occurred at about 3:36 p.m.  Nieto reported that
   he used the taser at approximately 3:30.  (Baumgartner Dec. Ex. P.)

27         [2] The taser recorded trigger pulls starting at 13:36.  (Chiles Depo. Ex. 1 pg. 8-9.)  Subtracting 8
   hours, which is the difference between Greenwich Mean Time and Pacific Daylight Time, the first test
28  fire would be at 5:36 a.m. on November 26, 2013, and the last at 11:43 a.m.

recorded a time that was 7 minutes and 42 seconds slow.  (Chiles Depo. 85:17-86:7, Ex. 1 pg. 2.)

Chiles subsequently conducted a test that showed that the particular model of Nieto's taser had a

consistent clock drift, meaning it was the same every day, except when exposed to extreme

temperatures (122 degrees, or -4 degrees Fahrenheit).  (Chiles Depo. 73:23-74:11; 79:13-16.)  Nieto's

taser was kept in the taser warehouse until just a month before the shooting, which has sufficient

controls that it does not reach those extreme temperatures.  (Chiles Depo. 102:23-103:9.)  No evidence

suggests that Nieto's taser was subjected to extreme temperatures.

After his initial report, at the request of the District Attorney, Chiles used the time drift

exhibited by the gun on June 11, 2014, to calculate the amount of clock drift per day, and calculated

how off the clock would have been on March 21, 2014.  (Chiles Depo. Ex. 6.)  He then made the

calculations using the time stamps from the microprocessor.  (Chiles Depo. Ex. 6.)  Correcting for the

time drift, the microprocessor reflected three separate and distinct trigger pulls on March 21, 2014 at

7:18:45 p.m., 7:18:52 p.m., and 7:19:01 p.m.[3]  (Chiles Depo. Ex. 6.)

The dispatch radio's recording from the 911 caller picked up gunshots at 7:18:40 and 7:19:20.

(Baumgartner Dec. ¶ 14, Ex. M, 911 call.)  The audio recording from the officers' radio transmission

picked up gunshots at 7:18:40 and 7:19:00.  (Baumgartner Dec. ¶ 15, Ex. N, dispatch recording.)

In addition to the three trigger pulls on March 21, 2014, the microprocessor recorded over 15

trigger pulls from March 5, 2014 up to March 21, 2014.  (Chiles Depo. Ex. 1 pg. 8-9.)  The cartridges

cost about $30 each.  (Chiles Depo. 39:3-4.)  It cannot be determined if a cartridge was attached at the

time of each of these trigger pulls.  (Chiles Depo. 35:20-36:1.)  A cartridge can be used only once to

deploy darts.  (Chiles Depo. 16:1-25.)  Defendants have been unable to determine the circumstances in

which the taser was used on those occasions.

---

[3] If the trigger had simply been held down, the trigger pulls would have been recorded at
exactly five second intervals.  Here, the intervals were 7 and 9 seconds, which Chiles confirmed
meant that the trigger had to be pulled three times, not just held down.  (Chiles Depo. 29:2-12.)

### D. The Medical Examiner Report and Bullet Trajectories Corroborate the Officers' Testimony That They Shot at Nieto From Down the Hill When He was Both Standing and Prone

The Medical Examiner's report examined the 14 gunshot entry wounds and the trajectory of the bullets creating the wounds.  (Hart Dec. ¶ 3.)  Additionally, the Crime Scene Investigators measured the locations of evidence, including the police cars where the officers took cover during the shooting, and the location of Nieto's body.  (Declaration of Michal Okliewicz ¶ 4.)

Craig Fries, an expert in ballistic trajectory analysis, analyzed the forensic data, including by using three-dimensional computer modeling.  (Declaration of Craig Fries, herein after "Fries Dec." ¶¶ 5-7.)  He concluded that the wound trajectories are consistent with Nieto in a Weaver stance or prone, with a shooter 25 to 30 feet away and slightly downhill.  (Fries Dec. ¶ 8.)  Although analysis cannot confirm Nieto's position (standing or prone) for every entry wound, for those that could be analyzed, all gunshot wounds are consistent with Nieto's two body positions testified to by the officers.  (Fries Dec. ¶ 10.)

All but two (C and Q) of the wounds entered from the anterior, or front, of Nieto's body. (Fries Dec. ¶ 16.)  These wounds occurred when Nieto was either standing with the upper part of his torso facing the officers, or when prone with his shoulders facing towards the officers.  (Fries Dec. ¶ 16.)

Of the two wounds (C and Q) described by the Medical Examiner as occurring in the posterior side of Nieto's body, wound C is on the top part of Nieto's shoulder, not in the back.  (Hart Dec. Ex. B; Fries Dec. ¶ 18.)  That wound is consistent with Nieto's prone position as described by the officers. (Fries Dec. ¶ 18.)  This gunshot wound is also wholly inconsistent with being fired at from close range.  (Fries Dec. ¶ 18.)

Wound Q, the only other posterior wound, entered in Nieto's mid back.  (Fries Dec. ¶ 19.)  The bullet from this wound entered at an extremely shallow angle, and lodged in Nieto's third vertebra. (Fries Dec. ¶ 19.)  To achieve such a shallow trajectory, the shot would have to come from many yards away, and from slightly downhill, while Nieto lay prone.  (Fries Dec. ¶ 19.)  It would not be possible to create such a shallow trajectory from close by to Nieto unless the shot came from the level of the

1  pavement.  (Fries Dec. ¶ 19.)  Thus, this posterior wound also is consistent with the officers'

2  testimony.  (Fries Dec. ¶ 9.)

3  **ARGUMENT**

**I.     STANDARD FOR SUMMARY JUDGMENT**

4

5         A Court properly grants summary judgment when no genuine and disputed issues of material

6  fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is

7  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

8  317, 322-23 (1986).  Material facts that would preclude the entry of summary judgment are those that,

9  under the applicable substantive law, may affect the outcome of the case.  *Anderson v. Liberty Lobby,*

10  *Inc.,* 477 U.S. 242, 248 (1986).

11        The moving party bears the burden of showing that there are no material factual disputes.

12  *Celotex*, 477 U.S. at 324.  Where, as here, the moving party does not bear the burden of proof on an

13  issue at trial, the moving party may discharge its burden of showing that there is no material factual

14  dispute by demonstrating that there is an absence of evidence to support the non-moving party's case.

15  *Id*. at 325.  The Court must grant summary judgment if Defendants "show that the nonmoving party

16  does not have enough evidence of an essential element to carry its ultimate burden of persuasion at

17  trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  The moving

18  party is not required to submit evidence showing the absence of a material fact on such issues, nor

19  must the moving party support its motion with evidence negating the non-moving party's claim.  *Id*.  If

20  the moving party shows an absence of evidence to support the non-moving party's claim, the burden

21  then shifts to the opposing party to produce "specific evidence, through affidavits or admissible

22  discovery material, to show that the dispute exists."  *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1409

23  (9th Cir. 1991).  A failure of proof concerning an essential element of the non-moving party's case

24  renders all other facts immaterial.  *Celotex*, 477 U.S. at 323.

25        Facts must be viewed in the light most favorable to the non-moving party only if there is a

26  genuine dispute to those facts.  *Scott v. Harris*, 550 U.S. 372 (2007).  Where the record taken as a

27  whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue

28  for trial and the Court should grant summary judgment.  *Id*.  When analyzing summary judgment in an

1   excessive force claim arising out of a death, the courts examine circumstantial evidence in addition to

2   the testimony of the officers.  See *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  Here, the

3   circumstantial evidence corroborates the officers' testimony.

### II.   PLAINTIFFS' CLAIMS ARISE UNDER THE 14TH AMENDMENT, AND THEY THEREFORE MUST PROVE THAT THE OFFICERS USED FORCE FOR A NON-LAW ENFORCEMENT PURPOSE AND WITH SUBJECTIVE MALICE TO PROVE THEIR CONSTITUTIONAL CLAIM

6       As the decedent's parents, Plaintiffs' constitutional claims arise from the 14th Amendment's

7   substantive due process liberty interests.  *See Moreland v. Las Vegas Metropolitan Police Dept.*, 159

8   F.3d 365, 369 (9th Cir. 1998); *Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998); *Porter v. Osborn*,

9   546 F.3d 1131, 1136 (9th Cir. 2008) (*quoting Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th

10  Cir. 1991)); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (noting that parents have a substantive due

11  process liberty interest under the Fourteenth Amendment in the care, custody, and control of their

12  children).  Only official conduct that "shocks the conscience" is cognizable as a Fourteenth

13  Amendment substantive due process violation.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846

14  (1998) (even if decision to engage in high-speed chase of motorcyclists that resulted in his death was

15  deliberately indifferent to motorcyclists safety, it does not meet standard for survivor action);

16  *Moreland*, 159 F.3d at 372 (applying *Lewis* standard to police involved in gun fight).  Plaintiffs must

17  prove not only that the officers used excessive and unreasonable force, but that they did so "with

18  purpose to harm" that is "unrelated to the legitimate use of force necessary to protect the public and

19  themselves" to prove a 14th Amendment claim.  *Moreland,* 159 F.3d at 373.  When officers are in a

20  confrontation with a suspect and must make decisions "in haste, under pressure, and frequently

21  without the luxury of a second chance," the plaintiff must prove subjective malice to establish liability.

22  *Lewis*, 523 U.S. at 853; s*ee Bingue v. Prunchak*, 512 F.3d 1169, 1174-77 (9th Cir. 2008); *Porter v.*

23  *Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

24      Plaintiffs here lack evidence that the officers used force for anything other than a legitimate

25  law enforcement objective and have no evidence of subjective malice.  Nieto met the description given

26  to the officers of the man who had a gun.  (Sawyer Depo. 33:17-25; Schiff Depo. 32:2-8, 42:24-

27  43:12.)  He walked directly at the officers down a wide, open road, in good light.  (Sawyer Depo.

28

37:21-25; Schiff Depo. 34:21-23.)  Nieto did not comply with the officers' commands to show his hands.  Instead he aggressively repeated the statement back to the officers.  (Sawyer Depo. 37:24-38:4, 51:3-6; Schiff Depo. 52:11-24.)  He then pulled out his gun and pointed it directly at the officers. (Sawyer Depo. 38:4; Schiff Depo. 52:12-15.)  All four officers reasonably believed that they were under immediate threat of deadly harm when Nieto pointed his gun at them.  (Sawyer Depo. 40:14-41:2; Baumgartner Dec. Ex. K (Sawyer interview) pg. 12:11-18; Schiff Depo. 58:12-25; Chew Depo. 34:4-11, 36:22-37:2; Morse Depo. 44:8-45:2.)

  None of the circumstantial evidence suggests that the officers' testimony is wrong or false. The officers were separated immediately following the shooting, and interviewed a few hours later. (Sawyer Depo. 65:6-11; Schiff Depo. 99:3-24.)  Officer Schiff and Sgt. Sawyer reported that Nieto first stood facing them, and then went down into a tactical prone position.  (Baumgartner Dec. Ex. K (Schiff interview) pg. 4:10-5:23; Ex. J (Sawyer interview) pg. 3:22-4:4.)  He then pointed his gun at them again.  (Baumgartner Dec. Ex. K (Schiff interview) pg. 4:10-5:23; Ex. J (Sawyer interview) pg. 3:22-4:4.)  Officers Morse and Chew arrived and saw Nieto in the prone position with his gun pointed at the officers.  (Baumgartner Dec. Ex. I (Morse interview) pg. 6:12-21; Ex. L (Chew interview).)  All of the officers testified that Nieto pointed his gun at them, with his arms extended towards them. (Baumgartner Dec. Ex. I (Morse interview) pg. 6:12-21; Ex. L (Chew interview); Ex. K (Schiff interview) pg. 4:10-5:23; Ex. J (Sawyer interview) pg. 3:22-4:4.)  None of the officers had previous taser training, but three of the officers independently reported a red laser sight.  (Baumgartner Dec. ¶ 13, Ex. L (Chew interview); Ex. J (Schiff interview) pg. 13:5-8; Ex. K (Sawyer interview) pg. 11:18-19.)  Officer Morse stated that he saw a light flash, which he believed looked like muzzle flashes from a gunshot.  (Baumgartner Dec. Ex. I (Morse interview) pg. 6:12-21, 8:1-10.)

  Sgt. Sawyer and Officer Chew both reported that they stopped shooting when Nieto's head and hands finally drooped down.  (Baumgartner Dec. ¶ 13, Ex. L (Chew interview); Ex. K (Sawyer interview) pg. 14:1-6.)  Sgt. Sawyer yelled cease fire, and Officers Morse and Schiff also stopped firing.  (Baumgartner Dec, Ex. I (Morse interview) pg. 9:7-21; Ex. J (Schiff interview) pg. 4:10-5:23.)

1  Plaintiffs have no evidence to support a claim that these four officers all acted with an intent to

2  harm Nieto other than for their legitimate law enforcement purposes of saving their own lives and

3  those of their fellow officers.  The Court should enter judgment for Defendants on this claim.

### III.   UNDER THE FOURTH AMENDMENT STANDARDS, THE OFFICERS USED REASONABLE FORCE AS A MATTER OF LAW WHEN THEY SHOT NIETO

6  The 4th Amendment applies to the claims made by the decedent's parents as successors in

7  interest to the decedent's estate.  For that claim, Plaintiffs must prove that they are the successors in

8  interest, and that the officers used objectively unreasonable force.  Defendants presume for purposes

9  of this motion that Plaintiffs will be able to prove that they are the successors in interest.

### A.   It is Reasonable as a Matter of Law for an Officer to Use Deadly Force When the Officer Reasonably Believes a Suspect is About to Shoot the Officers

11  In evaluating a 4th Amendment claim of excessive force, courts must balance the individual's

12  interest in being free from an application of force against the countervailing government interest at

13  stake.  *Graham v. Conner*, 490 U.S. 386 (1989).  The court asks "whether the officers' actions are

14  'objectively reasonable' in light of the facts and circumstances confronting them."  *Id*. at 397.  "The

15  calculus of reasonableness must embody allowance for the fact that police officers are often forced to

16  make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

17  the amount of force that is necessary in a particular situation."  *Id*. at 396-97.  For that reason,

18  reasonableness is judged from the perspective of the officer.

19  In a deadly force case, this Court has formulated a more specific version of the *Graham* test.

20  "Our case law requires that a reasonable officer under the circumstances believe herself or others to

21  face a threat of serious physical harm before using deadly force."  *Tennessee v. Garner*, 471 U.S. 1, 11

22  (1985); *Price v. Sery*, 513 F.3d 962, 971 (9th Cir. 2008).  To determine whether that test is satisfied,

23  courts pay "careful attention to the facts and circumstances of each particular case, including the

24  severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

25  officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

26  *Graham*, 490 U.S. at 396.  But the court does not limit itself to these factors, instead considering all of

27  the circumstances and "whatever specific factors may be appropriate in a particular case."  *Bryan v.*

1    *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quotation marks omitted).  The "most important"

2    factor is whether the suspect poses an "immediate threat to the safety of the officers or others."  *Smith*

3    *v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quotation marks omitted).  Throughout

4    this analysis, the prohibition on 20/20 hindsight continues to apply.  See *Ryburn v. Huff*, 132 S.Ct.

5    987, 991-92 (2012) (noting that courts are required to be "cautious about second-guessing a police

6    officer's assessment, made on the scene, of the danger presented by a particular situation").

7           Although a court must examine all of the circumstances justifying use of force, when a suspect

8    points a gun at officers causing them to reasonably believe that they are about to get shot, the officers

9    may use deadly force under the Fourth Amendment.  See *Penley v. Eslinger*, 605 F.3d 843 (11th Cir.

10   2010) (use of deadly force reasonable when 15 year old points what appears to be a semi-automatic

11   gun at officers); *Buruca v. District of Columbia*, 902 F.Supp.2d 75 (D.D.C. 2012) (use of deadly force

12   reasonable when suspect points gun at officers); *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397 (6th

13   Cir. 2007) (use of deadly force reasonable when suspect is holding a rifle, even if not pointing it at

14   officers at time of shooting); *Walker v. City of Atlanta*, 2014 WL 1224458 (D.Ga. 2014) (use of deadly

15   force reasonable when suspect pointed a gun at officer).

16   **B.     The Officers Used Reasonable Force Because the Decedent Pointed What
             Reasonably Appeared to be a Gun at the Officers**

17          All four of the officers who shot at Nieto approached the scene after hearing over the radio that

18   a person on Bernal Hill saw a man with a gun in a holster on his hip.  The first two officers who

19   arrived, Officer Schiff and Sgt. Sawyer, observed a man matching the suspect's description act as

20   though he fully intended to shot them.  The suspect did not begin to walk to the side of the road when

21   he saw the car approach, but rather marched "purposely," directly at the officers.  (Schiff Depo. 36:25-

22   37:6.)  He responded to their commands by repeated it back to them, saying "you show me YOUR

23   hands!"  (Schiff Depo. 47:21-48:2, Sawyer Depo. 36:1-4, 37:20-38:4, 45:13-17.)  The suspect then

24   squared off, pulled his gun out of his holster, and raised it with both hands pointing it in their

25   direction.  (Schiff Depo. 52:11-15; Sawyer Depo. 37:20-38:4.)  The gun was about 100 feet away.[4]

26   (Schiff Depo. 66:14-16; Sawyer Depo. 59:15-60:3.)  It did not have any yellow or colored markings on

27

28          [4] A regular city bus is 40 feet long, so picture two and a half bus lengths.

the muzzle or the front of the gun.  (Schiff Depo. 66:17-67:2; Sawyer Depo. 59:15-60:3.)  The gun had an operable red laser sight, and emitted light flashes from the muzzle.  (Chiles Depo. 21:14-22; 45:3-8.)  The officers, believing that Nieto was shooting or about to shoot them, shot back.  (Schiff Depo. 58:12-25; 66:23-67:5; Baumgartner Dec. Ex. J (Schiff interview) pg. 11:16-22; Baumgartner Dec. Ex. K (Sawyer interview) pg. 12:11-18.)  The first shots did not seem to effect Nieto.  (Schiff Depo. 59:21-60:2.)  Nieto then went to the ground in a prone position, which the officers perceived to be a "tactical position."  (Schiff Depo. 70:6-23, 71:4-6; Sawyer Depo. 52:17-21.) The officers continued to shoot at Nieto after he dropped prone on the ground, and pointed the gun as them again, with his hands extended towards them.  (Schiff Depo. 71:16-24; 74:9-20; Baumgartner Dec. Ex. K (Sawyer interview) pg. 13:11-15.)  They stopped when Nieto's head and gun finally drooped to the ground. (Schiff Depo. 76:21-77:8; Sawyer Depo. 53:22-54:1, 49:25-50:5.)

Although none of the officers were hit by bullets, and did not hear bullets hit their cars, the law is clear that an officer need not wait until an armed suspect actually attacks with a weapon before using deadly force.  *Lal v. California*, 610 F.3d 518 (9th Cir. 2010) (use of deadly force reasonable against suspect approaching with football size rock raised above his head); *Martinez v. County of Los Angeles*, 47 Cal. App. 4th 334, 344, 345 (1996) (reasonable force where suspect was armed with large knife, who did not attack but continued to advance slowly with knife raised despite commands, shot at 10 to 15 feet away; repeated commands given but no warning); *Monroe v. City of Phoenix, Ariz.*, 248 F.3d 851, 862 (9th Cir. 2001) overruled in part on other grounds by *Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007) (where officer was struggling with an armed suspect whose knife remained in his pocket, noting "[s]urely he was not required to wait and be seriously injured or killed before exercising his judgment and bringing the situation under control").  Moreover, Officers Schiff and Morse had reason to believe that Nieto was actually shooting, because he saw what appeared to them to be muzzle flashes.  (Schiff Depo. 58:12-25; Morse Depo. 44:16-45:2; 54:17-19.)

Plaintiffs lack any evidence to show that any officer made a mistake about what he saw, or falsified his statement.  Rather, all of the officers' statements, given that evening after they were separated, are consistent in the important details.  Three reported the red laser.  (Baumgartner Dec. ¶ 13, Ex. L (Chew interview); Ex. J (Schiff interview) pg. 13:5-8; Ex. K (Sawyer interview) pg. 11:18-

19.)  Officer Schiff and Sgt. Sawyer both reported Nieto's statement back to them in response to the command "show me your hands!"  (Baumgartner Depo. Ex. J (Schiff interview) pg. 4:10-5:23; Ex. K (Sawyer interview) pg. 3:22-5:4.)  Both officers reported Nieto immediately pulling out his gun, pointing it at them, and getting down in a prone or "tactical" position.  (*Id.*)  Officer Chew and Sgt. Sawyer both confirmed Nieto dropped his head and his gun.  (Baumgartner Dec. ¶ 13, Ex. L (Chew interview); Ex. K (Sawyer interview) pg. 14:1-6.)

The officers learned only after they shot Nieto that the gun in his hand did not pose an immediate deadly threat, because it was a taser.  Nothing in the officers testimony, or the circumstantial evidence, suggests that the officers knew or should have known that the gun in Nieto's hand shot darts and not bullets.  Chiles confirmed what the officers saw to make them believe the gun was real:  It had a red laser light, and the muzzle flashes.  (Chiles Depo. 51:8-11, 64:9-15.)  A third party confirmed that just before the shooting, the taser did not have any yellow blast doors.  (Snow Depo. 27:21-28:19.)  The bullet trajectory analysis confirms that the officers shot from far away.  (Fries Dec. ¶¶ 13-15.)  Each of the entry wounds is consistent with the officers' testimony regarding Nieto shooting at them first from a standing position, and then from a prone position on the ground.  (Fries Dec. ¶¶ 11-12.)  The officers' conclusions that they faced deadly force was reasonable under these circumstance, and their mistake does not make their use of deadly force unconstitutional.  See *Penley v. Eslinger*, 605 F.3d 843 (11th Cir. 2010) (shooting 15 year who had a toy gun not unconstitutional use of excessive force when officers reasonably perceived gun to be real); *Aipperspach v. McInerney*, 963 F.Supp.3d 901 (W.D. Mi. 2013) (no violation of Fourth Amendment to shoot suspect who had a pellet gun when officers reasonably believed it to be real); *Ali v. City of Louisville*, 395 F.Supp.2d 527 (W.D. Kent. 2005) (no violation of Fourth Amendment when shot suspect who raised a gun, although gun was a bb gun).

Evidence of Nieto's behavior and his medical condition provide further circumstantial evidence that the officers reasonably perceived a deadly threat.  On March 5, 2014, Nieto shot his taser at someone else, and caused his friend/girlfriend to be sufficiently concerned for her safety that she filed a request for a restraining order.  (Baumgartner Dec. Ex. Q.)  Nieto was not taking his prescribed medications for his paranoid schizophrenia.  (Hart Dec. Ex. B pg. 24.)  He previously had visions, and

heard voices.  (Baumgartner Dec. Ex. O.)  Just a few minutes before the shooting, three independent

witnesses observed Nieto act erratically, and appeared to them to be dangerous.  (Snow Depo. 18:5-11,

18:18-21, 24:17-25:3, 26:23-27:18, 29:1-30:2; Isgitt Depo. 8:19-20, 10:5-11; Fritz Depo. 12:1-4,

17:17-18:6.)  Just a few minutes before his encounter with the police, Nieto pulled out his taser and

pointed it at Evan Snow and his dog.  (Snow Depo. 26:23-27:18, 29:1-12.)  And, when Tim Isgitt and

Justin Fritz saw Nieto just minutes before the shooting, he acted oddly, including putting his hand on

his gun, and moving his hand around.  (Isgitt Depo. 8:19-20, 10:5-11; Fritz Depo. 12:1-4, 17:17-18:6.)

Isgitt believed that Nieto carried a firearm, not a taser.  (Isgitt Depo. 11:11-14.)

Thus, the Court need not rely simply on the self-serving statements of the officers to grant

summary judgment.  The circumstantial evidence also supports the conclusion that the officers shot

Nieto in fear for their lives after he pointed what reasonably appeared to be a gun at them.

Given the prospect of death or serious injury to themselves or their fellow officers, the officers

acted reasonably in shooting Nieto and stopping only when he no longer pointed his gun at them.

## IV.   QUALIFIED IMMUNITY PRECLUDES INDIVIDUAL LIABILITY BECAUSE NO CASE LAW SUGGESTS THAT THE FOURTH AMENDMENT PROHIBITS OFFICERS FROM SHOOTING A MAN POINTING A GUN AT THEM

Qualified immunity requires a two-step analysis.  The first step is to determine whether,

resolving any disputed facts in a plaintiff's favor, the official violated the plaintiff's constitutional

right.  The second step is to determine whether that right was "clearly established" in the specific

factual context confronting the official.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  Courts have

discretion to decide which of the two prongs of qualified immunity analysis to address first.  *Pearson

v. Callahan*, 555 U.S. 223, 236 (2009).  Unless the court decides both prongs in a plaintiff's favor, the

official cannot be liable for damages.  *Id*.  Defendants analyze the first prong above.

As shown above, there are no triable issue of fact as to whether the officers violated Nieto's

Fourth Amendment rights.  They did not.  If, however, the Court concludes that for some reason they

did, they would be nonetheless entitled to qualified immunity here because the unlawfulness of their

conduct was not clearly established.

1    The law is clearly established only when "every reasonable official would have understood that

2    what he is doing violates that right." *Ashcroft v. Al-Kidd*, 563 U.S. 731 (2011) (quotation marks

3    omitted).  The law and its application to the specific situation must be so clear-cut that it is "beyond

4    debate" that the action would violate the Constitution.  *Id*.  The standard "gives ample room for

5    mistaken judgments." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation marks omitted).  Unless

6    only a "plainly incompetent" officer could have considered his actions lawful in light of existing

7    precedent, qualified immunity protects the officer.  *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (per curiam)

8    (quotation marks omitted).

9    The qualified immunity question in this case depends on whether clearly established law

10   forbade use of deadly force on these or analogous facts—or, in other words, whether it would have

11   been clear to every reasonable officer that he should not shoot a suspect pointing a gun directly at

12   them.

13   Clearly established law did not forbid the use of deadly force here.  Courts have found that

14   officers may reasonably use deadly force against an armed suspect, even when they make a mistake in

15   their analysis of the facts or circumstances.  For example, in *Blanford v. Sacramento County*, 406 F.3d

16   1110 (9th Cir. 2005), the officers saw a suspect armed with a sword, who appeared to ignore their

17   commands and attempt to break into a house.  *Id*. at 1112-13.  Even though in that case the officers did

18   not see any potential victims within reach of the sword, they remained concerned that a person could

19   be inside the house, and the suspect could end up hurting someone.  *Id*. at 1113.  It turned out that the

20   suspect did not obey the officers' orders because he had on headphones and could not hear their

21   commands.  *Id*. at 1116.  It also turned out that the suspect lived in the house, and was not attempting

22   to break in.  *Id*. at 1113.  Nevertheless, the court held that because the officers could have believed that

23   the suspect posed a threat of immediate and serious injury, they reasonably shot the suspect, killing

24   him.  *Id*. at 1119.

25   The threat posed to the officers here was greater than the threat that justified the use of deadly

26   force in *Blanford*.  Nieto had a gun, not a sword.  He showed he heard the officers' commands by

27   repeating the command back to the officers.  He pointed the gun and appeared to be aiming it directly

28   at the officers.  The officers had no way of knowing that the gun could not kill or injure them from

MPA in supp. of MSJ
Case No. **C14-03823-NC**
20
n:\lit\li2014\141079\01046452.doc

1  where the suspect stood.  Thus, no case law would inform these officers that shooting Nieto under

2  these circumstances would be unconstitutional.

### V.   NO CITY POLICY RESULTED IN ANY DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS

The officers did not deprive Plaintiffs of their constitutional rights, and therefore Plaintiffs

cannot prevail against any defendant.  Moreover, even if somehow the court decides that there is a

question of fact on that issue, the City is not liable under Section 1983 solely because it employs

police officers who use excessive force or commit torts.  See, e.g., *Monell v. Dept. of Social Services*,

436 U.S. 658, 691 (1978).  Rather, a municipality's deliberate conduct must be the moving force

behind the injury; there must be a causal link between the municipal action and the deprivation of the

federal right.  *Id*. at 694.

Plaintiffs have no evidence that the City maintains a policy promoting use of excessive force,

particularly against armed individuals with guns.  Plaintiff did no discovery in this matter regarding

any municipal policy or custom.  Therefore, Plaintiff cannot present any admissible evidence to

support this claim, and the Court should grant summary judgment to the City.

### VI.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS BECAUSE DEFENDANTS HAVE A PRIVILEGE TO USE EXCESSIVE FORCE UNDER STATE LAW, PRECLUDING LIABILITY HERE

Under California law, a statutory privilege defeats all tort claims, including negligence claims.

*Gilmore v. Superior Court*, 230 Cal.App.3d 416, 421-422 (1991) ("A privileged act is by definition

one for which the actor is absolved of any tort liability, whether premised on the theory of negligence

or of intent."); see also *Horwich v. Superior Court*, 21 Cal. 4th 272, 285 (1999) (citing *Gilmore*)

("[W]hen the defendant has been justified in the use of deadly force against the decedent, the

privileged nature of the conduct is a defense to all civil liability regardless of the plaintiff's status.")

As *Gilmore* noted, the privilege bars liability whether based on negligent or intentional acts.  230

Cal.App.3d at 421-422.

Here, California Penal Code § 835a provides that "[a] peace officer who makes or attempts to

make an arrest need not retreat ... nor shall such officer be deemed an aggressor or lose his right to

self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome

resistance."  Moreover, California Penal Code § 196 establishes a privilege for peace officers to use deadly force.  The test for that privilege is the same as the test for when deadly force is reasonable under the Fourth Amendment.  *Brown v. Ransweiler*, 171 Cal.App.4th 516 (2009) ("Under Penal Code § 196, a police officer who kills someone has committed a justifiable homicide if the homicide was 'necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty' . . . There can be no civil liability under California law as the result of a justifiable homicide. [Citations.]"); see also *Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 349 (1996); *Gilmore*, 230 Cal.App.3d 416 (a justifiable homicide is a privileged act, which precludes all tort liability arising from that act).

Therefore, for the same reason the Court should grant summary judgment on Plaintiffs' Fourth Amendment claims, the Court should grant summary judgment on Plaintiffs' state tort claims for battery and negligence, including wrongful death.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to all Defendants on all of Plaintiff's claims.

Dated:  September 30, 2015

> DENNIS J. HERRERA
> City Attorney
> CHERYL ADAMS
> Chief Trial Deputy
> MARGARET W. BAUMGARTNER
> REBECCA BERS
> Deputy City Attorneys
>
>
> By:  */s/  Margaret W. Baumgartner*
> MARGARET W. BAUMGARTNER
>
> Attorneys for Defendants
> CITY AND COUNTY OF SAN FRANCISCO et al.