UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REFUGIO NIETO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No. 14-cv-03823 NC <br><br> **ORDER DENYING SUMMARY JUDGMENT AS TO PLAINTIFFS' CONSTITUTIONAL AND STATE LAW CLAIMS; GRANTING SUMMARY JUDGMENT AS TO PLAINTIFFS'** *MONELL* **CLAIM AGAINST SAN FRANCISCO** <br><br> Re: Dkt. No. 44 |

In this civil rights action, the parents of decedent Alejandro Nieto, Elvira and Refugio Nieto, sue San Francisco police officers and the City and County of San Francisco for the death of their son during an encounter with the police. According to one eyewitness to the events, Alejandro Nieto was walking casually in a eucalyptus grove of Bernal Heights Park with a Taser holstered at his waist just before dusk on March 21, 2014. Two San Francisco police officers, Schiff and Sawyer, approached him in a squad car without a siren or flashing lights. The officers got out of the car, yelled, "stop" and, without waiting for a response from Nieto, opened fire with their guns. According to the witness, Nieto did not take his hands out of his pockets or say anything to the officers. After the first four shots, Nieto fell to his knees and lay on his face. Two more officers, Morse and Chew, arrived on the scene and also opened fire on Nieto's prone body. In

Case No. 14-cv-03823 NC

total, the officers fired 48 shots at Nieto, 14-15 of which hit him, causing his death.

The officers, on the other hand, declare that when they responded to a radio report of an armed suspect matching Nieto's description in the park, he advanced towards the officers, refused to raise his hands when directed, and drew his weapon. The weapon appeared to the officers to be a black gun with a red laser sight trained on them. The officers, believing the weapon Nieto pointed at them with both hands was a gun, responded with fatal force. According to the officers, even after going to the ground Nieto continued to point his weapon in their direction from a tactical position, necessitating further fire from them and support officers who arrived on the scene.

The Nietos allege a violation of his Fourth Amendment right to be free from unreasonable search and seizure, a violation of their own Fourteenth Amendment due process, and state law claims of battery and wrongful death due to negligence. They allege that Officers Schiff, Sawyer, Morse, and Chew, and the City and County of San Francisco are responsible for Nieto's death.

Defendants move for summary judgment. After review of the admissible evidence, arguments of counsel, and applicable legal authority, the Court DENIES the Defendants' motion for summary judgment as to the Nietos' Fourth Amendment, Fourteenth Amendment, and state law claims because there is a genuine dispute of fact as to whether Nieto drew his weapon and pointed it at the police officers and whether they had a reasonable expectation that he would harm them or others. The Court GRANTS the Defendants' unopposed motion as to the Nietos' *Monell* claim against San Francisco.

**I.   LEGAL STANDARD**

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is improper if the evidence raises a genuinely disputed issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence

1 is such that a reasonable jury could return a verdict for the non-moving party." *Id.*
2 Summary judgment "does not denigrate the role of the jury. . . . Credibility determinations,
3 the weighing of evidence, and the drawing of legitimate inferences from the facts are jury
4 functions, not those of a judge . . . [Thus, the] evidence of the non-movant is to be
5 believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

6 The moving party bears the burden of identifying those portions of the pleadings,
7 discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.
8 *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving
9 party must go beyond the pleadings, and, by its own affidavits or discovery, set forth
10 specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c);
11 *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v.*
12 *Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).

### II. DISCUSSION

14 Defendants move for summary judgment on all of the Nietos' claims. The
15 Defendants argue that there is not a genuine dispute as to what happened in Bernal Heights
16 Park and that summary judgment is appropriate because no reasonable juror could find in
17 favor of the Nietos. The Nietos argue that there are multiple questions of material fact in
18 dispute such that summary judgment is not appropriate.

### A. Fourth Amendment Claim

20 To state a constitutional violation under 42 U.S.C. § 1983, a plaintiff must allege
21 that: (1) the conduct complained of was committed by a person acting under color of state
22 law; and (2) the conduct violated a right secured by the Constitution or laws of the United
23 States. *Gomez v. Toledo,* 446 U.S. 635, 639 (1980).

24 Here, it is undisputed that the defendant police officers were acting under color of
25 state law, and the Nietos first allege that the officers violated their son's Fourth
26 Amendment right to be free from "unreasonable searches and seizures," when they shot
27 him. It is undisputed that Nieto was "seized" within the meaning of the Fourth
28 Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("apprehension by the use of

Case No.14-cv-03823 NC     3

1   deadly force is a seizure subject to the reasonableness requirement of the Fourth
2   Amendment"). Thus, the Fourth Amendment inquiry for the Court is whether the force
3   used during his seizure was "objectively reasonable." *Arpin v. Santa Clara Valley*
4   *Transp. Agency,* 261 F.3d 912, 921 (9th Cir. 2001).

5   Moreover, at the summary judgment stage, the issue is whether the Defendants have
6   met their burden of demonstrating that there are no genuine issues of material fact for trial
7   and that they are entitled to judgment as a matter of law. Addressing summary judgment
8   on a Fourth Amendment excessive force claim, the Supreme Court stated, "[w]hen
9   opposing parties tell two different stories, one of which is blatantly contradicted by the
10  record, so that no reasonable jury could believe it, a court should not adopt that version of
11  the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550
12  U.S. 372, 380 (2007). In *Scott*, the plaintiff and defendants had different versions of the
13  facts, but there was an "added wrinkle": the "existence in the record of a videotape
14  capturing the events in question." *Id.* 378. The Court noted that the videotape "quite
15  clearly contradict[ed] the version of the story told by" the plaintiff. *Id*. Because there
16  were "no allegations or indications that this videotape was doctored or altered in any way,
17  nor any contention that what it depicts differ[ed] from what actually happened . . .
18  [plaintiff's] version of events [was] so utterly discredited by the record that no reasonable
19  jury could have believed him." *Id*. at 378, 380. Here, *Scott* does not control because there
20  is no such video. San Francisco could have a video, but it did not deploy cameras on the
21  officers at the time of the shooting.

22  The Defendants cite a district court case from Connecticut for the proposition that
23  *Scott* is not limited to situations in which there is a videotape of events. In *Braswell v.*
24  *Corley*, 2015 WL 575145, at *10 (D. Conn. Feb. 11, 2015), the defendant's versions of
25  events were utterly discredited by an official court transcript of his colloquy with the
26  judge. The court cited to *Scott* and stated, "[g]iven that the record consists of an official
27  transcript that sets forth a clear version of this colloquy, I need not credit [the defendant]'s
28  version of this colloquy, because no reasonable juror could believe it." *Id*. However, the

Case No. 14-cv-03823 NC      4

1   *Braswell* court had access to an independent, incontrovertible source—an official court

2   transcript—that is analogous to the videotape in *Scott*. Here, there is no such source.

3         Following *Scott*, the Ninth Circuit in *Gonzales v. City of Anaheim*, 747 F.3d 789,

4   797 (9th Cir. 2014), considered the summary judgment standard in a Fourth Amendment

5   case in the context of lethal force. In the course of a traffic stop, a suspect began to drive

6   away after a police officer had entered the passenger side of his minivan. *Id*. at 792. The

7   officer in the vehicle shot the suspect in the back of the head, stopping the car "less than

8   ten seconds after the car started moving." The officer estimated that the car was going 50

9   miles per hour. *Id*. at 793. The court found that genuine issues of material fact remained

10  as to how fast the suspect's vehicle was moving, whether the officer reasonably perceived

11  an immediate threat of death or serious bodily injury at the time he shot the suspect in the

12  head from six inches away, whether the officer could have used other methods to subdue

13  the suspect, and whether the officer failed to give a warning before he shot the suspect. *Id*.

14  at 797. These disputed facts precluded summary judgment on the plaintiffs' Fourth

15  Amendment claims in their § 1983 action. *Id*.

16        The *Gonzales* court stated, "[w]e do not hold that a reasonable jury must find in

17  favor of the plaintiffs on this record, only that it could . . . Based on the record before us,

18  we cannot say that a verdict in favor of the defendants on the claim for excessive force is

19  the only conclusion that a reasonable jury could reach." *Id*. at 797. The court emphasized

20  its obligation to view the evidence in the light most favorable to the plaintiff and found that

21  there was "a genuine dispute over [the speed of the car] based on [the officer]'s own

22  testimony." *Id*. at 796.

23        Here, there are two dramatically different versions of events presented by the

24  parties. The Defendants claim that officers Schiff and Sawyer drove into the park on a

25  service pathway, stopped their patrol car 25 to 30 yards away from Nieto and took cover

26  behind their patrol car doors. Dkt. No. 45. Schiff and Sawyer testified that Nieto was

27  marching toward them briskly and with purpose. *Id*. at 9:9-10.

28        However, Antonio Theodore, who also witnessed the encounter while walking his

Case No. 14-cv-03823 NC       5

dog in the park, testified that he observed Nieto walking casually and coolly as though he had no idea that the police were after him. Dkt. No. 57, Attachment A at 57-2, 58:1-19, 99 (Theodore Dep.). The Defendants claim that both officers Schiff and Sawyer ordered Nieto to "show me your hands!" and that he responded by saying "show me *your* hands!" Dkt. No. 45 at 9:18-21 (emphasis added). However, Theodore testified that he heard officers Schiff and Sawyer say only "stop" and nothing else, and that Nieto did not say anything in response. Theodore Dep. at 58:20-25, 101.

    Likewise, the Defendants claim that instead of stopping and showing his hands, Nieto pulled a Taser out of his holster and pointed it at the officers with both hands. Dkt. No. 45 at 9:22-23. However, Theodore testified that Nieto had both of his hands in his jacket pockets and that he never removed them from his pockets. Theodore Dep. at 63, 103. Defendants claim that Schiff and Sawyer both saw what they believed to be a black gun and the red light of a laser sight pointed directly at them, and that Schiff also saw a flash of light from the muzzle. Dkt. No. 45 at 9:24-27. However, Theodore testified that he never saw any lights of any sort coming from Nieto. Theodore Dep. at 64:21-66:8. Snow, another civilian who interacted with Nieto in the park earlier in the evening while walking his dog, testified that he observed that Nieto's Taser was not a gun. Snow Dep. at 34:9-14.

    The Defendants claim that after the initial shots were fired, Nieto did not go down immediately and that after some shots, he assumed a tactical position on the ground with both arms extended, still pointing the "gun" at the officers with his head raised towards the officers. Dkt. No. 45 at 10:4-8. However, Theodore testified that after the first four shots Nieto fell to his knees with his hands still in his pockets and that he appeared to be trying to take his hands out as if to raise them up. Theodore then heard another shot and saw Nieto fall to the ground on his face with his hands still in his jacket pockets. Theodore Dep. at 64, 70. Theodore also testified that there was virtually no time between when the officers told Nieto to "stop" and when they shot him. *Id*. at 105.

    Defendants claim that when officers Morse and Chew approached they heard

gunshots and observed Nieto prone on the ground with his arms extended. Dkt. No. 45 at 10:13-5:2. According to their testimony, Nieto was holding a gun shooting or readying himself to shoot their fellows officers. *Id*. They also saw a red laser sight or muzzle flashes coming from the gun, so they too began shooting at Nieto. *Id*.

However, Theodore testified that he observed another officer approach after the first four shots (which to him appeared to be fatal) had already been fired and after Nieto had fallen on his face with his hands underneath him. Theodore Dep. at 66:14-25. Theodore also testified that "the first four shots was [sic] the fatal ones." *Id*. at 64:10-12, 68:4-14.

Finally, Defendants claim that once the officers stopped shooting Nieto, they approached him and realized for the first time that he had a Taser, not a gun, and kicked the Taser away from his body. Dkt. No. 45 at 11:3-13. However, Theodore did not observe the officers take anything out of Nieto's hands or kick anything away from his body, once they approached and handcuffed Nieto. Theodore Dep. at 66:14-25, 102.

These disputed facts bear directly on whether a reasonable officer would have viewed Nieto as an immediate threat to themselves or others. Here, there is no videotape or other incontrovertible source to "blatantly contradict" the series of events as presented by witness Theodore. *Scott*, 550 U.S. at 380. If Theodore testifies at trial as he did at his deposition, and the four officers testify consistently with their reports and deposition testimony, then a jury will have to decide whom to believe. After drawing all inferences in the light most favorable to the Nietos, this Court cannot say as a matter of law that the officers acted reasonably in shooting Nieto. The Court accordingly denies the Defendants' motion for summary judgment on this issue. *Espinosa v. City and County of San Francisco,* 598 F.3d 528, 532 (9th Cir. 2010) ("In this case, the district court properly denied the summary judgment motion because there are genuine issues of fact regarding whether the officers violated [the decedent's] Fourth Amendment rights.").

**B. Fourteenth Amendment Claim**

For the Nietos' Fourteenth Amendment claim to survive summary judgment, there must be a genuine dispute of a material fact as to whether the officers engaged in conduct

that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("Only official conduct that shocks the conscience is cognizable as a due process violation."). The first issue is "whether the circumstances are such that actual deliberation [by the officers before taking the first shot] is practical." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). If the officers did not have time to deliberate, "a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objectives." *Gonzales*, 747 F.3d at 797 (citing *Porter*, 546 F.3d at 1137). However, if actual deliberation is possible, then an officer's "deliberate indifference" may shock the conscience. *Moreland*, 159 F.3d at 372.

Here, many of the same factual disputes that affect the Fourth Amendment claim weigh against summary judgment on the Nietos' Fourteenth Amendment claim. The Defendants claim that Schiff and Sawyer feared Nieto was shooting or about to shoot them, so they started shooting at him. Dkt. No. 45 at 10:1-4. However, Theodore testified that Nieto did not have anything in his hands and that his hands were in his pockets when the officers began shooting him. Theodore Dep. at 64:21-66:8, 103. Theodore also testified that the officers shot Nieto without giving any warning that they would shoot him or saying anything other than "stop," and that everything happened so quickly, Nieto had no idea what was going on. *Id*. at 60:7-10, 105. If Theodore's testimony is found credible, then a reasonable jury could find that there was ample time for the officers to deliberate before shooting. The statement by Snow, the civilian walking his dog, that he was able to identify Nieto's Taser as a Taser, not a gun, is also relevant. Snow Dep. at 34:9-14. Due to the same factual disputes as above, the Defendants' motion for summary judgment on the Nietos' Fourteenth Amendment claim is accordingly denied.

**C. Qualified Immunity**

The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out

Case No.14-cv-03823 NC         8

a violation of a constitutional right." *Id.* This inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. *Saucier,* 533 U.S. at 201. Second, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

Here, at step one, there are material questions of fact in dispute as to whether the officers used reasonable force on Nieto.

At step two, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202; *Walker v. Gomez,* 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201.

Here, the Defendants assert that even if the defendant officers violated Nieto's Fourth Amendment right by using excessive force, they are entitled to qualified immunity because as of 2014, case law was clear that officers may lawfully use deadly force when a suspect points a gun at them. Dkt. No. 45 at 26.

However, in 2014 "[c]ase law ha[d] clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson v. Torres,* 610 F.3d 546, 550 (9th Cir. 2010); *Curnow v. Ridgecrest Police,* 952 F.2d 321, 323, 325 (9th Cir. 1991) (affirming denial of qualified immunity for officers where, under the plaintiff's version of the 1986 shooting, the officers could not reasonably have believed the use of deadly force was lawful because the decedent did not point the gun at the officers and was not facing them when they shot him the first time). According to Theodore's testimony, Nieto did not advance towards the officers, say anything to them, or raise his weapon in their direction. And if Nieto did not

Case No.14-cv-03823 NC                9

1  present an immediate threat to the officers or others, they were not allowed to use deadly
2  force to apprehend him, and qualified immunity does not apply to their actions.  *Wilkinson,*
3  610 F.3d at 550; *Curnow,* 952 F.2d at 325.

4  More recently, the Supreme Court in *Mullenix v. Luna*, 136 S. Ct. 305, 309 (Nov. 9, 2015) rejected the Fifth Circuit's "formulation of the qualified immunity question in the Fourth Amendment context" because it "define[d] clearly established law at a high level of generality."  (internal citations omitted).  According to the Court in *Mullenix*, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established."  *Id*. (emphasis in original).  However, *Mullenix* does not control the question in this case because *Mullenix* was about whether or not the law was clearly established to prohibit police officers from using deadly force on a suspect fleeing in a car.  *Id*.  Here, the law is not in dispute.  Instead, there is a factual dispute about whether or not Nieto drew a weapon, threatened the officers, and whether the Taser was recognizable as a Taser, not a gun.

When these disputed material facts are resolved, the officers may be entitled to qualified immunity.  However, it would be premature to make that determination now.  *Wilkins v. City of Oakland,* 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (declining to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); *Chien Van Bui v. City & Cnty. of San Francisco*, No. 11-cv-04189 LB, 61 F. Supp. 3d 877, 898-99 (N.D. Cal. 2014) ("This is not to say that the officers may not be entitled to qualified immunity after the disputed material facts are resolved.  But for now, the court denies Defendants' motion insofar as it asks the court conclude that the officers are entitled to qualified immunity.").

Just as the Defendants' qualified immunity argument fails with respect to the

Case No.14-cv-03823 NC           10

1    Nietos' Fourth Amendment claim, their arguments fails with respect to the Nietos'
2    Fourteenth Amendment claim. This is because, based on the evidence presented by both
3    sides, the Court cannot decide as a matter of law whether it would have been "clear to a
4    reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*,
5    533 U.S. at 202; *Chien Van Bui*, 61 F. Supp. 3d at 902 ("In these circumstances, the court
6    denies the Defendants' motion insofar as it asks the court conclude that the officers are
7    entitled to qualified immunity.").

### D. *Monell* Claim

The Nietos originally asserted a *Monell* claim against the City and County of San Francisco for its failure to train the officers. In their opposition, Plaintiffs state that they do not oppose the Defendants' motion for summary judgment with respect to their *Monell* claim. Dkt. No. 57 at 5 n.1. Accordingly, the Court grants the Defendants' motion with respect to the Nietos' *Monell* claim and dismisses the constitutional claims against the City and County of San Francisco.

### E. State Law Claims

The Defendants also move for summary judgment on the Nietos' state tort claims for battery and negligent wrongful death. Dkt. No. 45 at 28. The Defendants argue that the defendant police officers qualify for a statutory privilege under California Penal Code § 835(a), which provides that a "peace officer who makes or attempts to make an arrest need not retreat . . . nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or overcome resistance." The Defendants also argue that they are entitled to a privilege under California Penal Code § 196 permitting peace officers to use deadly force for justified killings.

However, the Defendants themselves state that the test for privilege under California law "is the same as the test for when deadly force is reasonable under the Fourth Amendment." Dkt. No. 45 at 28 (citing *Brown v. Ransweiler*, 171 Cal. App. 4th 516 (2009)). They state, "[t]herefore, for the same reason the Court should grant summary

Case No. 14-cv-03823 NC                    11

judgment on Plaintiffs' Fourth Amendment claims, the Court should grant summary judgment on Plaintiffs' state claims for battery and negligence, including wrongful death." *Id.*

In their reply to the Nietos' opposition to summary judgment, the Defendants argue that the Nietos failed to address the Defendants' arguments regarding the state tort claims in the case. Dkt. No. 58 at 14. The Defendants therefore wish the Court to consider the Nietos' state law claims waived. *Id.*

However, the Nietos have identified several questions of fact that are in dispute and preclude summary judgment on the Fourth Amendment claim. Because their state law claims and state immunity statute require the same factual inquiry, summary judgment is likewise inappropriate on their state law claims.

## III. CONCLUSION

Because there remain genuine disputes of material fact in this case, the Court denies the Defendants' motion for summary judgment on the Nietos' claims, with the exception of their *Monell* claim against San Francisco.

**IT IS SO ORDERED.**

Dated: November 16, 2015

_____
NATHANAEL M. COUSINS
United States Magistrate Judge