DENNIS J. HERRERA, State Bar #139669
City Attorney
CHERYL ADAMS, State Bar #164194
Chief Trial Deputy
MARGARET W. BAUMGARTNER, State Bar #151762
REBECCA BERS, State Bar #287111
Deputy City Attorneys
Fox Plaza
1390 Market Street, 6th Floor
San Francisco, California 94102-5408
Telephone:    (415) 554-3859 [Baumgartner]
Telephone:    (415) 554-4224 [Bers]
Facsimile:    (415) 554-3837
E-Mail:       margaret.baumgartner@sfgov.org
E-Mail:       rebecca.bers@sfgov.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REFUGIO NIETO and ELVIRA NIETO individually and as the Co-Successors in Interest to ALEJANDRO NIETO, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, Police Chief GREG SUHR in his individual capacity, OFFICER JASON SAWYER, OFFICER RICHARD SCHIFF, OFFICER ROGER MORSE AND OFFICER NATE CHEW, DOES 5-50, individually and in their official capacities as Police Officer for the City and County of San Francisco, inclusive. <br><br> Defendants. | Case No. C14-03823-NC <br><br> **DEFENDANTS' TRIAL BRIEF** <br><br> Trial Date:    March 1, 2016 <br> Time:         9:00 a.m. <br> Place:        450 Golden Gate Avenue <br>               Courtroom D <br>               San Francisco, CA 94102 |

## INTRODUCTION AND STATEMENT OF FACTS

In the early evening of March 21, 2014, San Francisco Police Officer Richard Schiff drove a marked police car on patrol with Sgt. Jason Sawyer, his assigned training officer for that shift. As they were patrolling, they heard over the radio that someone had reported a latin male with a bright red jacket, with "a gun on his hip" on Bernal Hill, a park that was in their district. Officer Schiff therefore drove in that direction.

Bernal Hill Park is a large open area that sits atop a hill in the southern part of San Francisco, surrounded by residences. The area is frequented by dog walkers. There are numerous dirt trails. The only paved portion is a road that goes around the entire base of the hill, but gates block the western part of the access road on both the north and south entrances of the park.

Officer Schiff drove to the south-east portion of the hill. During the drive, dispatch reported that the man with the gun was pacing by a bench near a chain link fence, on the north side of the hill.

When the officers arrived on the south-east road, neither Officer Schiff nor Sgt. Sawyer observed anything out of the ordinary on that side of the hill. Dispatch reported that the man was still in the area "eating chips or sunflower seeds." So the officers drove east and north, around the hill to the other side. Because the officers did not observe any unusual activity, they were not even certain that they were in the right park, and again asked dispatch for more information. Dispatch again confirmed that the man with the gun was in the area, walking down the hill.

A gate blocks the access road on the north side of the hill, but a patrol car can squeeze between the gate and a rock, and make it through. The winding access road goes uphill from the gate, with a steep, high bluff rising on the left side, and a cliff falling away to the right. Officer Schiff, at Sgt. Sawyer's direction, drove past the gate, and started up the hill. As they did so, another officer reported over the radio that he could see the man in a red shirt walking down the hill towards Officer Schiff's patrol car. Officer Schiff and Sgt. Sawyer then reported "we got the guy right here."

As they approached the suspect, the officers had no obvious explanation as to why this man might be carrying a gun in a holster on his hip. They could not see the gun, but according to the information they had, the person in front of them on the hill had a gun in his possession. As the officers drove towards him, the man did not stop nor did he walk to the side of the road to get out of

the path of the car as the car approached. The officers found this to be unusual because he did not step out of the way of the car. The officers did not know what to expect from the man with the gun, and therefore they engaged in a cautious approach. At Sgt. Sawyer's direction, Officer Schiff stopped the police car close enough so that the suspect could hear them, and to have time to comply with their directions before he got close to them, but not so close as to be within arms' reach. Officer Schiff and Sgt. Sawyer stopped about 35 yards away from the man, who they later learned to be Alejandro "Alex" Nieto. They could not see anyone else on that part of the access road.

As Officer Schiff and Sgt. Sawyer began to engage with Nieto, Officers Roger Morse and Nate Chew, the two other officers who had reported that they could see the suspect walking towards Officer Schiff and Sgt. Sawyer, also drove their patrol car between the rock and the gate, and up the road. (It is common practice for more than one patrol car to respond to a call of a man with a gun.)

Officer Schiff and Sgt. Sawyer, again being cautious because they did not know why the man had the gun or what he might do with it, did not leave the partial cover of their car doors. They had their guns out of their holsters. From that position, they yelled "show me your hands" at Nieto. Officers receive training to order suspects to show their hands because they can then tell if the suspect has a weapon in his hands in a position to use it. Also by raising his or her hands, it increases the time it takes for a suspect to reach for or use a weapon. This makes the situation safer for the officers.

But Nieto did not raise his hands, or put them out to the side. Instead, he said "no, show me your hands!" His response to the officers indicated that he understood what the officers had ordered him to do, but that he did not intend to comply.

Nieto then did what every officer is trained to anticipate, but hopes never to see: Nieto pulled out what looked to them to be a gun out of his holster, held it like a gun, and pointed it directly at the officers. The officers could see a red laser beam coming from the gun, and the officers were aware that guns are sometimes equipped with red laser sights for better aim. Given the open road, Nieto's apparent understanding of their command, and the reports of a man with a gun on his hip, the officers had no doubt in their minds that Nieto pulled out his gun to shoot the officers.

The officers shot at Nieto, believing that their lives were in danger, to protect themselves and their fellow officers. Officers are trained that they shoot until the deadly threat to which they are

reacting is no longer a deadly threat. Even though the officers were shooting at him, Nieto did not immediately drop the gun or appear to react to the shots. Rather, he continued to point the gun at the officers as though he was shooting at them.

Both officers thought that one possible explanation for Nieto's failure to react to their shots was that he could be wearing body armor. The officers therefore changed their aims, trying to shoot at Nieto's head or legs. Nieto then changed his position from standing, to moving down into a prone position, on his stomach with his head facing the officers. To the officers, it appeared that Nieto intentionally dropped into the prone position to get a tactical advantage by making himself a smaller target, a move that both officer recognized as a tactical maneuver.

Nieto did not lay still on the ground. Rather raised his head and his hands and again pointed his gun again at the officers. Both officers believed that Nieto was still trying to shoot them, and that Nieto still posed a deadly threat.

As they were approaching, Officers Chew and Morse heard some of the shots, along with the radio transmission that shots had been fired. Officer Morse, the driver, stopped his car just to the right of Officer Schiff's car, about 10 feet off set from the front of Officer Schiff's car. They saw Nieto laying prone, with his head up facing the officers, and Sgt. Sawyer firing from the protection of his car doors. Officers Morse and Chew got out of their cars to assist Sgt. Sawyer and Officer Schiff. As Officer Chew got out, he saw the red laser beam coming from the gun, making him believe that Nieto intentionally was switching his aim to him. Officer Chew made an evasive maneuver to his right, trying to get out of the line of fire, and then moved back behind his car door and starting shooting at Nieto.

Officer Morse could see that Sgt. Sawyer, who was to Officer Morse's left, appeared to unwounded, but could not see Officer Schiff. He therefore moved behind Officer Schiff's car to come up the drivers' side, which was slightly sheltered from Nieto's line of fire because of the angle that it parked. Officer Morse saw that Officer Schiff did not appear to be injured. Officer Morse also saw a flash of light come from the muzzle of the gun that Nieto continued to point at the officers. Because it appeared to Officer Morse that Nieto was continuing to shoot at them, Officer Morse also started shooting at Nieto.

Within seconds, Sgt. Sawyer ordered a cease fire because he saw Nieto's head and hands drop towards the ground. At that time, the officers did not know if Nieto stopped pointing his gun at them because he gave up, or because he was so injured that he could no longer do so. Although still concerned that Nieto posed a threat to them, they all left the cover of their car doors, and approached Nieto on foot with their guns pointed at him.

When they got about five feet away from Nieto, they could see that Nieto's gun was boxy in shape, and had yellow markings and wires coming out of the front. Officer Morse kicked the gun out of Nieto's hands, and they put Nieto in handcuffs. The officers then rolled him over to give medical attention. Other officers, including Sgt. Seth Riskin, then arrived on the scene.

Department protocol requires that shooting officers be removed from the scene as soon as possible. Sgt. Riskin took over as the officer in charge of the crime scene, and the four officers went in separate cars back to the station, where they were later independently interviewed.

The paramedics pronounced Nieto dead at the scene.

## WITNESSES WHO MAY TESTIFY AT TRIAL, AND THEIR ROLE
### I. PERCIPIENT WITNESSES TO THE SHOOTING

No police officers other than the four shooting officers witnessed the actual shooting. No other officers other than Officer Schiff and Sgt. Sawyer observed Mr. Nieto's actions that instigated the shooting. Other than the four shooting officers, the parties have located only one other percipient witness, Antonio Theodore.

Theodore did not identify himself to the police at the time of the incident. Months later, he gave his name to someone, possibly Nieto's brother, Hector Nieto, indicating that he had observed the shooting. Theodore never gave an interview to Internal Affairs, the OCC, or the SFPD Homicide Division.

Defendants took Theodore's deposition more than a year after the incident. Theodore testified that he had been jogging west along the path that runs along the bluff about 75 feet above the access road. When he got to a location near the entrance gate to the park, he turned and saw Nieto walking down the road. Theodore has an astigmatism and is prescribed glasses, but was not wearing them on

this day. The location where he stopped is a long way away from where the shooting took place, and even with the best of eyesight it is difficult to make out any details in a person that far away.

Theodore's testimony about Nieto's actions during the shooting contradicts that of the officers in a number of aspects, including his testimony that he never saw Nieto take his hands out of his pockets, never saw him pointed a gun (or a taser) at the officers, and never saw an officer kick anything out of Nieto's hands. His testimony also is inconsistent with the scientific and forensic evidence, and much of his testimony is provably wrong. For example, Theodore states that only two officers participated in the shooting or were even near him, and that an officer with a rifle shot Nieto.

No party has found any other percipient witness to the shooting. Plaintiffs can prevail in this matter only if the jury believes Theodore's testimony. Defendants do not believe that as a matter of law it would not be reasonable to do so, given the overwhelming weight of the contradictory testimonial and scientific evidence, and Theodore's other issues regarding his ability to perceive the events and his credibility.

## II. PERCIPIENT WITNESSES TO MR. NIETO'S ODD BEHAVIOR IN THE PARK PRIOR TO THE SHOOTING

A number of witnesses provided statements regarding Nieto's pre-shooting behavior in the park. Tim Isgitt saw Nieto acting in an odd manner, including apparently shadow boxing with himself, a few minutes before the shooting. He saw Nieto's gun in his holster. Isgitt's boyfriend, Justin Fritz, called 911. Evan Snow also encountered Nieto. Snow's dog approached Nieto, who was eating something. Nieto then pulled out his gun, and pointed it at Snow and the dog. Snow confirms that from the front the gun looked like a real gun, and did not have yellow markings. Snow realized it was a taser only when Nieto turned it to the side to point it at Snow's dog.

## III. PERCIPIENT WITNESSES TO NIETO'S BEHAVIOR IN THE WEEKS LEADING UP TO THE SHOOTING

Nieto purchased the taser he fired at the officers just a few weeks prior to the shooting. Mr. Nieto's girlfriend, Yaijaira Barrera-Estrada, with whom he was living at the time of the shooting, testified that he purchased it as a birthday present to himself. (His birthday was March 4.) A few days later, Nieto had an altercation with the ex-husband of Barrerra-Estrada, Arthur Vega, in which Nieto used his taser on the ex-husband in front of Barrerra-Estrada's toddler son. The day of the shooting,

Barrerra-Estrada filed a restraining order against Nieto, filing a statement under oath that she was afraid of him. At her deposition, she stated that it was not true.

Defendants intend to call both Vega, who was not deposed, and Barrera-Estrada, who was, as witnesses at trial.

Like Barrerra-Estrada, Carolina Mitchell, Nieto's girlfriend in 2011, filed a restraining order against him. Defendants intend to call Mitchell's father, Jesse Gerarde, who observed some of Plaintiffs' behavior, as a witness at trial. Similarly, in 2011, Nieto was placed on a number of involuntary psychiatric holds.

## IV. EVIDENCE OF NIETO'S MENTAL HEALTH STATUS

In 2011, doctors diagnosed Nieto as a paranoid schizophrenic after a number of police encounters. He was placed on involuntary psychiatric holds, and was hospitalized for weeks. For some unknown period of time, including in mid-2013, he was taking anti-psychotic medications. At the time of his death, the toxicology report indicated that he was not taking his medications. Defendants will present evidence of Nieto's mental health status, and the lack of anti-depressants in his system, because it explains his otherwise inexplicable behavior on the day of the incident.

## V. FORENSIC EVIDENCE

Officer Roselyn Rouede conducted a crime scene investigation, which included "total station" measurements of the location and the evidence, and photographs. Sgt. Seth Riskin was the officer in charge of the scene. San Francisco's Medical Examiner, Dr. Amy Hart, conducted an autopsy. Officer Mark Prioa conducted a firearms analysis and investigation, including ballistics testing of the bullets that hit Nieto. Together, this evidence shows that Nieto's taser was found deployed at the scene, that no yellow "blast doors" were found, and that except for the wind blowing things away, the scene was not disturbed.

Additionally, an engineer from Taser International, Brian Chiles, downloaded the data from the taser and conducted an analysis regarding the trigger pulls recorded in that date. He will testify that the data confirms three trigger pulls at the time that the dispatch radio recorded gun fire.

## VI. EXPERT WITNESSES

Defendants hired three expert witnesses. Dr. Emily Keram has reviewed Nieto's medical and behavioral history, and will testify that Nieto's behavior in arming himself, and pointing and shooting his taser at the officers is consistent with the behavior of a paranoid schizophrenic such as Nieto. Plaintiffs did not designate any type of medical expert, nor did Plaintiffs designate any of Plaintiffs' treating physicians as witnesses.

Defendants provided the crime scene data to an expert, Craig Fries, who is an expert on 3D modeling. His analysis and 3d modeling will show that all of Nieto's wounds are consistent with the officers' testimony about both their and Nieto's positions, and cannot be reconciled with the testimony of Theodore, the witness who came forward months later. Plaintiffs have not disclosed any expert regarding bullet trajectories, crime scene analysis, or another other type of expert to examine the forensic data.

Lastly, both parties hired police practices experts. Defendants' expert, Don Cameron, will confirm that the police officers complied with their training when they shot at a suspect they believed was about to shoot them. Plaintiffs' expert, who does not have any relevant experience in training California Police officers, will testify that the officers should have known that the gun-shaped object that Nieto pulled out of his holster was a taser, and that the officers therefore should not have shot Nieto. Defendants have moved to exclude Mr. Clark's opinions because they are not proper expert opinions.

## THE CLAIMS AND THE APPLICABLE LAW

Plaintiffs sued the four shooting officers and the City on behalf of themselves under the 14th Amendment, and on behalf of Alejandro's estate under the 4th Amendment. Plaintiffs also brought negligence and battery causes of action. Plaintiffs have indicated that they intend to drop their battery claim. Additionally, the Court granted Defendants' motion for summary judgment on Plaintiffs' federal claims against the City. Thus, the remaining claims are on behalf of the estate under the Fourth Amendment, for the parents' loss of care, comfort and society under the Fourteenth Amendment, and for wrongful death based on negligence under state law.

For all claims, both state and federal, Plaintiffs carry the burden of proving that the force used by the officers was unreasonable. *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1274 (1996).

Defendants assert qualified immunity as an affirmative defense. Here, Defendants believe that should a jury find that Nieto pointed what looked to the officers like a firearm at them, and continued to point it at them while he was prone on the ground, that they would be entitled to qualified immunity. Because there are so few material questions in dispute, Defendants believe that the Court should ask special interrogatories of the jury to resolve any such material factual disputes, and then decide the issue of qualified immunity.

Defendants also assert for the state court matter an affirmative defense of self-defense and justifiable homicide. Defendants believe that Plaintiffs' carry the burden of proving the force was unreasonable should resolve this defense, but the legal and factual issues in this case continue to be in flux and therefore Defendants do not waive this defense.

## I. PLAINTIFFS' FOURTH AMENDMENT CLAIM
### A. Fourth Amendment Law in the Deadly Force Context

The Fourth Amendment allows officers to only use such force as is "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The reasonableness of a particular force used must be judged from the perspective of a reasonable officer on the scene, rather with the 20/20 vision of hindsight." *Id.*, citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). Thus, the question is not how much force was actually needed, but how much force a reasonable officer could possibly perceive would be needed. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

To determine whether the force was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham,* 490 U.S. at 396. In evaluating the nature and quality of the intrusion, the Court evaluates the type and amount of force used. The force used need not be "the least intrusive means," but only need to be "within that range of conduct . . . identif[ied] as reasonable." *Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002).

Cases list various factors for a court to consider in the determination of "reasonableness", but the most critical factor is whether the officers face an imminent threat of harm. *Gonzalez v. City of*

*Anaheim*, 747 F.3d 789, 783-94 (2014). In a claim involving the use of deadly force, such as this, "our case law requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force." *Price v. Sery*, 513 F.3d 962, 971 (9th Cir. 2008) (construing *Scott v. Harris*, 550 U.S. 372, 382-83 (2007)). "[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc); *Billington*, 292 F.3d at 1185. Thus, "an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack. In these circumstances, the courts cannot ask an officer to hold fire in order to ascertain whether the suspect will, in fact, injure or murder the officer. The high numbers of officer mortalities in recent years illustrate the unreasonableness of such a notion." *Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1072 (S.D. Cal. 1994), aff'd, 84 F.3d 1162 (9th Cir. 1996). "Absolute certainty of harm need not precede an act of self protection." *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010); *Monroe v. City of Phoenix, Ariz.*, 248 F.3d 851, 862 (9th Cir. 2001), overruled in part on other grounds by *Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007) (where officer was struggling with an armed suspect whose knife remained in his pocket, noting "[s]urely he was not required to wait and be seriously injured or killed before exercising his judgment and bringing the situation under control"). Numerous cases have held that even when a suspect has not used a weapon on anyone, including the officer, the officer may use deadly force if the officer perceives a threat. *Buruca v. District of Columbia*, 902 F.Supp.2d 75 (D.D.C. 2012) (use of deadly force reasonable when suspect points gun at officers); *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007) (use of deadly force reasonable when suspect is holding a rifle, even if not pointing it at officers at time of shooting); *Walker v. City of Atlanta*, 2014 WL 1224458 (D.Ga. 2014) (use of deadly force reasonable when suspect pointed a gun at officer).

In considering the totality of the circumstances facing the officers that justify the use of deadly force, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split- second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). "We must never allow the theoretical, sanitized

Defendants' Trial Brief                                   10                                   n:\lit\li2014\141079\01076817.doc
Case No. **C14-03823-NC**

world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

Thus, even if after the fact the officers' perception of a deadly threat proves to be incorrect, because, for example, the officer mistakenly believed that the suspect had a real firearm, the officer does not violate the Fourth Amendment in using deadly force. *Penley v. Eslinger*, 605 F.3d 843 (11th Cir. 2010) (shooting 15 year old who had a toy gun not unconstitutional use of excessive force when officers reasonably perceived gun to be real); *Aipperspach v. McInerney*, 963 F.Supp.3d 901 (W.D. Mi. 2013) (no violation of Fourth Amendment to shoot suspect who had a pellet gun when officers reasonably believed it to be real); *Ali v. City of Louisville*, 395 F.Supp.2d 527 (W.D. Kent. 2005) (no violation of Fourth Amendment when shot suspect who raised a gun, although gun was a bb gun).

**B.    Damages Available Under the Fourth Amendment**

Under the Fourth Amendment, Plaintiffs can recover only the damages on behalf of the estate, including pain and suffering damages that the decedent may have experienced between the time of the shooting and his death. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014). Here, there is no evidence concerning the period of time that Nieto may have survived after being wounded.

**II.    PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM**

**A.    Fourteenth Amendment Law for Family Members**

Federal claims brought by survivors of a deadly force decedent are governed by the Fourteenth Amendment, and not the Fourth Amendment standards. *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 369 (9th Cir. 1998); *Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998). In the Ninth Circuit, "a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child." See *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) (quoting *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (noting that parents have a substantive due process liberty interest under the Fourteenth Amendment in the care, custody, and control of their children). Only official conduct that "shocks the conscience" is cognizable as a Fourteenth Amendment substantive

due process violation. See *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (even if decision to engage in high-speed chase of motorcyclists that resulted in his death was deliberately indifferent to motorcyclists safety, does not meet standard for survivor action).

If a use of force is objectively reasonable under the Fourth Amendment, then it also complies with the Fourteenth Amendment. *Moreland*, 159 F.3d at 371 n.4. Thus, a Fourteenth Amendment claim has additional requirements, including a subjective component. In *Moreland*, the Ninth Circuit explained that there can be no liability under the Fourteenth Amendment unless plaintiffs prove the officers "acted with a purpose to harm" a decedent that was "unrelated to the legitimate use of force necessary to protect the public and themselves." *Id*. at 373, relying on *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). Thus, when officers are in a confrontation with a suspect and must make decisions "in haste, under pressure, and frequently without the luxury of a second chance," *Lewis*, 523 U.S. at 853, a plaintiff must prove subjective malice must be proved to establish liability. *Gonzales v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014); *Bingue v. Prunchak*, 512 F.3d 1169, 1174-77 (9th Cir. 2008); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Only if Plaintiffs prove that the officers had a "purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives" can they prevail. *Gonzales*, 747 F.3d at 797.

**B.     Damages Available Under the Fourteenth Amendment**

The damages available under the 14th Amendment are general damages for the loss of care, comfort and society of the decedent. Plaintiffs are not entitled to speculative damages. For claims regarding the loss of adult children, such claims require proof that the decedent would, in the future, provide monetary support to the parent.

Here, Nieto's parents claim that Nieto lived with them, and would occasionally buy groceries. Barrerra-Estrada, on the other hand, claimed that Nieto lived with her. There is little to no evidence regarding the amount of money earned by Nieto. Further, his mental illness appears to preclude a reasonable belief that he would provide any monetary benefit to his parents in the future.

### III. PLAINTIFFS' STATE LAW CLAIMS
#### A. Applicable State Law Provisions

Plaintiffs bring two state law tort claims, for negligence and battery. Under state law, however, a police officer cannot be liable for a use of reasonable force. Cal. Penal Code § 835a. Therefore, if Plaintiffs do not prevail on their Fourth Amendment claim, they cannot prevail on their state law claims. See *Hernandez v City of Pomona*, 46 Cal 4th 501, 518-19 (2009), *Hayes v. City of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013) ("Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims"); *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009).

There are some cases, including *Hayes*, that suggest that pre-shooting conduct may, in certain circumstances, give rise to a separate negligence claim. Defendants are not clear how such law would apply here. Plaintiffs never alleged any pre-shooting negligent conduct, and could not do so. All that the officers did here was respond to a call with a man with a gun, and drive towards Nieto on an open road.

There is also a penal code provision regarding justifiable homicide, Penal Code § 196, and an affirmative defense of self-defense. Defendants believe that the privilege to use reasonable force under Penal Code § 835a obviates the need for instruction and decision related to these matters.

Additionally, because Plaintiffs' state law claim is based on negligence, the jury would have to decide comparative negligence. See e.g., *Willis v. City of Fresno*, 2014 WL 1419239 (E.D. Cal. April 24, 2014) (discussing comparative negligence in law enforcement shooting death case).

#### B. Damages Available to Plaintiffs Under the State Law Claim

Wrongful death plaintiffs may recover both special damages and general damages for the loss of care, comfort and society of a child, even an adult child. See CACI 3921. However, there are no punitive damages available for the state tort of wrongful death. See *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757 (1981).

### IV. OVERLAPPING STATE AND FEDERAL CLAIMS

Defendants are concerned regarding juror confusion and the possibility of conflicting verdicts if all of Plaintiffs' claims go to the jury. It appears that damages under Plaintiffs' state law claims

would be a sub-set of those if they prevail on their federal claims, because the federal claims could include punitive damages and attorneys' fees, and would not be reduced by possible comparative negligence.  Submitting the federal claims to the Court also would not be confused by issues concerning affirmative defenses such as self-defense.  Defendants believe that a discussion at the pretrial conference regarding this overlap would be in order.

Dated:  January 27, 2016

                        DENNIS J. HERRERA
                        City Attorney
                        CHERYL ADAMS
                        Chief Trial Deputy
                        MARGARET W. BAUMGARTNER
                        REBECCA BERS
                        Deputy City Attorneys

                    By: */s/ Margaret W. Baumgartner*
                        MARGARET W. BAUMGARTNER

                        Attorneys for Defendants
                        CITY AND COUNTY OF SAN FRANCISCO et al.