**Volume 6**

**Pages 1011 - 1180**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

REFUGIO NIETO, ET AL.,            )
                                  )
          Plaintiffs,             )
                                  )
  VS.                             )    **NO. C 14-3823-NC**
                                  )
CITY AND COUNTY OF SAN            )
FRANCISCO, ET AL.,                )
                                  )
          Defendants.             )
_____  )

                        San Francisco, California
                        Tuesday, March 8, 2016

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

For Plaintiffs:
                        THE LAW OFFICE OF JOHN L. BURRIS
                        7677 Oakport Street - Suite 1120
                        Oakland, CA  94621
                   **BY:  ADANTE POINTER, ATTORNEY AT AW**
                        **LATEEF GRAY, ATTORNEY AT LAW**

For Defendants:
                        OFFICE OF THE CITY ATTORNEY
                        1390 Market Street - 6th Floor
                        San Francisco, CA  94102
                   **BY:  MARGARET BAUMGARTNER, ATTORNEY AT LAW**
                        **REBECCA BERS, ATTORNEY AT LAW**

Reported By:       Pamela Batalo Hebel, CSR No. 3593, RMR,
                   FCRR, Official Reporter

<u>**I N D E X**</u>

Tuesday, March 8, 2016 - Volume 6

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Plaintiffs' Rests                        | 1019     | 6        |
| Defense Rests                            | 1148     | 6        |

| **PLAINTIFFS' WITNESSES**                | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **NIETO, ELVIRA (RECALLED)**             |          |          |
| (PREVIOUSLY SWORN)                       | 1014     | 6        |
| Cross-Examination by Ms. Baumgartner     | 1014     | 6        |

| **DEFENDANTS' WITNESSES**                | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **SNOW, EVAN**                           |          |          |
| (SWORN)                                  | 1020     | 6        |
| Direct Examination by Ms. Bers           | 1020     | 6        |
| Cross-Examination by Mr. Gray            | 1036     | 6        |
| Redirect Examination by Ms. Bers         | 1050     | 6        |
| **ISGITT, TIMOTHY**                      |          |          |
| (SWORN)                                  | 1053     | 6        |
| Direct Examination by Ms. Bers           | 1053     | 6        |
| Cross-Examination by Mr. Gray            | 1061     | 6        |
| **SAWYER, JASON (RECALLED)**             |          |          |
| (PREVIOUSLY SWORN)                       | 1066     | 6        |
| Direct Examination by Ms. Baumgartner    | 1066     | 6        |
| Cross-Examination by Mr. Pointer         | 1067     | 6        |
| **CAMERON, DONALD**                      |          |          |
| (SWORN)                                  | 1113     | 6        |
| Direct Examination by Ms. Baumgartner    | 1114     | 6        |
| Cross-Examination by Mr. Pointer         | 1145     | 6        |

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS**           | **IDEN** | **EVID** | **VOL.** |
|------------------------------|----------|----------|----------|
| Page B-2 of Exhibit 19       |          | 1037     | 6        |

| | |
|---|---|
| 1 | <u>Tuesday - March 8, 2016</u>                    <u>9:07 a.m.</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Please come to order.  Court is now in |
| 5 | session. |
| 6 | **THE COURT:**  Good morning.  Welcome back.  Everybody |
| 7 | may be seated, please. |
| 8 | Our jurors are assembled now, and I've given the parties |
| 9 | some drafts to look at.  We'll visit those later in the day |
| 10 | without the jury present when we have a little more time. |
| 11 | Any issues before we resume the examination of Mrs. Nieto? |
| 12 | **MS. BAUMGARTNER:**  Simply that I think that there will |
| 13 | end up being a gap -- I'm thinking there might be a gap between |
| 14 | the witness testimony this morning and Mr. Cameron's |
| 15 | availability this afternoon.  He's leaving his house at noon, |
| 16 | the earliest he can leave it, and will be here as soon as |
| 17 | possible.  After that he says it takes between 45 and an hour |
| 18 | and a half, depending on the traffic. |
| 19 | **THE COURT:**  I think that's probably an opportunity for |
| 20 | us to take up some of the legal issues, just kind of clean up |
| 21 | from the trial, not clean up the courtroom but just getting |
| 22 | things prepared.  Thank you for letting me know. |
| 23 | **MS. BAUMGARTNER:**  Thank you. |
| 24 | Let's bring in our jurors. |
| 25 | (Proceedings were heard in the presence of the jury:) |

1    **THE COURT:** Welcome back to our jurors. We are going

2 to resume the examination of Mrs. Nieto with the examination by

3 the defendants' counsel.

4    If Mrs. Nieto will come forward.

5    **ELVIRA NIETO**, **PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**

6    **THE COURT:** Good morning. If you can please be

7 seated.

8    **CROSS-EXAMINATION**

9 **BY MS. BAUMGARTNER:**

10 **Q.** Good morning, Mrs. Nieto.

11 **A.** Good morning.

12 **Q.** I just have a very few questions.

13    You didn't know that your son owned a taser; right?

14 **A.** I never saw it.

15 **Q.** And he never talked to you about purchasing a taser?

16 **A.** No.

17 **Q.** And you saw him that evening before he left for Bernal

18 Hill; right?

19 **A.** Yes.

20 **Q.** And at that time, he wasn't wearing a holster, was he?

21 **A.** Well, he had his jacket on.

22 **Q.** But you didn't see a holster; right?

23 **A.** No.

24    **MS. BAUMGARTNER:** No further questions, Your Honor.

25    **THE COURT:** Thank you.

1          Any examination further by plaintiffs' counsel?

2               **MR. POINTER:**  No, Your Honor.

3               **THE COURT:**  All right.  Well, it's been a short visit

4     with you this morning, but I will give the jurors a five-minute

5     break.  If you have any questions for Mrs. Nieto, we will pose

6     them; if you don't, we will move on to the next witness.  We

7     will be in a five-minute recess.

8          (Proceedings were heard out of presence of the jury:)

9               **MS. BAUMGARTNER:**  Your Honor, I don't know if the

10    plaintiff is going to rest or not at this particular point, but

11    our next witness is in the back of the line trying to get in.

12    I sent Ms. Bers down to try to get him in quicker.  He's here.

13    He just can't get in the building.

14              **THE COURT:**  Good luck in his efforts.  I will ask

15    Mr. Pointer what his intentions are.

16              **MR. POINTER:**  Our intention is to rest.  Who is the

17    defendants next witness?

18              **MS. BAUMGARTNER:**  Mr. Snow.  We would I do intend to

19    make a Rule 50 motion so --

20              **THE COURT:**  We can do that then if you are ready for

21    it.

22              **MS. BAUMGARTNER:**  All right.  Thank you.

23              **THE COURT:**  We take a five-minute break because we

24    need a five-minute break anyway.

25                    (Recess taken at 9:12 a.m.)

1              (Proceedings resumed at 9:16 a.m.)

2         **THE CLERK:**  Please come to order.  Court is again in

3    session.

4         **THE COURT:**  All right.  We are returned.  Please be

5    seated.

6         The jurors have no questions for Mrs. Nieto.  And with the

7    jury not being present, Mr. Pointer, are there going to be any

8    additional exhibits which you wish to move into evidence before

9    the close of your case?

10        **MR. POINTER:**  Yes, Your Honor, there are.

11        **THE COURT:**  One moment.  We can discuss those outside

12   the presence of the jury since now is a good time to do it.

13        **MR. POINTER:**  Yes, Your Honor.  We're asking that

14   Mr. Chiles' taser report be moved into evidence, as well as --

15        **THE COURT:**  How about a number on that?

16        **MR. POINTER:**  Yes.  That's Exhibit No. 84 -- I'm

17   sorry.  86.  And then there is an Exhibit 84 which is his

18   deposition.  There was an exhibit labeled 2 and then what has

19   been referred to during the course of his testimony as the TSA

20   form which essentially is the request for him to conduct his

21   examination which he testified to as well.

22        **THE COURT:**  All right.

23        Are there any other documents you wish to move into

24   evidence or stipulations, any other --

25        **MR. POINTER:**  I just want to make sure that's it.  I

1  believe that's it, Your Honor.

2      **THE COURT:**  So by my records, Exhibit 2, the TSA form

3  to Exhibit 84 was already admitted into evidence so no further

4  action is required on that one.

5      And you're seeking to move in the entire June 30 taser

6  report for Mr. Chiles, Exhibit 86.  Is there any objection to

7  that?

8      **MS. BAUMGARTNER:**  Yes, Your Honor.  We didn't have an

9  opportunity -- if he had intended to move it into evidence, we

10  would have asked him further questions about it.  We also would

11  have moved into evidence the emails back and forth, but because

12  it was not moved into evidence, we didn't.

13      **THE COURT:**  One moment.  I'm just going to refresh my

14  memory with it.

15      Mr. Pointer, what is the need of the admission which of

16  course is not an evidentiary standard?  There has already been

17  testimony about it.  The objection is made to the timing of the

18  question.  Why isn't the testimony complete as is?

19      **MR. POINTER:**  Your Honor, it's a contemporaneous

20  statement as well as a business record of --

21      **THE COURT:**  I'm not asking about the -- that aspect.

22  Why didn't you ask to move it in at the time of testimony?

23      **MR. POINTER:**  Well, Your Honor, frankly, we had

24  extensive testimony from it, and we didn't ask at that time,

25  which was really more of an inadvertence on my part.

1    Given that evidence is still open and it's been my

2    experience that things can be moved in before the close of

3    evidence, I did want to make sure that I -- housekeeping, if

4    you will.

5    **THE COURT:**  All right.  We'll call it housekeeping.

6    I'm going to exclude the document because Mr. Chiles is not

7    here.  He did fly in to testify, is my recollection, and is not

8    present for follow on testimony.  If he were here in the

9    courtroom, then I think it would be one thing, but he's not,

10   and while there might be an argument for necessity of

11   completeness to have this document in to have the jury

12   understand what he testified to, I don't think that's necessary

13   because there was a thorough examination by both parties

14   covering the most important parts here, and Exhibit 84 has two

15   pages that already are in evidence that was timely moved in,

16   and that would have been the time to move in Exhibit 86 at the

17   same time, if that was what you wanted to do.  So I'm going to

18   keep 86 out.

19   **MR. POINTER:**  Very well, Your Honor.

20   **THE COURT:**  With the anticipation -- let me ask, is

21   the next witness here yet?

22   **MS. BERS:**  Yes.

23   **MS. BAUMGARTNER:**  He is here.

24   **THE COURT:**  With the anticipation of a Rule 50 motion,

25   do you want to take this witness and those to come and then

1  take up that motion when we have a little bit of gap in the

2  schedule?  Would that make sense?

3         **MS. BAUMGARTNER:**  It does, Your Honor.  We actually

4  have two witnesses here, and if we could get them both on and

5  get them back to their lives.

6         **THE COURT:**  I think that would be in the interests of

7  justice.  Let's bring the jury back in, and we will give the

8  plaintiffs a chance to rest.

9      (Proceedings were heard in the presence of the jury:)

10        **THE COURT:**  Mr. Pointer, do the Nietos have any

11  further evidence to present?

12        **MR. POINTER:**  No, Your Honor.  Plaintiffs rest.

13                    (Plaintiffs' rest)

14       **THE COURT:**  Ladies and Gentlemen of the jury, we have

15  reached a milestone in the case.  The plaintiffs have rested

16  their case.  Reminder to keep an open mind and consider all the

17  evidence, not just the evidence presented so far.

18     It will now be the defendants' opportunity to present some

19  evidence.  They have presented some evidence already with the

20  permission of the Court, but now they can continue that

21  presentation.

22     If the defendants could call their next witness, please.

23        **MS. BERS:**  Yes.  We call Evan Snow.

24        **THE COURT:**  All right.  Mr. Snow may come in.

25     Mr. Snow, if you will come on forward here to the witness

1    stand.  Just one moment, sir.  We are going to take away one of

2    those chairs.  Thank you.

3                    **EVAN SNOW**, **DEFENDANTS' WITNESS, SWORN**

4              **THE CLERK:**  Please be seated.  Please state your full

5    name for the record.

6              **THE WITNESS:**  My name is Evan Jacob Snow.

7              **THE COURT:**  Mr. Snow, if you can pull the microphone

8    as close to you as you can and get yourself comfortable there.

9              **THE WITNESS:**  How's that?  Okay.

10                        **DIRECT EXAMINATION**

11   BY MS. BERS:

12   **Q.**  Mr. Snow, we've met before.  I'm Rebecca Bers, and I

13   represent the defendants in this case.  I'm going to ask you

14   some questions.

15        Have you testified in court before?

16   **A.**  No, I have not.

17   **Q.**  Are you a little nervous today?

18   **A.**  Yeah.  Yeah.

19   **Q.**  Okay.  All right.  Well, we're just going to start by

20   talking about your familiarity with Bernal Heights Park.

21        Were you familiar with Bernal Hill Park in 2014?

22   **A.**  Yes.  Very familiar.  I went there sometimes two, three

23   times a day with my dog.

24   **Q.**  What is your dog's name?

25   **A.**  Luna.

1    **Q.**    How old was she in March of 2014?

2    **A.**    Let's see.  Her -- a little over a year old.  It's --

3    let's see.  A year and a few months.  Yeah.  Still a little bit

4    in the puppy stage.

5    **Q.**    All right.  I'm going to put up a little map here.  Can

6    you see that?

7    **A.**    Yeah, I can see that.

8    **Q.**    Are you familiar with this part of Bernal Heights?

9    **A.**    Yes.  I'm very familiar with the entire park, so, yeah.

10    **Q.**    Great.

11    So now you know that we're here talking about an incident

12    related to March 21, 2014; right?

13    **A.**    Yes.

14    **Q.**    Okay.  Did you visit Bernal Heights Park on March 21,

15    2014?

16    **A.**    Yes.

17    **Q.**    What were you doing there?

18    **A.**    I was doing my evening dog walk, as usual.

19    **Q.**    Okay.  How often do you walk Luna?

20    **A.**    I would take her to Bernal Park, I'd say, twice a day

21    usually; morning before I headed off to work and in the evening

22    when I -- afternoon, evening when I got back.

23    **Q.**    Did you live in the neighborhood at that time?

24    **A.**    Yes.  I lived at 114 Lundys Lane, which was just west of

25    Bernal Park, I believe.

1    **Q.**    If you were looking at this map, to the left --

2    **A.**    Yep.  Yeah.

3    **Q.**    -- when you were walking in Bernal Hill, was it common to

4    see people walking dogs off leash?

5    **A.**    All the time.  I -- when I moved there, I didn't realize

6    it was an off-leash dog area.  I was really happy to find out

7    that it was.  People let their dogs off the leash all the time

8    there.

9    **Q.**    Did you walk Luna off-leash?

10   **A.**    I did, yeah.

11   **Q.**    So let's talk about March 21, 2014.  What time about did

12   you go to the park with Luna?

13   **A.**    I went up -- I'm sure it was around 6:00.  I went -- we

14   had a satellite office in -- actually nearby here, and I left

15   work.  I got home, and I took her up to the park so, you know,

16   I recall going -- I mean, I recall the incident and what time

17   it was, but I know I left the house around 6:00 or so.

18   **Q.**    Okay.  When you got to the park, what did you do?

19   **A.**    You know, we usually head up the stairs over on the west

20   side.

21   **Q.**    Are they have visible on the map?

22   **A.**    It's a little hard for me to see on that side, but in fact

23   they might be just beyond -- not visible on the map -- just

24   beyond those trees that are -- that's in the, I guess,

25   southwest corner of the map.

1    Q.   And you can get up and point to the map if that's helpful.

2    If you can point, even if it's not directly in the map -- if

3    you can point where it is approximately.

4    A.   It's approximately -- the stairs are approximately here

5    (indicating).

6    Q.   Okay.

7    A.   I believe.  It's a little disorienting to see the map from

8    a different perspective, but the stairs are about right there

9    (indicating).

10   Q.   Okay.  And from a different perspective, you mean because

11   it's aerial?

12   A.   It's aerial.  You know, the maps that I provided were more

13   of a little bit farther up the hill.  I would say up the hill

14   where most of the encounter took place for me.

15   Q.   And did you walk around the park before you encountered

16   anybody?

17   A.   Yeah.  So I headed up the stairs.  I took a right, which

18   is heading up the hill, looped around the -- the peak of the

19   hill a little bit, and I was done with my walk and descending

20   the hill when the encounter took place.

21   Q.   Were you descending the hill at the same time where you

22   entered the hill?

23   A.   Yes.

24   Q.   What do you consider the top of the hill, just to get an

25   idea of where you were walking.  You can use this map if it's

1  helpful.

2  **A.**   Let's see.  So the top of the hill I would consider the

3  radio tower here (indicating).  I believe that's a radio tower.

4  **Q.**   Yeah.

5  **A.**   Yeah.  The radio tower is the top of the hill.

6  **Q.**   You walked around the radio tower and then back down?

7  **A.**   Yeah.  This appears to be the paved road that goes up so

8  we'd walk -- we'd come up the stairs and walk around the loop

9  that would be, you know, too far south here and come up and

10  kind of loop around.  Sometimes we'd go this way along this

11  trail (indicating), but this -- this evening in particular, we

12  came back down the paved trail, the paved road there.

13  **Q.**   And at some point, did you encounter a person on the hill

14  wearing a red jacket and black pants?

15  **A.**   I did, yes.

16  **Q.**   And where were you when you first saw him?

17  **A.**   So as you descend this paved trail that comes off of the

18  radio tower, there's a -- a blocked driveway.  Then a little

19  past that there is a water fountain, and then a little past

20  that, there's a -- a bench that has a slope with kind of

21  makeshift trails that go down to some residential houses.

22      I was between the water fountain and the benches and, you

23  know, heading down the -- down the hill back home, and I saw

24  this person come up the hill over by the benches.

25  **Q.**   Okay.  And if you could -- I know that it's not on this

1    map -- could you show us where in relation to the map that was?

2    **A.**    Yeah.  So in my mind, the paved road descends from the

3    radio tower.  It kind of swoops around here (indicating), and

4    it would be kind of in this area (indicating).  I just want to

5    make sure I'm correct.  That is -- yeah.  It would be in this

6    area here (indicating), the water fountain and benches would be

7    about here (indicating).  The trail loops around in this area,

8    and then the stairs are right here (indicating).  So -- so kind

9    of this zone (indicating).

10   **Q.**   And you're talking about the paved path that goes around

11   the park; right?

12   **A.**    Yes.

13   **Q.**   When you refer to the blocked driveway, do you mean the

14   sort of southern entrance of Bernal Heights Park where there's

15   a gate?

16   **A.**    Right.  The street that you can drive on ascends to the

17   back, I guess, on the south side and then it's blocked off.  I

18   see police cruisers kind of in Bernal Park every once in a

19   while or -- but, yeah, there's -- it's gated, it's blocked off.

20   Yeah.  So that side.

21   **Q.**   And what about the person wearing a red jacket and black

22   pants made you notice him?

23          **MR. GRAY:**  Objection.  Leading.  Assumes facts not in

24   evidence.

25          **THE COURT:**  Overruled.

1          **THE WITNESS:**  So I have to say his demeanor was very

2     erratic.  His shoulders were incredibly tight, and his

3     movements were quick, and he was spinning around a lot, moving

4     back and forth quickly and erratically.

5     **BY MS. BERS:**

6     **Q.**   Was he doing anything with his hands?

7          **MR. GRAY:**  Objection.  Leading.

8          **THE COURT:**  Sustained.

9     **BY MS. BERS:**

10    **Q.**   Was there anything else about him that you noticed that

11    immediately drew your attention?

12    **A.**   Well, he was holding some chips.  I think they were Sun

13    Chips or something.  It was kind of a small bag of chips.

14    **Q.**   Okay.  And why did that draw your attention?

15    **A.**   Well, the problem with people -- some dog owners on Bernal

16    Hill -- is that some people feel they're being very generous

17    and nice by giving out treats to dogs, and I don't want

18    somebody to give my dog treats because she learns to beg that

19    way.  And so whenever I see somebody holding food, it raises my

20    concern because I don't want my dog to run over to them and beg

21    for food.

22    **Q.**   Okay.

23    **A.**   So that's why his demeanor and movements combined

24    withholding food raised my awareness that we wanted to stay

25    away.

1  Q.   Okay.  Did anything happen after you noticed him?

2  A.   Yeah.  My dog ran over to try to get some -- get a treat.

3  Q.   Okay.  And what happened next?

4  A.   So, I mean, the person started becoming a little more

5  agitated by my dog, and I didn't want to agitate him further,

6  so I called my dog back over to me.

7  Q.   And what was he doing that made you think he was getting

8  more agitated?

9  A.   Pulling the chips away from the dog, spinning around more,

10  like his movements were becoming quicker and more erratic.

11  Q.   And what happened after you called Luna back to you?

12  A.   She came over, like a good girl, and I gave her some

13  praise, and I thought the situation was diffused.  At that

14  point I was distracted by someone running by, and I took my

15  eyes off of Luna.

16  Q.   And what happened then?

17  A.   So the gentleman we encountered had descended the hill a

18  little more as I was distracted.  Luna really wanted a treat so

19  she followed him as he was descending the hill.

20  Q.   Going back to this demonstrative that we used, can you

21  tell on the map is it counterclockwise or clockwise that he was

22  headed?

23  A.   Counterclockwise -- I'm sorry.  The opposite of that.

24  Clockwise.

25  Q.   Clockwise.  And he was heading clockwise, and Luna

1   followed him?

2   **A.**    Yes.

3   **Q.**    And where were you?

4   **A.**    So at that point, I was a little, I guess we'd say, north

5   of the benches where I initially encountered him.  This whole

6   encounter has that kind of clockwise movement there.  We are

7   all kind of constantly making some movement in that direction.

8   **Q.**    Okay.  What happened after Luna started to follow the man

9   in the red jacket?

10  **A.**    So things moved -- started moving pretty quickly then, but

11  he had -- he was descending the hill, you know.  As my head was

12  turned -- he must have been moving pretty quickly.  And Luna

13  was following him, and he ran down to some benches past that

14  grove of trees.

15  **Q.**    Okay.  And what happened then?

16  **A.**    He jumped up on one of the benches as I was -- you know, I

17  really -- I tried to be a very responsible dog owner.  I didn't

18  want my dog to bother this guy.  So, you know, I'm trying to

19  get her back to me as quickly as possible.  He jumped up on the

20  bench as I was -- as I was heading in that direction as quickly

21  as possible.

22  **Q.**    What were you doing to try to get your dog back?

23  **A.**    Heading in that direction and calling her name, using

24  my -- my verbal and hand cues to try to get her back to come to

25  me.

1   **Q.**   And was she coming to you?

2   **A.**   At that time, no.  No.  She was -- she was really

3   transfixed on the treats, so -- so it -- it took a little

4   while.

5   **Q.**   Okay.  And what happened next?

6   **A.**   The gentleman got up on the -- on the bench, and at this

7   point, he -- as I was trying to close the distance between us,

8   he turned to me and he lifted his shirt, and I wanted to be a

9   little more detailed than -- than the deposition in this

10  matter.

11          **MR. GRAY:**   I'm going to object, Your Honor.  We've

12  already established that we should stick to what we testified

13  to in the deposition for all witnesses.

14          **THE COURT:**   Overruled.

15      You have to answer the questions, Mr. Snow.  The jury

16  doesn't know what you said during your deposition so there has

17  got to be questions and answers here.

18          **THE WITNESS:**   Okay.

19      So I've read some accounts in the media where this gets a

20  little confused so I want to be extra clear.

21      He raised his shirt to reveal an object in his -- that

22  appeared to be in a holster in his waistband.  The manner in

23  which he raised it wasn't -- was in a threatening way, a

24  menacing way towards me.  He wanted me to know that he had an

25  object.  I felt like he knew it appeared to be a pistol.  It

1    looked like a pistol.

2         **THE COURT:**  Let's go on there and have a next

3    question.

4         **MR. GRAY:**  Judge, I'm going to move to strike that as

5    speculation, the last portion about what Mr. Nieto knew and

6    wanted to do.

7         **THE COURT:**  Overruled.

8         Let's have a next question.

9    **BY MS. BERS:**

10   **Q.**   What about his actions made you feel that way?

11   **A.**   He lifted his shirt.  I saw an object in a holster in his

12   waistband.  I thought it was the -- the grip of a pistol.  I

13   was incredibly frightened at that time.  I thought he had a

14   pistol and was threatening me with a pistol.

15   **Q.**   What did you do when you saw what you thought was the grip

16   of a pistol?

17   **A.**   I froze in my tracks.

18   **Q.**   Did you say anything to him?

19   **A.**   No.

20   **Q.**   Did he say anything to you?

21   **A.**   At that moment, no.

22   **Q.**   What happened next?

23   **A.**   He reached and he grabbed the object in the holster.  He

24   removed it from the holster, and he pointed it directly at me.

25   **Q.**   And at that time, what were you thinking?

1    **A.**    I'm going to get shot.  I'm going to die here right now.

2    **Q.**    What color was the object that this person was pointing at

3    you?

4    **A.**    To me it looked like a pistol.  It looked -- I thought it

5    must be a 9mm pistol or something.  All I could see was black,

6    especially when I just saw the grip or when I saw it straight

7    on, it -- it appeared to be just a black pistol.

8    **Q.**    And are you familiar with guns?

9    **A.**    Yes.  I'm a registered gun owner, and I -- I have been to

10    ranges before.

11    **Q.**    Were you afraid that you might die?

12    **A.**    Absolutely.

13    **Q.**    Then what happened?

14    **A.**    So after a brief moment of aiming it at me, he turned --

15    my dog was on -- he was facing me so my dog was on his right

16    side, my left side next to the bench.  He turned it to aim at

17    my dog.

18        At that moment, I thought, oh, shit, he's going to shoot

19    my dog.  After -- after a brief moment -- second -- like things

20    are happening so quickly.  After he turned, I could -- I could

21    see the object in profile, and -- and at that point I realized

22    it was, you know, not a pistol but a taser by the shape of the

23    muzzle.  Then I thought a taser could kill a dog so I felt a

24    brief moment of relief that it wasn't a pistol and I was out of

25    range of the -- of a taser but still nervous and very anxious

1    and afraid for my dog.

2    **Q.**    Okay.  Let's step back.

3        How far away were you when this transpired, when this

4    person pointed a gun at you?

5    **A.**    About 20 feet.  When he initially like got to the bench, I

6    was about 40 feet away, but I closed that gap pretty quickly

7    trying to get my dog back, and this encounter occurred about 20

8    feet apart.

9    **Q.**    And you hadn't moved between when he pointed the gun at

10    you and when he pointed it at your dog?

11    **A.**    I promise you when I thought somebody was pointing a gun

12    at me, I didn't come any closer.

13    **Q.**    Okay.  And what happened after this man pointed a gun at

14    your dog?

15    **A.**    I said, "Please don't shoot my dog.  She just wants a

16    treat."  I used a really strong and stern voice to call her

17    back.  I think after -- and, you know, my hand signals, and

18    after about two tries, she came back to me, and I put her on

19    the leash.

20    **Q.**    Okay.  And did Mr. Nieto or the person you later learned

21    to be Mr. Nieto say anything to you or your dog during this

22    encounter?

23    **A.**    Yeah.  After I -- you know, after she was on her way back

24    and I got her on the leash, I went now back -- ascended the

25    hill a little bit to go down the steps, and as I was -- and as

1    I was moving away and moving towards the steps, he was saying

2    things like, "Yeah.  Come on, motherfucker.  That's right,

3    bitch.  Fuck you."  That kind of stuff, that kind of language.

4    **Q.**    Okay.  And did you respond at all?

5    **A.**    No.

6    **Q.**    What was your immediate reaction after you heard those

7    things?

8    **A.**    I -- I was very upset.  I -- and my immediate reaction

9    was, you know, I went down the hill.  I wondered if I should

10    call 911 or if I should call -- I felt -- I felt out of danger,

11    I was out of range, and I was going back home so I felt out of

12    danger, and I opted to call non-emergency police.  I couldn't

13    get through to non-emergency police so after -- I don't think I

14    had my phone on me so I had to go home, and then I called

15    non-emergency police, and after about three times of not

16    getting through, I stopped trying.  I . . .

17    **Q.**    Okay.  And did you talk to anyone else about the incident?

18    **A.**    Yeah.  I -- I talked to my friend Noreen Lahey.  She also

19    is a dog owner who I met at Bernal Hill, and my recollection is

20    I texted her about it.

21    **Q.**    Okay.  And did you warn anyone about this man on the hill

22    with a taser?

23    **A.**    Yes.

24            **MR. GRAY:**  Objection.  Objection.  Leading.

25            **THE COURT:**  Sustained.

1    BY MS. BERS:

2    **Q.**   Did you do anything else after the incident?

3    **A.**   I mean, I -- I texted with Noreen.  I may have -- I'm not

4    sure.  I may have texted with my mom.  You know, I'm not going

5    to answer the question about warning, so I . . .

6    **Q.**   Now, you recognize that he was wearing a jacket and black

7    pants.  Do you remember anything else about Mr. Nieto's

8    clothing?

9    **A.**   Just flat-brim hat, windbreaker, you know, red coloring.

10   I don't really recall anything else.

11   **Q.**   Do you remember if he was wearing sunglasses?

12   **A.**   No.  No.  I don't recall.

13   **Q.**   Did you ever hear gunshots?

14   **A.**   No.

15   **Q.**   How did you learn about the incident involving Mr. Nieto

16   and the police?

17          **MR. GRAY:**  Objection.  Relevance, hearsay.

18          **THE COURT:**  Sustained.

19   BY MS. BERS:

20   **Q.**   Did you know that night that there had been an incident

21   between Mr. Nieto and the police?

22          **MR. GRAY:**  Objection.  Relevance.

23          **THE COURT:**  Sustained.

24   BY MS. BERS:

25   **Q.**   Did you hear any commands by anyone that night?

1    **A.**    No.

2    **Q.**    When Mr. Nieto pointed the gun at you, did you see any

3    wires falling out of the front of the gun?

4    **A.**    No.

5    **Q.**    Are you familiar with tasers at all?

6    **A.**    Yeah.  I've never used one, but I've researched them,

7    considering purchasing one.

8    **Q.**    Do you know what blast doors are?

9    **A.**    Yes.

10    **MR. GRAY:**  Objection.  Relevance.  Foundation.

11    **THE COURT:**  Overruled.

12    **BY MS. BERS:**

13    **Q.**    Did you see any blast doors on the taser gun when

14    Mr. Nieto pointed it at you?

15    **A.**    No.

16    **Q.**    Mr. Snow, do you want to be here today?

17    **A.**    That's a very difficult question to answer.  I really --

18    not particularly.  Given the situation, I feel like I'm doing

19    the right thing, but I really feel terrible about the outcome,

20    but -- but I think it's the right thing to do, to be here

21    today.

22    **MS. BERS:**  No further questions.

23    **THE COURT:**  Thank you.

24    Examination by the Nietos' counsel?

25    **MR. GRAY:**  Sure.  May I take this down, Your Honor?

1          **THE COURT:**  You may.

2                   **CROSS-EXAMINATION**

3    **BY MR. GRAY:**

4    **Q.**   Now, Mr. Snow, you testified on direct that it's common

5    for people to walk their dogs off leash at Bernal Hill park;

6    correct?

7    **A.**   Yes.

8    **Q.**   Now, it's also common for those dog owners to watch their

9    dogs; correct?

10   **A.**   Yes.

11   **Q.**   Now, your dog is a Siberian Husky; correct?

12   **A.**   Yes.

13   **Q.**   I would like to take you to Exhibit 23, Bates No. 4.

14         **MS. BERS:**  Objection.  I believe this exhibit was

15   withdrawn.

16         **THE COURT:**  One moment.  It was.

17         **MR. GRAY:**  Exhibit 19?

18         **MS. BERS:**  Objection, Your Honor.  I believe the

19   plaintiffs' counsel is showing something to the jury that

20   should not be seen.

21         **MR. GRAY:**  We haven't shown anything.

22         **THE COURT:**  I don't think the jury has seen anything.

23         **MR. GRAY:**  But it's actually a picture of his dog,

24   Your Honor.  Exhibit 19.  It's Exhibit 19, Attachment B-2,

25   Your Honor.

1      **THE COURT:**  I have it before me.

2          Are you going to be seeking to move it into evidence?

3          **MR. GRAY:**  Yes.

4          **THE COURT:**  Any objection to that photo?

5          **MS. BERS:**  Just that we thought it was withdrawn.  I

6    think it's actually the same photograph that was submitted as

7    the --

8          **THE COURT:**  Is there any objection to B-2?

9          **MS. BERS:**  Same objections as before.

10         **THE COURT:**  Overruled.

11         Exhibit B-2, the page B-2 of Exhibit 19 is admitted.

12

     (Trial Exhibit Page B-2 of Exhibit 19 received in evidence)

13

14   **BY MR. GRAY:**

15   **Q.**   So, Mr. Snow, this is your Siberian Husky in this photo;

16   is that correct?

17   **A.**   Yes.  This is Luna.

18   **Q.**   This is the dog that you let get away from you on

19   March 21, 2014; correct?

20   **A.**   No.  I wouldn't phrase it that way.

21   **Q.**   Well, let me ask you this.

22         Can we dim the lights, please, so the jurors can see this.

23         So this is your dog; correct?

24   **A.**   Yes.

25   **Q.**   This is a dog you had with you on March 21, 2014; correct?

1    **A.**    Yes.

2    **Q.**    Now, when you first noticed Mr. Nieto, you made a racist

3    prejudgment about him; correct?

4    **A.**    No.

5    **Q.**    You first -- when you first saw him, you presumed him to

6    be a gang member; correct?

7    **A.**    No.  That is incorrect.  Absolutely incorrect.

8                **MR. GRAY:**  Your Honor, I want to take --

9                **THE WITNESS:**  I believe in previous depositions I said

10    that he was dressed similarly to people that I had seen in

11    gangs, but I did not presume or assume he was in a gang, no.

12                **MR. GRAY:**  Your Honor, I would like to go to Exhibit

13    19, page 22, beginning at line 22, through 23, line 1.

14                **MS. BERS:**  I'm going to object, Your Honor.  For

15    completeness, this is not the entire answer, and I also don't

16    believe that this is proper impeachment.

17                **THE COURT:**  Where do you think the question and answer

18    should begin?

19                **MS. BERS:**  It should begin at 12.

20                **THE COURT:**  All right.  You may read from 22, line 11,

21    Mr. Gray.  22, line 11.  This is the September 24, 2015

22    deposition plaintiff Snow.

23    **BY MR. GRAY:**

24    **Q.**    And when you testified at your deposition, you were under

25    oath; correct?

1    **A.**    Yes.

2    **Q.**    You were being honest; correct?

3    **A.**    Yes.

4    **MS. BERS:**  Objection, Your Honor, to what they're

5    showing.  It's actually more than what was -- what was

6    indicated to be read.  It's the entire page of the deposition

7    transcript.  It's inappropriate to show the jury more than what

8    is being read to them.

9    **THE COURT:**  Read the impeachment.

10    **MR. GRAY:**  Sure.

11    "**Q.**  Great.  So were you walking back to the Esmeralda

12    stairs when you first saw Mr. Nieto?

13    "**A.**  Yes, I was walking in that direction.

14    "**Q.**  How did he first come to your attention?

15    "**A.**  I was walking in the direction of the Esmeralda

16    stairs between these two sets of benches, closer to the

17    benches that are on the Esmeralda side, when Mr. Nieto

18    walked up this little side trail area.  I'm pointing to

19    the map.  He walked up here carrying a bag of chips, at

20    which point I just noticed him.  Oftentimes I would see

21    people smoking weed and things on the Esmeralda corridor

22    who I would have imagined I might want to stay away from.

23    Given my experience at Berkeley High and the attire of

24    gang members, I made a quick judgment to put Alex --

25    Mr. Nieto in that category of people that I would not mess

1  around with based on his attire at the time."

2  **Q.**  So you made a quick prejudgment of Mr. Nieto; correct?

3  **A.**  Yes, but you classified that as racist, and assuming that

4  he was in a gang, which is completely false.  Your accusations

5  were untrue.

6  **Q.**  If you say so, sir.

7  Let's continue on.  Now, you testified on direct that you

8  were distracted by a runner; correct?

9  **A.**  Yes.  I was distracted by an attractive woman running by.

10  **Q.**  That's because you were staring at, in your words, her

11  butt; correct?

12  **MS. BERS:**  Objection.  Relevance.

13  **THE COURT:**  Overruled.

14  **BY MR. GRAY:**

15  **Q.**  Correct?

16  **A.**  Her back was to me, and I believe I used that term, yes.

17  **Q.**  In fact, when you testified at your deposition 18 months

18  later, you said one of the three things you remembered about

19  this incident was the jogger's butt; correct?

20  **A.**  One of the three things.  I was trying to add a little

21  humor to the situation.  I suppose that was inappropriate.

22  **Q.**  So you knew what you were there at the deposition for;

23  correct?

24  **MS. BERS:**  Objection.  Relevance.

25  **THE COURT:**  Overruled.

**BY MR. GRAY:**

**Q.**   Correct?

**A.**   Yes.

**Q.**   You knew a person had lost their life; correct?

      **MS. BERS:**  Objection.  Argumentative.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  Yes.  It was very tragic.  I'm sorry
about that.

**BY MR. GRAY:**

**Q.**   And you chose to make humor during this situation?

      **MS. BERS:**  Objection.  Argumentative.

      **THE COURT:**  Overruled.

**BY MR. GRAY:**

**Q.**   You chose to make humor during this situation?

**A.**   We all deal with tragedy different ways.

**Q.**   But you chose to make humor during a tragic situation;
correct?

      **MS. BERS:**  Objection.  Argumentative.  Asked and
answered.

      **THE COURT:**  Sustained.

**BY MR. GRAY:**

**Q.**   Now, when you first -- when your dog first approached
Mr. Nieto, Mr. Nieto started moving very quickly and rapidly
left to right trying to keep his chips away from your Siberian
Husky; correct?

1  **A.**    I'm sorry.  I didn't hear the question.

2  **Q.**    When your dog -- the first time he approached Mr. Nieto,

3  Mr. Nieto started moving very quickly and rapidly left to right

4  trying to keep his chips away from your Siberian Husky;

5  correct?

6            **MS. BERS:**  Objection.  Calls for speculation.

7            **THE COURT:**  Overruled.

8            **THE WITNESS:**  I -- I don't know what the question is.

9  Did I say that?  Is that the question?

10 **BY MR. GRAY:**

11 **Q.**    Is that what he was doing?

12 **A.**    Yes.  Yes.

13 **Q.**    You called your Siberian Husky back; correct?

14 **A.**    Yes.

15 **Q.**    Your dog, your Siberian Husky, came back; correct?

16 **A.**    Yes.

17 **Q.**    It was at this point you became distracted by the runner's

18 butt; correct?

19 **A.**    I was distracted by the runner, yes.

20 **Q.**    And you were focused on her butt; correct?

21 **A.**    No.

22 **Q.**    Well, correct me if I'm wrong.  During the deposition 18

23 months later, you said that was one of the things that stuck

24 out to you, was her butt; correct?

25            **MS. BERS:**  Objection.  Asked and answered.

1    **THE COURT:**  Sustained.  We've covered this, Mr. Gray.

2    Let's move on.

3    **BY MR. GRAY:**

4    **Q.**  So after you turn around from watching this woman's

5    butt --

6    **THE COURT:**  Mr. Gray, let's return to the stadium

7    here.

8    **BY MR. GRAY:**

9    **Q.**  -- Mr. Nieto runs and gets on a bench; correct?

10   **A.**  Yes.

11   **Q.**  And it's at this point that you're 40 feet away from

12   Mr. Nieto; correct?

13   **A.**  No.  At the time he was running in the bench area, I was

14   about 40 feet away.  You know, I was closing the gap as he got

15   on the bench.  So we'll say, yes, as he was getting on the

16   bench, I was about 40 feet away.

17   **Q.**  And your dog, your Siberian Husky, was barking or howling

18   at Mr. Nieto; correct?

19   **A.**  Well, Siberian Huskies --

20   **Q.**  Please answer the question.  Was your dog barking or

21   howling?

22   **A.**  It's difficult to answer because the sounds that a

23   Siberian Husky makes are hard to qualify.  She was vocalizing,

24   one would say, for a Siberian husky.  She was alerting me to

25   possible danger.

1           **MR. GRAY:**  Your Honor, we're back on his deposition,

2     page 28, line 15, through 29, line 2.

3           **MS. BERS:**  Objection.  This is improper impeachment.

4     It's the same thing he just said.

5           **THE COURT:**  You may proceed.

6           **MR. GRAY:**  (Reading):

7       **"Q.**  And then what happened?

8       **"A.**  Mr. Nieto ran down to -- I'm looking at Exhibit 3

9           now, and he ran down to these benches and jumped up on the

10          benches.  My dog followed him.  Huskies tend to be very

11          vocal, and Luna essentially, if they sense danger.  One of

12          the things that make dogs sense dangers are our gait and

13          postures, like Mr. Nieto had that evening, and unusual

14          behavior, like the way he was moving.  So she was at that

15          point vocalizing, barking or kind of howling to let me

16          know danger was there, you know, in his direction.  He was

17          on the bench.  I believe it was the top bench here.

18      **Q.**  Your Siberian husky was barking or howling; correct?"

19      **A.**  Well, it's difficult to put a term -- you have to use

20    words when you describe something.  Vocalizing really is the

21    most appropriate term.  I can imitate the sound if you'd like.

22      **Q.**  So your dog was following Mr. Nieto; correct?

23      **A.**  Yes.

24      **Q.**  And Mr. Nieto appeared to be trying to get away from your

25    dog; correct?

1    **A.**    Yes.

2    **Q.**    And at this point, you're not within range of your dog;

3    correct?

4    **A.**    No.   Incorrect.   I was in vocal range.

5    **Q.**    How about grabbing range?

6    **A.**    No.

7    **Q.**    So you couldn't grab your dog and tell him to come back;

8    correct?

9    **A.**    That is correct.

10   **Q.**    Now, when Mr. Nieto first got on the bench, he was not

11   gesturing or talking to your unleashed Siberian Husky; correct?

12   **A.**    That is correct.   Yeah.   He didn't seem -- he seemed more

13   interested in me than the dog.

14   **Q.**    And Mr. Nieto was facing over the back of the bench

15   towards you; correct?

16   **A.**    Yes.

17   **Q.**    Mr. Nieto first aimed the taser at your howling dog;

18   correct?

19   **A.**    No.   No.   I never said that.

20        **MR. GRAY:**  Your Honor, this is Exhibit 20.

21        **THE COURT:**  At?

22        **MR. GRAY:**  Page 4, lines 2 through 3.  I can read the

23   whole paragraph, if you'd like.

24        **MS. BERS:**  I'm sorry.  I'm not seeing where you are.

25        **THE COURT:**  I don't -- that does not line up to me.

1         **MS. BERS:**  I'm sorry, Your Honor.  I don't think that

2    this line --

3         **THE COURT:**  I already said that.

4    BY MR. GRAY:

5    **Q.**   Now, you realized that this object was a taser from 20

6    feet away in profile; correct?

7    **A.**   When I was able to see it in profile, yes.

8    **Q.**   From 20 feet away?

9    **A.**   Yeah.

10   **Q.**   Mr. Nieto never pulled its trigger; correct?

11   **A.**   I don't know.

12        **MR. GRAY:**  Your Honor, we're at his deposition, page

13   35, lines 21 through 23, Your Honor.

14        **THE WITNESS:**  I would say I have no recollection --

15        **THE COURT:**  One moment.  You may read in the

16   deposition.

17        **MR. GRAY:**  (Reading):

18       **"Q.**  As far as you could tell, did he ever actually pull

19       the trigger?

20       **"A.**  No."

21   **Q.**   He never pulled the trigger; correct?

22   **A.**   As far as I could tell.  I have no recollection of him

23   pulling the trigger, but I don't know for sure.

24   **Q.**   Your dog was never struck with the taser; correct?

25   **A.**   What I mean is I don't even know if the taser was working.

1    He may have pulled the trigger.  I don't know.  Nothing ever

2    shot out of the taser.

3    **Q.**    Your dog didn't act like he was struck; correct?

4    **A.**    No.

5    **Q.**    You never struck; correct?

6    **A.**    I don't recall the trigger being pulled, to the best of my

7    knowledge.

8    **Q.**    And this incident with Mr. Nieto happened before

9    7:00 p.m.; correct?

10   **A.**    Yeah.  You know, it must have been right -- I don't know

11   the exact time it occurred, to be honest.  I know when I called

12   non-emergency police because I looked at my phone records, but

13   there was some time -- a couple minute gaps in between the

14   incident and that call.

15           **MR. GRAY:**  Your Honor, I'm going to point the Court's

16   attention to page 26, line 25, through 27, line 14.

17           **MS. BERS:**  Of what?

18           **MR. GRAY:**  Of his deposition.  Page 26, line 25.

19           **THE COURT:**  You may.

20   **BY MR. GRAY:**

21   **Q.**    (Reading):

22        "**Q.**  You said you had a specific knowledge of the time

23        that this incident" -- strike that.

24           **THE COURT:**  Mr. gray, slow down and do it once.

25           **MR. GRAY:**  (Reading):

1  **"Q.**  You said you had a specific knowledge" --

2  I'll get it right.

3  **"Q.**  You said you had a specific knowledge of the time

4  that this occurred; is that right?

5  **"A.**  Yes.

6  **"Q.**  What time was that?"

7      **THE COURT:**  That was a question.

8      **MR. GRAY:**  Question.

9      (Reading):

10  **"A.**  It was right before 7:00 p.m.  You know, I mean, I

11  don't have specific knowledge of each moment we're here,

12  but I do recall that, number one, because of the position

13  of the sun but also because after this encounter, I called

14  emergency police."

15      **THE COURT:**  Back up.  I'll take over from there.

16      (Read by the Court):

17  **"Q.**  What time was that?

18  **"A.**  It was right before 7:00 p.m.  You know, I mean, I

19  don't have of specific knowledge of each moment we're

20  here, but I do recall that, number one, because of the

21  position of the sun but also because after this encounter,

22  I called non-emergency police.  I called non-emergency

23  police because I felt I was no longer in danger.  In

24  retrospect I should have called 911.  I called

25  non-emergency police as soon as I got back to my house,

1    and I recall the phone call going out at 7:05, 7:06 p.m.,

2    right if that zone."

3    Next question.

4  **BY MR. GRAY:**

5  **Q.**    So this incident happened before 7:00 p.m.; correct?

6  **A.**    Like I said, you know, I don't recall the exact times.

7  We're in and around the 7:00 zone, time zone.  I -- the only

8  thing I can specifically tell you is when my phone calls went

9  out and, you know, I can tell you an estimated span of time to

10  walk briskly from the stairs to my house, which leads me to

11  estimate in and around 7:00 p.m.

12  **Q.**    And you also know that the behavior your Siberian Husky

13  was exhibiting could be construed as aggressive by someone who

14  doesn't know Siberian Huskies; correct?

15  **A.**    Yes.  Yes.  I can -- I can imagine that to be the case.

16  **Q.**    Now, after this incident, you texted a lady named Noreen

17  Lahey; correct?

18  **A.**    Yes.

19  **Q.**    And you texted her that you wish you were in a state like

20  Florida so you would have been justified in shooting Mr. Nieto;

21  correct?

22  **A.**    You know, I had thought that my life was going to be taken

23  from me, and I may have said some things that day I might

24  regret, but I was extremely upset, I'll say traumatized by the

25  incident.  I thought I was going to die that night.  I was

1  upset at this guy.

2  **Q.**  You also referred to Mr. Nieto in a racial slur; correct?

3  **A.**  I don't know.  I can't recall.  I may have.  My

4  grandfather, Jose Portillo, used to use a lot of, you know,

5  slurs in -- in a -- in a kind of friendly, colloquial manner.

6  **Q.**  Oh, really?

7  **A.**  Yes.

8  **Q.**  You didn't see a laser on the taser; correct?

9  **A.**  No.

10  **Q.**  So there was no red dot pointing at you; correct?

11  **A.**  No.  I didn't see a laser.

12  **Q.**  No red dot pointing at your dog; correct?

13  **A.**  I did not see a laser.

14          **MR. GRAY:**  No more questions.

15          **THE COURT:**  Thank you.

16      Further examination from the defendants?

17              <u>**REDIRECT EXAMINATION**</u>

18  BY MS. BERS:

19  **Q.**  Now, Mr. Snow, you were asked about Mr. Nieto's erratic

20  movements as it relates to his chips.  Was he making erratic

21  movements other than pulling his chips away from your dog?

22          **MR. GRAY:**  Objection.  Leading.

23          **THE COURT:**  Sustained.

24  BY MS. BERS:

25  **Q.**  Can you clarify what you were referring to as Mr. Nieto's

1    erratic movements?

2            MR. GRAY:  Objection.  This exceeds the scope, and I

3    don't think he has asked for clarification.

4            THE COURT:  Overruled.

5            THE WITNESS:  He -- you know, what I've seen

6    associated with people moving erratically and something that my

7    dog can vocalize about are people with very tense demeanor and

8    I -- and like tight shoulders.  He had very tense and tight

9    shoulders, and he was, I was going to say, moving back and

10   forth, darting back and forth kind of quickly, turning around,

11   making very quick movements.

12   BY MS. BERS:

13   Q.   Was he doing that before Luna approached him?

14           MR. GRAY:  Objection.  Leading.

15           THE COURT:  Sustained.

16   BY MS. BERS:

17   Q.   When did you notice he was doing those things?

18   A.   As he ascended the hill, he -- and before Luna approached

19   him, I saw -- something seemed off with his -- with his posture

20   and gait, so even before we had any interaction.

21           MS. BERS:  Thank you.

22       I have no further questions.

23           THE COURT:  Mr. Gray, would you like to ask any

24   further questions?

25           MR. GRAY:  No further questions.

```
1          THE COURT:  All right.  We will take a 10-minute
2    recess now.  Ladies and Gentlemen, if you have any questions
3    for the witness, you may pose them during that break.
4          Mr. Snow, if you can hang around for ten more minutes, you
5    may step down.
6          (Proceedings were heard out of presence of the jury:)
7          THE COURT:  Who will the next witness be after
8    Mr. Snow?
9          MS. BAUMGARTNER:  Mr. Isgitt.
10         THE COURT:  All right.  Back in 10.
11                   (Recess taken at 10:12 a.m.)
12              (Proceedings resumed at 10:20 a.m.)
13         (Proceedings were heard out of presence of the jury:)
14         THE CLERK:  Please come to order.  Court is again in
15    session.
16         THE COURT:  You may be seated.  Back on the record.
17    Our jurors have no questions for Mr. Snow so he may be
18    excused from further examination.  We will bring in our jurors
19    and the defense will call its next witness.
20         (Proceedings were heard in the presence of the jury:)
21         THE COURT:  Everyone may be seated.  Mr. Snow has been
22    excused, and the defendants are to call their next witness,
23    please.
24         MS. BERS:  We call Timothy Isgitt.
25         THE COURT:  Good morning, Mr. Isgitt.  If you can come
```

1    forward here and watch your step as you go up the stairs.

2    **TIMOTHY ISGITT**, **DEFENDANTS WITNESS, SWORN**

3    **THE CLERK:**  Please be seated.  Please state your full

4    name for the record.

5    **THE WITNESS:**  Timothy Lane Isgitt.

6    **DIRECT EXAMINATION**

7    BY MS. BERS:

8    **Q.**   Mr. Isgitt, my name is Rebecca Bers.  I represent the

9    defendants in this case.  We've met before.

10    You haven't had -- haven't testified in court before, have

11    you?

12    **A.**   No.

13    **Q.**   It's just going to be like the deposition.  I will ask you

14    questions and you answer.

15    **A.**   Okay.

16    **Q.**   Now, I've put up the demonstrative that shows part of

17    Bernal Hill Park.  Are you familiar with that?

18    **A.**   Yes.

19    **Q.**   And back in 2014, did you have a habit of visiting Bernal

20    Heights Park?

21    **A.**   Yes.  We lived nearby and walked our dogs there a lot.

22    **Q.**   Okay.  And "we" was you and --

23    **A.**   My partner, Justin.

24    **Q.**   The jury has already heard from Justin.

25    **A.**   Okay.

1    **THE COURT:**  Mr. Isgitt, if you can pull the

2    microphone -- I know you're turning to look at the exhibit at

3    the same time -- to make sure the jury can hear you.  Thank you

4    very much.

5    **BY MS. BERS:**

6    **Q.**    How many dogs do you have?

7    **A.**    Two.

8    **Q.**    What type of dogs do you have?

9    **A.**    Old Bull Dog and an English Springer Spaniel.

10   **Q.**    Did you walk your dogs off leash in Bernal Hill?

11   **A.**    Yes.

12   **Q.**    Did you see other people walking their dogs off leash in

13   Bernal Hill?

14   **A.**    Yes, uh-huh.

15   **Q.**    You know that we're here talking about an incident that

16   occurred on March 21, 2014?

17   **A.**    Yeah.

18   **Q.**    Were you visiting the Hill on that day?

19   **A.**    Yes.

20   **Q.**    Okay.  When about did you arrive at the Hill?

21   **A.**    I don't remember exactly.  In the late afternoon after

22   work.  6:00 maybe, something like that.

23   **Q.**    And did you walk around the park at all before you had any

24   encounters?

25   **A.**    Yes.  We typically circled the Hill, and I think that day

1    we were going sort of clockwise.  We -- we parked off the

2    picture at the top there, but we were sort of going clockwise

3    around sort of the paved part of the Hill.

4    **Q.**   At some point did you encounter a person on the Hill

5    wearing a red jacket and black pants?

6    **A.**   Yes.

7    **Q.**   Is there any particular reason why you noticed that

8    person?

9    **A.**   I noticed the gun that was holstered on his -- on his hip.

10   **Q.**   Okay.  And where was this that you encountered him?

11   **A.**   I guess it's the west side of the Hill or the northwest

12   side of the Hill by the chain link fence that's there.

13   **Q.**   It is it visible on this map here?

14   **A.**   Can I look?

15   **Q.**   You can get up, yes.  If you are speaking, please speak

16   loudly.

17   **A.**   I think it's right here (indicating), yes.

18   **Q.**   Okay.  And what about him did you notice other than the

19   gun on his hip?

20   **A.**   He seemed to be anxious or nervous or talking to himself

21   or something like that, and he -- I noticed that he kept

22   touching his gun, like with his hand.

23   **Q.**   Okay.  And did you hear him --

24   **A.**   No.

25   **Q.**   -- say things to himself?

1    **A.**    No.

2    **Q.**    How did you think he was talking to himself?

3    **A.**    Just his body language, primarily.  He seemed to be sort

4    of moving around a lot as though maybe getting ready for a

5    speech or something like that.  I'm not suggesting that's what

6    he was doing but that sort of activity.

7    **Q.**    Okay.  And you indicated that he was touching his gun?

8    **A.**    Yes.

9    **Q.**    In what manner?  And you can demonstrate, if that's

10    helpful.

11    **A.**    He had his -- I think had his jacket sort of pulled up

12    over the top of it, and he kept sort of like just motioning

13    with his hand to the top of it, which I think was the sort of

14    main concerning factor for -- for us, for me and Justin.

15    **Q.**    And how did it make you feel?

16    **A.**    I guess uncomfortable.  It was an unusual sight, I would

17    say.

18        Was that helpful?  Sorry.

19    **Q.**    Yeah.  Yeah.  That's fine.

20        Are you familiar with guns at all?

21    **A.**    Sort of, yes.  I mean, I grew up in Texas, and everybody

22    has a gun in Texas, so, yeah.  Yeah.

23    **Q.**    Okay.  And did you have any idea what type of gun it was

24    that he had at his belt?

25    **A.**    No, no, I did not.

1  **Q.**    What did you do when you saw the gun?

2  **A.**    I think I had a conversation with Justin about whether we

3  should call 911.

4  **Q.**    Okay.

5  **A.**    That's all.  And we kept sort of -- we kept moving past

6  him down the road.

7  **Q.**    How close were you to him when you noticed the gun?

8  **A.**    I don't remember exactly, but it was -- it was some

9  distance, like maybe to the corner of the courtroom, perhaps,

10  that far away or maybe even further.  I don't remember.

11  **Q.**    Okay.  And were you afraid that he might hurt you?

12         **MR. GRAY:**  Objection.  Leading.

13         **THE COURT:**  Sustained.

14  **BY MS. BERS:**

15  **Q.**    Okay.  Were you afraid of anything at that point?

16         **MR. GRAY:**  Objection.  Leading.

17         **THE COURT:**  Sustained.  Try a question with a who,

18  what, when, where, a question in it.

19  **BY MS. BERS:**

20  **Q.**    When you saw the gun from that distance, what did you

21  feel?

22  **A.**    I felt like I needed to get my dogs on a leash and get

23  past him.

24  **Q.**    And -- and where were your dogs at that point?

25  **A.**    They -- so we walked them off leash, as do most people in

1  Bernal, and they were -- they don't go far.  They were close,

2  close enough to sort of reach down and leash them up, so . . .

3  **Q.**   And so what did you do at that point?

4  **A.**   I -- I don't remember entirely exactly the exact sequence

5  of events, but I'm sure that I got them on the leash and sort

6  of went on past him, and then we sort of ended up at the top

7  corner here of -- of the park.  There's a series of steps that

8  are going down there, and I was trying to get toward our car.

9  **Q.**   Okay.  And you can point on the map where you were when

10  you went down the stairs, if you can see it.

11  **A.**   Sure.  Right here (indicating).

12  **Q.**   Okay.  And you mentioned that you had a conversation with

13  Justin about calling 911.  What happened after you had that

14  conversation?

15  **A.**   He -- he called.  I don't remember every word that was

16  said in the conversation or even how long it took, but he

17  called and got on the phone, and we continued to move toward

18  those steps that I just pointed to.

19  **Q.**   Did you encounter anyone else as you were walking?

20  **A.**   Yes.  A man who was also walking his dog.  I think it was

21  just one dog.  I don't remember anything about him other than

22  he had a beard.  He came up to us, and he had passed Mr. Nieto

23  as well, and he said, "Did you see the guy with the gun?"  And

24  I said, "Yes.  Justin's on the phone with 911 right now."  And

25  then -- I'm sorry -- and then coming up the access road, so

1   from right to left, I believe there were two women that we saw

2   and stopped from making the turn there and suggested they go

3   back down the hill.

4   **Q.**   And why did you do that?

5   **A.**   Because we saw a guy with a gun or what we thought was a

6   gun.

7   **Q.**   Okay.  And did you relay that information to them?

8   **A.**   Yes.

9   **Q.**   Did Mr. Nieto ever say anything to you or Justin or your

10  dogs?

11  **A.**   No.

12  **Q.**   Did you ever make eye contact with him?

13  **A.**   No.

14  **Q.**   Did you hear gunshots?

15  **A.**   I did, yes.

16  **Q.**   And where were you when you heard gunshots?

17  **A.**   You can't see it on this map but to the north of the

18  steps, which is actually downhill significantly, but I was

19  headed back toward our car.  Justin was still near the stairs,

20  and we heard the -- we heard gunshots starting.  I thought

21  somebody was firing at us because I could hear -- maybe it was

22  tree branches breaking or something.  I thought that they were

23  hitting the side of the houses that we were standing next to.

24  **Q.**   And what did you do at that point?

25  **A.**   I ducked behind a -- not my car but another car that was

1    close by and -- and yelled at Justin to get down.

2    **Q.**    And what happened next?

3    **A.**    I don't exactly remember.  I remember Justin not getting

4    down and running down the hill, and then we both sort of like

5    crawled to our car and got in our car and drove north to where

6    there's a street that ends -- it might be Bonview Street, I

7    think -- to where it dead ends and then took a right.  And then

8    we drove to Folsom Street where we saw a cop -- a police

9    officer and stopped and were telling him the information that

10   we saw.

11   **Q.**    Did you hear anyone yell any commands?

12   **A.**    No.

13   **Q.**    Did you hear anyone yell "red"?

14   **A.**    No.

15   **Q.**    Did you hear anyone yell "covering"?

16   **A.**    No.

17   **Q.**    Give me just one moment.

18        Did you notice anything else about Mr. Nieto's clothing

19   when you saw him, other than the red jacket and the black

20   pants?

21            **MR. GRAY:**  Objection.  Leading.

22            **THE COURT:**  Sustained.

23   BY MS. BERS:

24   **Q.**    What did you notice about Mr. Nieto's closing, if

25   anything?

1    **MR. GRAY:** Objection. Asked and answered.

2    **THE COURT:** Overruled.

3    **THE WITNESS:** I remember that he was -- had black

4  pants and a red jacket. I think that's pretty much it. I

5  think he may have been wearing a hat. I don't recall today.

6  **BY MS. BERS:**

7  **Q.** Do you know if he was wearing sunglasses?

8  **A.** No. I don't know. Sorry.

9    **MS. BERS:** Thank you.

10    **THE COURT:** Examination by the Nieto's counsel?

11  <u>**CROSS-EXAMINATION**</u>

12  **BY MR. GRAY:**

13  **Q.** Good morning, Mr. Isgitt. How are you?

14  **A.** Good.

15  **Q.** You and I have met before; correct?

16  **A.** Yes.

17  **Q.** Are you a little nervous?

18  **A.** Yes.

19  **Q.** I am, too, so we'll get through this together. It will be

20  brief.

21    Now, Mr. Nieto never said anything to you?

22  **A.** No.

23  **Q.** He never said anything to your partner?

24  **A.** That's correct.

25  **Q.** He never pointed this object at you?

1  **A.**    That's correct.

2  **Q.**    He never pointed this object at your dogs?

3  **A.**    That's correct.

4  **Q.**    Now, you frequented Bernal Hill Park frequently at this

5  time; correct?

6  **A.**    Yes.

7  **Q.**    And you walked your dog off leash?

8  **A.**    Yes.

9  **Q.**    You also made sure to keep an eye on your dog; correct?

10  **A.**    That's correct.

11  **Q.**    So that it wouldn't get too far away from you?

12  **A.**    That's correct.

13  **Q.**    And you never heard Mr. Nieto yell anything on the day in

14  question; correct?

15  **A.**    That's correct.

16      **MR. GRAY:**  Thank you for coming.  No further

17  questions.

18      **THE COURT:**  Any examination further by the defendants?

19      **MS. BERS:**  Nothing.

20      **THE COURT:**  Mr. Isgitt, if you can hang on for five

21  minutes, we are going to take a brief recess.  If the jurors

22  have any question, they will write them down.  If not, we will

23  move on to our next evidence.  Thank you.

24              (Recess taken at 10:35 a.m.)

25              (Proceedings resumed at 10:40 a.m.)

1    (Proceedings were heard out of presence of the jury:)

2    **THE CLERK:**  Please come to order.  Court is again in

3    session.

4    **THE COURT:**  You may be seated.  We hear from our

5    jurors that they have no questions for Mr. Isgitt so he may be

6    excused.

7    What will be the next order of business for the

8    defendants?

9    **MS. BAUMGARTNER:**  I have about three questions to ask

10    of Sergeant Sawyer.  I'm going to recall him to just clarify

11    something, and then we will have Mr. Cameron this afternoon,

12    and that's it.

13    **THE COURT:**  Shall we plan for that period?  Is 1:00

14    when you said would be the best time?

15    **MS. BAUMGARTNER:**  We're hoping he will be here by 1:00

16    and he should be.  As he said, it sometimes takes a little

17    longer, depending on the traffic.  I have my people checking in

18    with him to make sure about when he leaves and when he gets

19    here, and hopefully there won't be a line.

20    **THE COURT:**  What I don't have is a way of

21    communicating with the jurors when they're not here.  If I send

22    them out for lunch, I don't want them to be not knowing when to

23    come back.

24    **MS. BAUMGARTNER:**  I think that it would be more

25    prudent to have them come back at 1:30, Your Honor, if that's

1    okay because we know he will be here by then.

2             THE COURT:  All right.

3        Next question:  Are you going to be ready in between 11:00

4    and 1:00 to present your Rule 50 motion and to discuss the

5    verdict form and final jury instructions?

6             MS. BAUMGARTNER:  I am, Your Honor.

7             THE COURT:  Will the plaintiffs be ready?

8             MR. POINTER:  We will, Your Honor.

9             THE COURT:  Do you want to do that before lunch or

10   after lunch?

11            MR. POINTER:  I'm flexible, Your Honor.

12            MS. BAUMGARTNER:  I think it would make sense to do it

13   before lunch.

14            THE COURT:  I think it would, too.

15       Here is my plan, subject to further input from you,

16   Mr. Pointer, would be to have Sergeant -- Lieutenant Sawyer

17   testify further.  We will excuse the jurors until 1:30.  We

18   will take a few minute break, come and take the Rule 50 motion,

19   discuss the verdict form and jury questions, and hoping we can

20   have a lunch break when we conclude that process and pick up

21   with the testimony of Mr. Cameron at 1:30.  Does that work?

22            MS. BAUMGARTNER:  Yes.

23            THE COURT:  Mr. Pointer?

24            MR. POINTER:  Yes.  I was going to ask for an offer of

25   proof as to what Lieutenant Sawyer is getting back on the stand

1    to say since they did his direct.

2         **THE COURT:**  We don't need an offer of proof.  It's

3    their case so we'll find out in a second what he says.

4         How much testimony do you expect from Mr. Cameron?  How

5    long will that go?

6         **MS. BAUMGARTNER:**  I imagine about 45 minutes from us.

7         **THE COURT:**  And from the Nietos?

8         **MR. POINTER:**  Three hours.

9         Maybe about 15, 20 minutes, Your Honor.

10        **THE COURT:**  All right.  That means we could be in a

11   position for closing arguments starting today but probably not

12   all of them.  So my expectation is we probably won't do that

13   because I want to give you a chance to prepare for them.

14        **MR. POINTER:**  Appreciate that.

15        **THE COURT:**  Also I don't want to bifurcate them and

16   have one party go or be cut off in the middle.  If that all

17   goes according to plan, we will resume tomorrow at 9:00 with

18   the final instructions and the closing arguments.

19        That's one thing I did want to communicate.  I will

20   give -- once we have agreed upon the final instructions, I will

21   give the instructions before your closing arguments so I'll

22   lead into you and you will do the arguments and then the

23   deliberations will begin.

24        All right.  Good plan.  We will bring our jurors back in

25   and call our next witness.

1     **MS. BAUMGARTNER:**  Thank you, Your Honor.

2     (Proceedings were heard in the presence of the jury:)

3     **THE COURT:**  Mr. Isgitt has been excused.  If the

4     defendants will call their next witness.

5     **MS. BAUMGARTNER:**  Your Honor, I would like to recall

6     to the stand Lieutenant Jason Sawyer.

7     **THE COURT:**  You may.

8     **JASON SAWYER**,

9     called as a witness for the Defendants, having been previously

10     duly sworn, testified further as follows:

11     **THE COURT:**  Lieutenant Sawyer, you remain under oath

12     from your prior testimony.

13     **THE WITNESS:**  Yes, sir.  I understand.

14     **DIRECT EXAMINATION**

15     BY MS. BAUMGARTNER:

16     **Q.**   Lieutenant Sawyer, I just wanted to clarify one extremely

17     minor point.

18     You were here when Mark Prioa testified; right?

19     **A.**   Yes, I was.

20     **Q.**   Did you hear his testimony about the device that you had

21     on your handgun?

22     **A.**   Yes, I do.

23     **Q.**   Do you remember that he said something about the gun

24     being -- having a laser?

25     **A.**   Yes.  I believe he referred to the attachment as a light

1    laser.

2    **Q.**   Can you explain again what that device was in terms of a

3    laser?

4    **A.**   Yes.  The device that was attached to the bottom of my

5    pistol is a flashlight only.  It does have the capability of

6    using a laser.  Our police range has disabled that function.

7    It has never, since it's been issued to me, been able to become

8    a laser, and in order to be put back as a laser, the range, our

9    police range, would have to re-enable that function.

10   **Q.**   Do you have the capability of enabling that function?

11   **A.**   No.  I don't know how that even works.

12          **MS. BAUMGARTNER:**  No further questions, Your Honor.

13          **THE COURT:**  Thank you.

14       Any cross-examination by the Nietos' counsel?

15                     <u>**CROSS-EXAMINATION**</u>

16   **BY MR. POINTER:**

17   **Q.**   So Lieutenant Sawyer, you disagree with Mr. Prioa;

18   correct?

19          **MS. BAUMGARTNER:**  Objection, Your Honor.  Argumentive.

20          **THE COURT:**  Overruled.

21          **THE WITNESS:**  That actually requires a little bit of

22   explanation.

23       I don't disagree in the sense that when he referred to it

24   as a light laser, if you were to purchase that product out of

25   the box, I can see how it can be functional as a light and/or a

1    laser, but in my case to be specific, the laser has been

2    disabled, and I don't have the ability to turn it on.

3    **BY MR. POINTER:**

4    **Q.**    You also heard his testimony where he said he actually

5    tested your gun and this laser and said that it was operational

6    is that; correct?

7                **MS. BAUMGARTNER:**  Objection, Your Honor.  That

8    actually mischaracterizes the testimony and is compound.

9                **THE COURT:**  Sustained.

10               **MR. POINTER:**  No further questions.

11               **THE COURT:**  Thank you.

12       The jury may think I'm making you go in and out

13   frequently, but I'm going to give you a chance for some further

14   questions and let you know we are on schedule in the case, and

15   I will give you an update when you return as to what is going

16   to occur next.

17       We will be in recess for just a few minutes.

18                    (Recess taken at 10:46 a.m.)

19                (Proceedings resumed at 10:50 a.m.)

20    (Proceedings were heard out of presence of the jury:)

21               **THE COURT:**  Everybody may be seated.  There are no

22   further questions from the jury for Lieutenant Sawyer.

23       Outside the presence of the jury, are there any other

24   exhibits that you seek to move in, stipulations of fact, any

25   other things, or are you going to rest?

1           **MS. BAUMGARTNER:** Well, after Mr. Cameron.

2           **THE COURT:** After Mr. Cameron --

3           **MS. BAUMGARTNER:** We will rest.

4           **THE COURT:** But no other evidence to present before

5      Mr. Cameron?

6           **MS. BAUMGARTNER:** Correct.

7           **THE COURT:** All right. Let's bring our jury back in.

8           (Proceedings were heard in the presence of the jury:)

9           **THE COURT:** Everyone may be seated. There are no

10     further questions for Lieutenant Sawyer.

11          Ladies and Gentlemen, as I mentioned, we are on

12     schedule -- a little bit of ahead of what I expected the

13     schedule to be. We only have one witness expected to remain

14     with testimony in the case. That will be this afternoon, Don

15     Cameron, who is one of the defendants' experts proffered who

16     will be here at 1:30.

17          After that, I expect to instruct you on the law of the

18     case, and I expect we will leave a little bit early today and

19     then return tomorrow at 9:00 a.m. for the closing arguments.

20     And then after the closing arguments, the case will be

21     presented to you for your deliberations.

22          We are going to have a little extra-long lunch break now.

23     I also have some legal issues to talk about with the lawyers in

24     preparation for the closing arguments and instructions, so we

25     will be doing some work here in the courtroom, but I'm going to

1    release you now to return at 1:30 p.m. for further examination

2    of the last witness.

3        So I hope that's not an inconvenience to give you an

4    extra-long period of time.  It was not by my design, but

5    sometimes there is some imprecision in knowing how long

6    witnesses might go, and so that's what has caused that.

7        We will see you at 1:30.  Thank you very much.

8        (Proceedings were heard out of presence of the jury:)

9        **THE COURT:**  Is there a motion from the defense?

10        **MS. BAUMGARTNER:**  Yes, there is, Your Honor.  I would

11    like to make a motion under Rule 50.

12        **THE COURT:**  Let me tell the audience what Rule 50 is

13    so they know what that means.

14        Under Rule 50 of the Federal Rules of Civil Procedure,

15    once a party has been fully heard on an issue during a jury

16    trial and the Court finds that a reasonable jury would not have

17    a legally-sufficient evidentiary basis to find for the party on

18    that issue, the Court may resolve the issue against the party

19    and grant a motion for judgment as a matter of law against the

20    party on a claim or defense that, under the controlling law,

21    can be maintained or defeated only with a favorable finding on

22    that issue.

23        The motion under Rule 50 may be made at any time before

24    the case is submitted to the jury, and the case has not been

25    submitted to the jury yet so now is an appropriate time.  The

1    motion must specify the judgment sought and the law and the

2    facts that entitle the movement to the judgment.

3        So now is the -- is an appropriate time for the defendants

4    to make a motion under Rule 50, specifying both the judgment

5    sought and the law and facts that support the motion.

6            MS. BAUMGARTNER:   Thank you, Your Honor.

7        First I'll start with the Fourteenth Amendment claim in

8    this particular matter.  As Your Honor knows, the law states

9    that in order to prevail on this claim, not only does the

10   plaintiff have to prove that the officers acted unreasonably,

11   used excessive force in violation of the Fourth Amendment, they

12   also have to prove that there was an intent to cause harm

13   unrelated to a legitimate law enforcement purpose.

14       We have two different items of testimony regarding what

15   happened at this particular scene.  All four officers testified

16   that they used force in this particular case because they

17   feared for their lives and they believed that they were in

18   imminent danger of death or great bodily injury.  The only

19   testimony that would suggest that that is not true is

20   Mr. Theodore.

21       Mr. Theodore is an inherently unreliable and not credible

22   witness.  He admitted to that himself on the stand.  He says

23   that he doesn't remember a lot of things, that he is, in fact,

24   an alcoholic.

25       During his testimony, he was impeached repeatedly with his

1    prior deposition testimony where he was just as adamant about

2    some information on one day and just as adamant that it was

3    false on the other.

4        And I don't think that any reasonable jury could give

5    credibility to his statement that from the place that he put

6    himself on the map where the witness is on the map to where

7    Mr. Nieto was that he could see whether or not he had his hands

8    in his pockets.

9        I will also submit that given Mr. Fries' testimony about

10   what position Mr.-- what position the shooters would have to be

11   in from where Mr. Nieto was standing with his hands in his

12   pockets, that that is not physically possible.  It's certainly

13   not possible based on any of the evidence that is available in

14   this particular case.

15       That given those two things, the fact that Mr. Theodore

16   himself stated that he has problems with his memory and is an

17   alcoholic and the combination of that with the testimony of

18   Mr. Fries would not allow a reasonable jury to decide that

19   Mr. Nieto had his hands in his pockets.

20       The only alternative testimony, of course, is that of the

21   officers who said that he pulled out a gun and pointed it at

22   them.

23       For purposes of the Fourteenth Amendment claim, we don't

24   even have to decide whether training or the officers' use of

25   lethal force in that particular situation could have been,

1    although I don't believe that it was -- could have been

2    instigated by their failure of tactics, which is what Mr. Clark

3    suggested.  Mr. Clark even said that if somebody believes --

4    reasonably believes that they are in danger of imminent bodily

5    harm, that they have the authority to use lethal force.

6        So I believe that given the testimony that's in this case,

7    that no reasonable jury could find on the Fourteenth Amendment

8    claim with the intent issue of the intent to cause harm outside

9    of a legitimate law enforcement purpose.

10       Similar argument applies to the Fourth Amendment claim.

11   Mr. Nieto -- again, I don't believe that there is any credible

12   testimony that Mr. Nieto was doing anything other than pointing

13   a gun at the officers.  Interestingly enough, Mr. Clark didn't

14   have any testimony about the ceasing of firing, for example.

15   There is no expert testimony about when these officers should

16   have stopped firing or anything like that.  They have all

17   testified about their training.  They've testified about why

18   they stopped firing, and there is no reason to believe that --

19   or there is no evidence upon which the jury could determine on

20   this record that the officers fired too many shots, I believe

21   is really what the argument is there with respect to them.

22       **THE COURT:**  What about the testimony from Mr. Theodore

23   about the sequence of the shots that he heard and the evidence

24   on the audio recording that has shots and even the officer

25   testimony about the sequencing of shots?  Viewed in the light

1    most favorable to the plaintiffs, could that suggest and raise

2    a question of whether there were -- was a period of

3    deliberation during the second -- before, not during -- before

4    the second phase of firing?

5         MS. BAUMGARTNER:  Well, certainly it is consistent

6    with what the officers said about Mr. Nieto going to the

7    ground.  That -- one of the officers testified that he had to

8    reload, and during that period of time, he, of course, was not

9    firing.

10        It's unclear about what the actual sequence of shots was

11   here.  It does make sense that the officers could reassess.

12   They've all testified that what they saw after Mr. Nieto went

13   to the ground was him again raise his head and point the gun at

14   them.  There is -- it makes sense that they might -- that there

15   would be less sound going on.

16        I also think that Mr. Theodore's -- and all of the

17   testimony about the sequence of shots is uncertain as to time

18   and -- in terms of this extremely short period of time,

19   obviously, and also what the sounds actually were.

20        We do hear some gunshot sounds on the radio recordings.

21        THE COURT:  Radio recordings.  That's what I'm

22   referring to.

23        MS. BAUMGARTNER:  Yes.  But we don't know whether

24   those -- except for when Sergeant Sawyer had keyed his mic and

25   was very close to them, we don't know what those sounds are as

1    to whether they are in fact echos, which one of the witnesses

2    indicated they might be, or whether they are actually direct

3    gunfire sounds.  We do know sound reverberates.  The recordings

4    obviously are not picking up a lot of information.  For

5    example, you can hear on the radio recordings somebody yelling

6    in the background at one point, but you can't really tell what

7    they're saying, things like that.  It's very difficult to

8    determine the actual sequence of shots and whether all of these

9    people heard the same thing, why the pauses occurred or

10    anything of that nature.

11        Again, these four officers all testified that the reason

12    that they continued shooting was because they continued to

13    perceive danger.

14        So the -- that, I believe, addresses the reasonableness of

15    the -- under the Fourth Amendment, that no reasonable jury

16    could believe Mr. Theodore's account that he had his hands in

17    his pockets.

18        Then we have the negligence claim.  I don't think that

19    anything that --

20        **THE COURT:**  Just to back up on the Fourth Amendment

21    claim, one aspect of Mr. Clark's testimony was about the --

22    his -- part of his analysis was that the officers should not

23    have -- should not have advanced in the way that they did

24    towards Mr. Nieto and should have made a perimeter or a

25    containment and that that was a -- a failure that could, in his

1    opinion, arise to a constitutional violation.  That would be

2    the argument that the plaintiffs will make from that testimony.

3         What is your analysis of the timing and sequence of the

4    approach before the shooting began as to whether that might be

5    any part of a constitutional claim?

6         **MS. BAUMGARTNER:**  So it is -- I don't believe that

7    that's any part of a constitutional analysis.  The

8    constitutional cases, I -- I can't think of them off the top of

9    my head -- do talk about how that portion of the tactics are

10   not actually part -- well, they're part of the Fourth Amendment

11   analysis, but they're not a separate part.

12        So the constitutional cases say that that's just part of

13   the entire analysis of whether it was reasonable or not.  And

14   there's no indication, given the particular scenario that

15   existed here, that these officers sort of forced Mr. Nieto into

16   this particular situation.  He had a clear road.  They were far

17   enough away that they weren't about to leap on top of him.  He

18   could have turned around and left.  There was -- they didn't

19   instigate this.  It was Mr. Nieto who did.  So no matter what

20   their tactics were beforehand, what they were faced with was

21   all of a sudden a man pulling a gun on them and aiming it at

22   them.

23        So in this case it's not the tactics that sort of

24   instigated this.  There is no causation there with respect to

25   this particular incident.  It's not like a hostage situation or

1    somebody who has been surrounded or anything like that.  It's

2    very different from those kind of cases.

3         We will also have the testimony of Mr. Cameron --

4         **THE COURT:**  That's to come.  On Rule 50, it's not

5    Mr. Cameron's testimony; it's what was the plaintiffs' case and

6    does it get them over the bar.

7         **MS. BAUMGARTNER:**  These officers also testified about

8    when it is that they create a containment in a perimeter, and

9    it's when they have a known objective, and they did testify to

10   that, and nobody testified differently.

11        They said that Mr.-- they didn't know yet whether they had

12   a known objective.  They didn't know why Mr. Nieto was carrying

13   a gun.  It could have been for some kind of legitimate reason.

14   They testified that this is not a situation in which they are

15   trained or that they believe a containment or perimeter is

16   appropriate.

17        I would also state that there is no time to do that in

18   this particular situation.  There's -- the terrain that existed

19   at the time didn't allow them to surround him at all.

20   There's -- they were not able to get up the road behind

21   Mr. Nieto, which Officer Schiff testified that he would have

22   preferred to have done because of being at the higher ground.

23   That was not -- it was simply not physically possible in this

24   particular situation before their encounter with Mr. Nieto.

25        **THE COURT:**  All right.  I interrupted you.  You were

1    moving on to the negligence count.

2         **MS. BAUMGARTNER:**  Right.

3         So I wanted to point out that for the Fourteenth Amendment

4    and the Fourth Amendment claim, there is not just the

5    underlying constitutional claim; there is also the issue of

6    qualified immunity.

7         **THE COURT:**  Yes.

8         **MS. BAUMGARTNER:**  And I believe the same facts support

9    qualified immunity, and I didn't want to neglect to point that

10   out.

11        With respect to the negligence claim, I think it's

12   essentially the same facts.  I know we will be discussing at

13   some point sort of how that works with the jury instructions

14   and the verdict form, but I don't believe that there is any

15   suggestion here that these officers acted unreasonably.  I

16   believe that the only testimony about that was that Mr. Clark

17   said that they should have parked down at the park gate.

18        Again, I don't believe that their failure to try and

19   encounter Mr. Nieto from the approximation of the park gate is

20   what caused any of this to happen.  That Mr. Nieto, in fact,

21   had sufficient room to react to them appropriately.  They

22   didn't immediately jump on top of them; again, those kind of

23   situations.  I don't think anything they did with respect to

24   that is unreasonable.

25        I also believe that under Penal Code Section 835(a), the

1    same standard with reasonableness would apply, and for the same

2    reasons that the officers should not be liable under the Fourth

3    Amendment, they would not be liable for negligence.

4        I also wanted to point out the punitive damages issue.

5    There are -- as you know, the standard is, I believe -- I

6    forget the phrase.  It changes from state to federal court.

7    Malicious, oppressive, and with reckless disregard.  There is

8    nothing here that would suggest to -- there is no testimony

9    upon which a reasonable jury could determine that these

10   officers acted maliciously or oppressively or with reckless

11   disregard.  They were out there doing their job the best

12   possible way they could, and they approached a man that they

13   knew nothing of.  They didn't -- they -- again, that there was

14   nothing about their actions that would suggest any kind of

15   malicious, oppressive intent, or that they were reckless in

16   this particular case.

17       So I believe we should obtain judgment on the punitive

18   damages claim in this particular case prior to the case going

19   to the jury.

20           **THE COURT:**  Thank you.

21       Mr. Pointer.

22           **MR. POINTER:**  Yes.

23       As the Court very well knows, the standard is very high as

24   it relates to a Rule 50 motion because credibility, inferences,

25   and fact-finding are the province of the jury and not the

1      Court.  That is according to *Costa vs. Desert Palace*, which is

2      a Ninth Circuit case of 2002.

3          What the defendants are essentially asking the Court to do

4      is take the case away from the jury.  Many of the things -- in

5      fact, all of the things, I submit, that the defense is

6      stylizing as being uncontroverted, uncontested or admissions

7      are things that we definitely see from the record are all in

8      contention.  There are opposite views and opposite inferences

9      that should be drawn at this stage in a Rule 50 motion on

10     behalf of the non-moving party, which is the plaintiffs in this

11     matter.

12         As it relates to the totality of the circumstances,

13     looking at the Fourth Amendment under *Graham*, one of the

14     factors for the Court to consider is alternate methods of

15     subduing the person, and so that goes to some of the testimony

16     that Mr. Clark talked about.  It also goes to essentially the

17     thrust of what these officers claim they did or did not do by

18     the course of responding to this particular call for service.

19         I would also note that there is more than just

20     Mr. Theodore, although he is one of -- is the only percipient

21     witness, not-interested-witness at that, that actually saw the

22     particular incident.  Although defendants once again want to

23     stylize Mr. Theodore as impeaching himself and/or backing away

24     from his testimony, all that impeachment went to whether or not

25     he met with an investigator a year and a half after the

1    incident as opposed to impeaching him or having him back up

2    from the -- from the observations in which he claims he

3    testified at his deposition as well as here that he had.

4         And so, once again, I think that's more of a

5    mischaracterization of the record, but that's something for the

6    jury to decide what they remember and what they recollect as

7    opposed for it to be taken out of the jury's hands.

8         I note that in terms of evaluating this case, Mr. Nieto,

9    from our position -- and we think the evidence shows or at

10   least there has been testimony -- had his hands in his pocket

11   and at the very least did not point any object at the officers.

12   With that being said, a simple statement by an officer that he

13   fears for his life is not enough.  It must be objective factors

14   to justify concern that an objectively reasonable -- that are

15   objectively reasonable with contemporaneous knowledge of the

16   fact, and that's under *Deorle vs. Rutherford*.

17        So if you have here, which we think there are in this case

18   where we have some, a witness saying he was not holding an

19   object, you have officers who are claiming that this particular

20   object is doing a number of things that their own -- that the

21   expert that they retained or the expert that was consulted by

22   the defendants in this case to examine that object says does

23   not behave in that particular way would not exhibit the type of

24   characteristics that they testified to under oath as it doing,

25   then that also sets up a conflict and a contradiction within

1    the record.  That is for the jury to decide whether or not --

2    who they believe and/or how this took place.

3         And with all that being said, the -- this matter should

4    not be taken out of the hands of the jury.  It should remain in

5    the hands of the jury because it's once again for them to

6    decide these material factual disputes.

7         I would also note that as it relates to punitive damages,

8    by here the very conduct, if the jury were to believe that the

9    officers behaved in the way that they did, which is abusing

10   and/or taking advantage of their positions as police officers

11   or their status as police officers to engage in conduct that

12   violated somebody's rights, that in and of itself could be and

13   it has been recognized to be the definition of punitive

14   damage-type actions being oppressive and/or malicious.

15        And with that -- on top of the fact, if you want to talk

16   about recklessness, 59 shots in a public park, that, too, is

17   something for a jury to consider as it relates in the idea of

18   recklessness.

19             **THE COURT:**  What is the record establishing that there

20   were 59 shots fired?

21             **MR. POINTER:**  Well, we have Officer Cagney, who was --

22   I'm sorry -- Inspector Cagney who was the lead homicide

23   detective who says that based upon his understanding of being

24   the lead homicide investigator in this particular case, that 59

25   shots were fired by these officers.  He sat right here on the

1    stand and said that.

2        So I think that's ample record because he is the person

3    out of anybody here -- the officers say they didn't count their

4    shots.  They can't contradict what he did.  Mr. Prioa, who came

5    in here, was never able to give any clear, competent testimony

6    as to how many bullets came from any of these officers' guns,

7    but you have the lead homicide inspector who claims that he

8    presided over the case, directed people to investigate things,

9    follow up on leads, and that it was his task to determine the

10   amount and type of force that was used during the course of

11   this incident -- he himself sat here on the record and said

12   there was 59 shots fired during the course of this incident.

13       **THE COURT:**  All right.  Anything further from the

14   defendants?

15       **MS. BAUMGARTNER:**  Yes.

16       I believe under *Graham vs. Connor* -- well, I know under

17   *Graham vs. Connor*, neither this jury nor the Court is supposed

18   to second guess a split-second decision that these officers had

19   to make.

20       All of the testimony is that they, in fact, had to make

21   that split second decision.  That we are not entitled, as

22   Your Honor knows, to look at this with the 20/20 vision of

23   hindsight.

24       In determining whether these officers used reasonable

25   force, the fact that this was a taser as opposed to a firearm

1    should not be taken into account.

2        And as I said, even Mr. Clark said that if somebody has a

3    gun pointed at them, that they think they are firing at them,

4    they get to fire back.

5        So I believe there is, in fact, objective reasons to

6    believe any reasonable officer at the scene, not just these

7    four officers, would believe that their lives were in danger

8    and that they were entitled to use lethal force.

9        I would once again object about the testimony that

10   Mr. Chiles was consulted by defendants.  He was, in fact,

11   consulted by the District Attorney, not us.

12       And lastly, what Mr. Cagney said or Inspector Cagney said

13   was in response to a very specific question, "have you heard,"

14   he said "yes," and that's all there was to it.  He could have

15   heard that in the newspaper, he could have heard that from

16   reading the accounts of this particular trial.  There is no

17   basis for any argument that in fact there were in fact 59 shots

18   fired in this particular case.

19       In fact, the testimony is that there were 48 casings that

20   were found at the scene but no testimony about how many shots

21   were actually fired by these officers.

22       **THE COURT:**  All right.

23       Anything further from you, Mr. Pointer?

24       **MR. POINTER:**  I just note that under *Harris vs.*

25   *Roderick*, which is a Ninth Circuit case, 1997, "law enforcement

1    may not kill suspects who do not pose an imminent threat to

2    their safety or the safety of others simply because they are

3    armed."  And we're not conceding or admitting that Mr. Nieto

4    pointed anything at these officers nor do we have -- and so

5    with that being said, we don't --

6              THE COURT:  Your argument is not that you have

7    conceded that.  You've made the argument that Mr. Theodore

8    testified to something different than that, and you're not

9    conceding it, and at this point in the proceedings, I have to

10   view the evidence in the light most favorable to the non-moving

11   party, which is to the plaintiffs, in making that

12   determination.

13        Now, if this case goes to the jury, the jury does not have

14   to view the evidence in the light most favorable to anybody.

15   They consider all the evidence in its totality in rendering a

16   verdict.

17        At this point in the proceedings, I have to give all the

18   inferences to the plaintiffs as to that and as to what

19   Mr. Theodore said.  So even if there was impeachment -- and

20   there was of Mr. Theodore -- I can't discredit and I don't hear

21   the defendants aren't saying that -- that the plaintiffs have

22   conceded that Mr. Theodore didn't see what he testified to.

23        All right.  My ruling on the motion is going to defer the

24   motion until after trial, which is one of the options under

25   Rule 50, and to allow the further evidence to be presented and

1    for the jury to deliberate and render a verdict on the

2    information that's been presented.  And I may invite further

3    briefing after the trial, as well as an opportunity for a

4    renewed motion after trial.

5        Thank you very much.

6            **MR. POINTER:**  Thank you.

7        **THE COURT:**  You would like five minutes?  Let's take

8    five minutes and come back and talk about the verdict form and

9    jury instructions.

10                    (Recess taken at 11:16 a.m.)

11                (Proceedings resumed at 11:26 a.m.)

12        **THE CLERK:**  Please come to order.  Court is again in

13   session.

14        **THE COURT:**  All right.  Everyone may be seated.  I

15   thought of two other issues before we talk about the jury

16   instructions or verdict form.  There's a tie-in to them.

17        There was an agreement in the pretrial filings that the

18   burial expense records and costs were going to be admitted, but

19   the plaintiffs did not move them into evidence during your case

20   in chief.  Where that ties into the jury instructions and

21   verdict form is whether there is nominal damages or whether

22   there are economic damages of any type.  There was a motion in

23   limine as to any economic damages other than the burial

24   expenses, but there has been no record in the case about burial

25   expenses.

1      So my question is, is that a measure of damages the

2  plaintiffs wish to present to the jury and on what evidence,

3  and if not, should we strike that from the instructions?  What

4  is your intention?

5      **MR. POINTER:**  It appears based upon the state of

6  evidence that that should be struck.

7      **THE COURT:**  Do you then wish to seek a measure of

8  nominal damages in the case?  My instinct was that that would

9  not appropriate in the case because there are very real

10  damages, and especially if they were burial expenses, that was

11  an economic measure of damages that would be in the record, but

12  now that it's not in the record, what is your intention?

13      **MR. POINTER:**  Yes, Your Honor.

14      We actually have the same view.  I think in our initial

15  jury instructions, we didn't even submit nominal damages, and

16  I'm not asking them to be included either.

17      **THE COURT:**  All right.  So I will then excise -- and I

18  did take out the nominal damages from the proposed

19  instructions, but I wanted to kind of have a record as to why I

20  was doing that, and the reason why I did it was, one, in

21  partial expectation that there was going to be evidence about

22  burial expenses, but, two, there has been testimony from

23  Mrs. Nieto about damages that I think creates a record that if

24  the jury determines liability, that there will be damages that

25  they can return a verdict on.  So I will not give an

1    instruction on nominal damages and will have not have a verdict

2    entry form for that.

3        **MS. BAUMGARTNER:**  I would like to point one thing

4    which of course is that Mr. Nieto didn't testimony, and I don't

5    believe that Mrs. Nieto's statement about what he did every day

6    is sufficient for a reasonable jury to award him any monetary

7    damages, and because the instructions are that the jury has to

8    consider each of the plaintiffs separately, I just want, before

9    we go further, for everyone to be aware that I may argue that

10   he is not -- he would not be entitled to any damages if there

11   is no nominal damage instruction.

12       **THE COURT:**  We just had the Rule 50 motion, and that

13   might have been part of your motion.  I'll consider that as a

14   supplement to your earlier argument.

15      There is evidence in the record from Mrs. Nieto's

16   testimony about the impact on him.  You can and will argue that

17   that does not amount to the damages they seek, but that will be

18   a question for the jury to determine or something for me to

19   address in a post-trial motion.

20      But as drafted, there are entry -- there is line entries

21   for both of the plaintiffs as well as for each of the defendant

22   officers.

23       **MS. BAUMGARTNER:**  Right.  I wasn't suggesting that we

24   take out the line entry.  I just want everyone to be aware that

25   usually in a case where someone argues that they haven't proven

1    damages, in a constitutional case, there is a nominal damages

2    question.  I'm fine without it.  I just want to make clear that

3    the record is clear about that.

4         **THE COURT:**  But you have no objection to removing the

5    nominal damages -- actually not removing it.  It's not in the

6    current draft.  You have no objection to there not being a

7    nominal damages entry line on the verdict form.

8         **MS. BAUMGARTNER:**  I don't have an objection.

9         **THE COURT:**  The next issue I want to come back to was

10   I believe in Mr. Cameron's expert report, there is two things.

11   One is a -- some rebuttal of Clark's testimony about the taser

12   and what he saw in the taser.  Given that we excluded the

13   testimony about the taser from Mr. Clark and had very limited

14   testimony about what was found at the scene, I'm not going to

15   allow Mr. Cameron to go outside the scope of that in rebutting

16   Mr. Clark.

17        **MS. BAUMGARTNER:**  That is perfectly fine, Your Honor.

18        **THE COURT:**  The reason for that is we might have to

19   have Mr. Clark return to rebut the rebuttal and that would

20   prolong the proceedings.  And also I have determined that any

21   expert's assessment of what the taser looked like is not

22   something that's prone to expert opinion.

23        Secondly, I think in his report, he made some comment on

24   Mr. Snow's testimony and what Snow saw as being some basis for

25   the reasonableness of the officers' conduct that day.  There

1    has been no testimony that the officers knew anything about

2    what Mr. Snow said or saw that day so there should be no expert

3    opinion coming from Mr. Cameron about the reasonableness that

4    is derived from something that Snow said.

5         **MS. BAUMGARTNER:**  Thank you, Your Honor.  I just want

6    to make a note of that so I can forewarn Mr. Cameron about

7    that.

8         **THE COURT:**  It wasn't a big part of his report but

9    just --

10         **MS. BAUMGARTNER:**  Thank you.

11         **THE COURT:**  -- a small issue.

12    To kind of step back to big picture, Mr. Pointer, one of

13    the questions I foresaw yesterday was whether you wished to

14    continue with the negligence wrongful death count, and if yes,

15    how to deal with comparative negligence given that we have --

16    and then the logistics of the verdict form and how to address

17    that to the jury, the jury instructions and the complexity

18    here.  We've got four officer defendants and two plaintiffs and

19    Mr. Nieto himself.  So what is your intention?

20         **MR. POINTER:**  Your Honor, we are not going to proceed

21    with the wrongful death claim.  We're withdrawing that.

22         **THE COURT:**  All right.  So I will take that out of the

23    instructions and verdict form.  That will take a little bit of

24    drafting time, but I -- we will get that done and get a

25    re-draft to you on that issue.  That will strike all the

1    comparative negligence sections.

2         **MS. BAUMGARTNER:**  I would like to note that that does

3    require at least a change in the header for the damages because

4    the damages instruction does specifically reference California

5    state law, and it is essentially the same damages instruction

6    for federal law.  I just want to make sure there is no

7    confusion.

8         **THE COURT:**  I'm just going to have to go back and do a

9    comb-through on that.

10        I didn't say this, but let me kind of go back to it.  In

11   drafting -- and I gave the parties revised final jury

12   instructions, verdict form this morning -- I used the parties'

13   pretrial stipulation for the agreed-upon final instructions,

14   and I believe I included all of the ones that the parties had

15   agreed to in the final instructions.  I took out a few that did

16   not come up during the trial.

17        For example, there was an agreed-upon instruction for

18   interrogatories, and I don't think there was any

19   interrogatories read to the jury during the trial.

20        I removed the section for stipulated facts because I don't

21   think in fact there were any stipulated facts presented to the

22   jury during the trial.

23        I took out the section on sidebar conferences with the

24   Court because we didn't have any sidebar conferences during the

25   trial.

1          So there are a few things which I took out which did not

2     actually take place during the trial, but I think my objective

3     was to put in all the things that were agreed upon between the

4     parties and take out just a few that were not necessary.

5          Then I added the one non-federal proposed instruction that

6     was, I think, CACI 3925 on the arguments of attorneys are not

7     evidence of damages.  You agreed to that one, so I put that one

8     in as well.  That's a state law instruction.

9          My objective was always, when possible, to use the pattern

10    Ninth Circuit instruction when one is available.

11         Now, the one distinct area where one is not available is

12    the Fourteenth Amendment claim, and *City of Anaheim* is the

13    primary case cited by the defendants as the substantive basis.

14    It's on page 11 of my revised instruction.  It has the header

15    32.  So that is one area where there is some disagreement

16    before trial, and I have used, I think, principally the

17    instruction suggested by the defense on this one.

18         And, Mr. Pointer, I wanted to bring that to your attention

19    as being one that was disagreed upon and I think is worthy of

20    focusing -- especially given the dismissal of the wrongful

21    death count, this one is going to be the focus of the closing

22    arguments, I suspect.

23         **MS. BAUMGARTNER:**  Your Honor, can I make one comment

24    about this?

25         **THE COURT:**  You may.

1      **MS. BAUMGARTNER:**  You're speaking directly here if the

2   jury finds that the officers did not have time to deliberate.

3   There is case law on that that suggests that in this type of

4   scenario where they're making decision after decision very

5   quickly, that it is this matter of law that they don't have

6   time to deliberate.

7      The time to deliberate, again, has been discussed in case

8   law.  I got the instructions this morning so I don't have that

9   case law in front of me.  But it does suggest time to

10  deliberate such as, you know, just gathering people up, giving

11  them periods of time to actually, for example, discuss matters,

12  make choices, and not have to do that instantaneously.

13      **THE COURT:**  The question is whether we should give the

14  jury a further instruction on what "time to deliberate" means,

15  and there are cases discussing it.  There is not a case that

16  I'm aware of that says "here is what the Court must tell a jury

17  that time to deliberate means."  There is cases that are

18  illustrative of what it means, some saying there was time to

19  deliberate, some saying there wasn't time to deliberate, and

20  one can derive some guidance from those cases, but

21  unfortunately, they don't lead to a preapproved instruction

22  that says "and in a case like this, here is what you tell the

23  jury about what it means."  So we can craft something and

24  that's what we are doing right now, to see if there might be

25  some further explanation so the jury hears this and says, "I

1    know what -- I know what *time to deliberate* means."  The danger

2    is that you both may have different interpretations of "what

3    time to deliberate" means, and you will tell them to the jury,

4    and the jury may say, "Help.  Each side is asking me to

5    interpret *time to deliberate* in a different way, and the Court

6    has said one thing and the parties interpret it a different

7    way," whether that means we should give a further explanation

8    of that.

9        Or if your view is that the evidence is such that as a

10   matter of law, essentially there should be no decision-making

11   here by the jury about "time to deliberate" because there was

12   no time to deliberate, so the question is just did the officers

13   use force that shocks the conscious and had a purpose to harm

14   outside -- unrelated to their legitimate law enforcement

15   objectives.

16       I take it the latter is your position, and I should not

17   give an instruction about "time to deliberate"?

18            **MS. BAUMGARTNER:**  That is my position.

19            **THE COURT:**  Mr. Pointer, what is the evidence that

20   suggests that I should give the jury the decision about "time

21   to deliberate," and if you think that I should, how can we

22   inform them better, or do you think this is sufficient to

23   inform them about how they make that decision?

24            **MR. POINTER:**  I guess I will take the last question

25   first.

1    I think this is sufficient based upon what I see.  And in

2    terms of the evidence and what's been presented to the jury,

3    it's clear that this incident took place over the course of six

4    minutes.  The officers who fired the initial shots came to the

5    scene.  They were on the way to the scene.  They had a radio.

6    They had communications with dispatch.  They talked to the

7    other officers.  They saw other officers.  They elected on

8    their own to go into the park in order to essentially make a

9    contact with Mr. Nieto.  They've testified that they had some

10   conversations once they made the decision to go into the park.

11   That's all time to deliberate.  And then at the point that they

12   get out of the car, they then have this one-sided firefight,

13   frankly.

14       And so what you have here and from our perspective is

15   there is ample time to deliberate.  There is ample time to

16   figure out a plan and/or decide how to approach this particular

17   situation, all from the officers' mouths, actually.

18       So I think that that is something that is appropriate for

19   the jury to decide, and, frankly, it should go the other way in

20   terms of their -- the record establishing that there was time

21   to deliberate.  But I understand that from the jury -- from the

22   jury instruction standpoint at this time in the case that that

23   should be something that the jury should be allowed to

24   consider.

25            **THE COURT:**  So you would suggest using the language as

1    drafted in the current draft on page 11 for this --

2          **MR. POINTER:**  Yes.

3          **THE COURT:**  Ms. Baumgartner, if I -- what would you --

4    so having heard that position, what is your suggestion as to

5    how I should modify the instruction, if at all?

6          **MS. BAUMGARTNER:**  So I -- in my trial brief,

7    Your Honor, I did cite to some of the cases regarding this need

8    to make decisions in haste.  What the case law says is that

9    it's not just all of the decisions leading up to the encounter,

10   it's not the time of driving and various things like that.

11   It's the time to react once they know that there is a potential

12   threat.

13        And in this case, there was really the real threat.  Not

14   if there's -- potential threat is a very broad term.  Obviously

15   there could be circumstances in which everybody in the world is

16   a threat, but what we're talking about here is the decision to

17   use deadly force and how much time they had to deliberate about

18   using deadly force.

19        The testimony here is that they had an incredibly short

20   period of time to make that determination.  They didn't know

21   who this man was --

22        **THE COURT:**  So what words would you suggest I add then

23   to the instruction to clarify that the time to deliberate is

24   connected to the deadly force rather than time to deliberate

25   about whether to go to work that day or whether to respond to

1    the call or whether to drive to the scene, that it's

2    deliberation in connection with the perception of harm?

3          **MS. BAUMGARTNER:**  So I haven't had a chance to reread

4    these cases in light of this particular argument.  I did cite

5    to *County of Sacramento vs. Lewis*, a Supreme Court case that

6    discusses this matter, and the phrase used there is when they

7    must make a decision, quote, in haste under pressure and

8    frequently without the luxury of a second chance.  That's what

9    I quoted.

10        But, again, I would like to have an opportunity to reread

11    these cases and to determine whether there is some -- something

12    else that suggests that that language should be different.

13          **THE COURT:**  All right.  I'm going to as well, and this

14    is -- of all the things in the law here, I think this is the

15    trickiest one because there is not a preapproved Ninth Circuit

16    instruction on it and the factual circumstances of each case in

17    this area are a little bit different, and that difference can

18    be meaningful as far as the deliberation and how much time

19    there was, but it's not just time.  It's also the circumstances

20    of the time, what was happening during that period of time that

21    I want to make sure we are not only using appropriate words but

22    are using case law that is as directly applicable as possible.

23        I will look and all the parties can look at the *Lewis* case

24    and any other authority.  And so on this one, I will revisit

25    that and have a further conversation about it, maybe after

1    Mr. Cameron's testimony.

2          **MS. BAUMGARTNER:**  All right.  I probably won't have an

3    opportunity --

4          **THE COURT:**  Well, you can read over lunch.  We have to

5    have this resolved before we direct it to the jury's attention,

6    so it has to be today.

7       All right.  Kind of jump topics here a little bit.

8    Punitive damages, I did take out the final paragraph of the

9    punitive damages instruction which is about how to decide the

10   amount of the punitive damages, given that that's been

11   bifurcated.  If there is a determination that punitive damages

12   are appropriate, then we will give a further instruction on --

13   the pattern instruction on how to determine the amount of

14   punitive damages and as well as a short verdict form in that

15   area, so that is not included here for that reason.

16         **MS. BAUMGARTNER:**  I did note on the verdict form that

17   the Court is asking one question about punitive damages.  I

18   believe that the instruction accounts for two at this

19   particular stage.  One is, of course, the finding about whether

20   the actions were malicious, oppressive.  The other is do you

21   decide to award such damages.  And I believe that the law and

22   the instructions make that two separate questions.

23      They can find that the actions were malicious and

24   oppressive, etc., and still decide not to award punitive

25   damages.

1        THE COURT:  My interpretation of that -- thank you for

2    bringing that up -- they are going to have another -- if they

3    determine that there was malicious or reckless disregard and

4    they mark "yes" in one of those boxes, there will be a next

5    question which is the amount, and they will have an option then

6    of not awarding punitive damages, so that's when I'm going to

7    get to that box.

8        MS. BAUMGARTNER:  All right.  It was my understanding

9    that we go through the first two first because obviously that

10   second question is what's necessary before we put on any

11   testimony from the officers about their net worth.  And I think

12   that that is a question that is -- that will be more confusing

13   later on when they have had testimony about net worth because

14   that second question may be based on their net worth as opposed

15   to whether they believe this case, the facts of the case,

16   suggest that punitive damages should be awarded.  In other

17   words, it's a different question --

18        THE COURT:  That is the bit of the trickiness of

19   bifurcating, the issue is whether to go into it all now or not.

20       Mr. Pointer, what do you think at this point?  Should I

21   have a separate line entry in the verdict form for "do you

22   award the plaintiffs punitive damages," or are you comfortable

23   it being combined into one entry?  This is paragraph 16 in the

24   verdict form.

25        MR. POINTER:  I'm fine with it as stated, Your Honor,

1    with a combined question.

2         **THE COURT:** All right. I think I'm going to keep 16

3    as is, and if they mark "yes" -- if they get to that box and

4    mark "yes," we are going to have a separate entry coming later

5    of how much with zero being a possibility.

6         **MS. BAUMGARTNER:** Then I think that the last line here

7    in the instruction that was submitted to us today --

8         **THE COURT:** The last line of the instruction?

9         **MS. BAUMGARTNER:** Yes.

10        -- possibly does not apply to our current situation

11   because that, in fact, says you may impose punitive damages,

12   and apparently that's not the decision that they are making

13   right now.

14        **THE COURT:** When you say the last line?

15        **MS. BAUMGARTNER:** "You may impose punitive damages

16   against one or more of the defendants and not others and may

17   award different amounts against different defendants." That's

18   the very last line on 38 on page 14.

19        **THE COURT:** So I could strike that line now and wait

20   to give it later.

21        **MS. BAUMGARTNER:** If you put it in there, Your Honor,

22   I will want to argue that -- again, that they should decide not

23   to impose punitive damages and then they are not going to have

24   a question about that --

25        **THE COURT:** Why don't we strike that sentence.

1          **MR. POINTER:**  That makes sense.  That's consistent

2     with the verdict.

3          **THE COURT:**  When I say "strike," we will defer it

4     until later determination and not give the instruction now.

5          All right.  Give me one second.  I'm just going to -- so

6     we will modify -- I'm kind of just going through the

7     instructions from front to back.

8          We'll modify the claims and defenses.  I'm going to add

9     maybe a few sentences saying that one of the claims has been

10    removed because they'll undoubtedly notice that what they are

11    being asked to determine now is a little bit different than

12    what I said at the beginning.  I'll instruct the jury not to

13    speculate as to the reasons that there has been a change in the

14    instruction.

15         And no party is going to -- there is not -- this is not an

16    admission by the plaintiffs that there was no merit to the

17    claim.  The defendants will not say in closing arguments that

18    the plaintiffs have made any sort of admission on that count.

19    It will just be dropped, and the jury will not speculate as to

20    why it's been dropped.

21         **MS. BAUMGARTNER:**  I'm sorry.  Was that the

22    language you were going to --

23         **THE COURT:**  I'm going to draft some language about

24    that.

25         **MS. BAUMGARTNER:**  And we will have a chance to --

1    **THE COURT:**  Yes.

2    **MS. BAUMGARTNER:**  Thank you.

3    **THE COURT:**  Jumping ahead to what's -- the chapter is

4    18, transcripts of audio recordings, have identified the 911

5    call and the police dispatch messages.  I would use that term

6    rather than CAD, hoping that that was plain English.

7    Let's talk about charts and summaries.  This is 25 and 26.

8    Both parties have used as a demonstrative the fold-out chart

9    over there.  I'm not sure what it's titled.  It's not in

10   evidence.  So that's the reference to charts not received in

11   evidence.

12   Do the parties wish -- both parties have used it during

13   examinations of various witnesses.  Do the parties wish it to

14   be in evidence?  Would you agree to it or should we keep it as

15   a demonstrative?

16   **MR. POINTER:**  I'm not agreeing to that, Your Honor.

17   **THE COURT:**  All right.  Then we will keep it as a

18   chart and summary not in evidence.

19   Moving ahead to 27, evidence in electronic format.  There

20   was the audio and then the dueling versions of the audio with

21   the track of the timestamp over it, and I don't know if there

22   has been any further conferring about the presentation of that

23   to the jury.

24   **MS. BAUMGARTNER:**  No, but I do have a recommendation.

25   **THE COURT:**  What is your recommendation?

1      **MS. BAUMGARTNER:**  We have in the past provided what we

2  call a clean laptop.  Our IT staff is able to provide a laptop

3  that has no internet capability, has absolutely nothing else on

4  it, etc., and have, in fact, provided instructions, written

5  instructions approved by the other side to the jury about how

6  to listen to an audiotape that has two channels.  And we would

7  again be willing to do that in this particular case if that's

8  acceptable.

9      **THE COURT:**  So the Court has its own computer that has

10 that same functionality.  It does -- now, as far as

11 instructions to the jury about how to toggle the two tracks,

12 that's not part of the current instruction, and if you have an

13 instruction proposed to give them, I think that would be a good

14 thing to share with the other side --

15     **MS. BAUMGARTNER:**  We would need to check to see if

16 your computer works the same as ours in terms of changing the

17 balance.  That's what it is.  You find the screen that changes

18 the balance left and right and you remove one side and play the

19 other.  It is the same piece of evidence.  The audio is on --

20     **THE COURT:**  The question is how does the jury access

21 it --

22     **MS. BAUMGARTNER:**  Right.

23     **THE COURT:**  -- and make it work in a way that they can

24 understand?

25     **MS. BAUMGARTNER:**  And if we have an opportunity to see

1    the court's computer and to put the exhibit in there and make

2    it work, we would be willing to write out those instructions

3    for the jury and present them to plaintiffs' counsel.

4          **THE COURT:**  Let me ask my deputy.  She may be working

5    on it right now.  That takes a little bit of coordination.

6    It's going to take coordination, whether it's through your

7    hardware or the court's hardware and for plaintiffs' counsel

8    also to be comfortable with it, especially if it's hardware

9    provided by the defendants, we want to make sure it works.

10       So I think that probably the easiest way is to use the

11    court's hardware because we know it works and there is less

12    concern, I'd expect, from the plaintiffs that they don't know

13    what it is.  And I would suggest that you confer later today

14    about the instruction we can give the jury on how to make it

15    work.  We will kind of circle back to that as a later action.

16          **MS. BAUMGARTNER:**  Right.  It's often been the case

17    that the judge reads the instructions and the case goes to the

18    jury and they are simply told that if they wish to listen to

19    the audio, that they will be given something in the

20    instructions which gives us a little more time perhaps.

21          **THE COURT:**  We may have a little more time.  I think

22    it's going to -- every piece of evidence is important, but I

23    think it's evidence that they are going to want to listen to,

24    and there is not a thousand pieces of evidence for them to look

25    at, so I don't want to be waiting a day to get something

1    important.  I want them to be able to deliberate fully with all

2    the evidence, so let's get that ready for tomorrow morning.

3            **MS. BAUMGARTNER:**  One item about that particular piece

4    of evidence.

5        The evidence that was admitted, the audiotape that was

6    admitted, is half an hour long and only certainly portions of

7    it were played for the jury.  In prior cases, often what we've

8    done is we've said you have the entire half hour or whatever it

9    may be but that no party sees any reason to listen to it past

10   the point that it was played in the courtroom.

11           **THE COURT:**  So do you want the entire recording to go

12   to the jury?

13           **MS. BAUMGARTNER:**  It would be fine with me if it did

14   not.  I was -- I'm just --

15           **THE COURT:**  And, Mr. Pointer, do you want the entire

16   recording to go to the jury?

17           **MR. POINTER:**  Well, you know, in thinking about it in

18   terms of getting items of evidence to the jury, we are going to

19   have to haggle and/or try to figure out which portions should

20   go so I would prefer for it just to go to the jury in its

21   database.  And I think the jury is smart enough to figure out

22   where they want to stop and/or listen to --

23           **THE COURT:**  My suggestion would be if we give them

24   some direction as to which part of it they heard in court so

25   they don't have to be searching through it to say which part is

1    which.  I think that would be helpful to the jury's

2    understanding in being able to match up what they heard versus

3    what they are doing so they're not just searching through.

4        The way that can be done -- and this is helpful in other

5    areas of evidence, too.  I have a list of

6    three-hundred-and-something documents which were marked and not

7    all of them are the jury going to see.  I'm going to ask you to

8    work together to create an index of what's actually in

9    evidence.  You can use the -- our minutes from the trial.  This

10   is also a process of making sure we have been keeping -- that

11   you agree with our recordkeeping, make sure there has been no

12   errors, and will help the jury to actually have a list of what

13   is in evidence so they can quickly access it, and that chart

14   might include information about which parts of the audio --

15   both how to access it and also which parts were heard in court.

16   That will be something we'll get done tonight for tomorrow

17   morning.

18       All right.  That's the technology.  There is no video, so

19   that will be the audio recordings.

20       Let's see.  Moving ahead, we talked about -- moving ahead

21   to the 1983 claim, Sections 28 and 29, those are the pattern

22   instructions from the Ninth Circuit.  31 I think is not

23   controverted.

24       We will remove the wrongful death section.  We will remove

25   contributory negligence section.  We will remove California

1    Penal Code Section 196.  We are going to remove the funeral and

2    burial expenses.  We will remove the section on wrongful death,

3    California state law damages.

4         MS. BAUMGARTNER:  I think that's the only damages

5    section.

6         THE COURT:  No.

7         MS. BAUMGARTNER:  Oh, right.  We have the earlier one.

8         THE COURT:  At 37 there is a damages proof section

9    under federal law, which I'll keep in, although striking the

10   funeral and burial expenses line.

11     And then I'm going to remove all of Section 40.

12        MS. BAUMGARTNER:  I again want to talk about the

13   crossover between the damages available under the Fourteenth

14   Amendment and the negligence standard.

15        THE COURT:  Yes.

16        MS. BAUMGARTNER:  It's my understanding that the

17   standard is the same for wrongful death and loss of care,

18   comfort, and society under the Fourteenth Amendment, and I

19   believe that the provisions regarding what not to consider in

20   the wrongful death statute apply to the Fourteenth Amendment as

21   well, and those aren't in there.

22        THE COURT:  So the language, just to make sure I'm

23   following you -- at the bottom of page 15 there is a paragraph

24   that begins, "In determining the Nieto's loss do not consider 1

25   through 3."  You would like to move that over and include that

1    in the instruction?

2                MS. BAUMGARTNER:  Yes, Your Honor.

3            THE COURT:  Any objection to that?

4            MR. POINTER:  I think the pattern instruction is fine,

5    the instruction that the Court already has as it relates to

6    what the jury is to consider under damages, Instruction No. 37.

7    I mean, because the jury, in considering 37 and comparing it to

8    40 and looking at what the defendants are seeking to include

9    it -- it seems to me that 37 encompasses what the jury is to

10   include --

11           THE COURT:  The question is -- or one of the questions

12   is, as drafted in 37 where it says "to pain and suffering" --

13   it doesn't specify whose pain and suffering there, whereas in

14   40, evidence not to consider, it identifies Alejandro Nieto's

15   pain and suffering, so carving out yes to the Nieto parents'

16   pain and suffering, no as to his pain and suffering, if that,

17   Ms. Baumgartner, is what you are intending to clarify.

18           MS. BAUMGARTNER:  That -- yes.  That is part of it.

19       It's also the issue of the poverty or the wealth.  I think

20   that that's important to inform the jury of.

21       I would like to keep in mind that the -- because there is

22   no Fourteenth Amendment pattern jury instruction, obviously

23   it's a little bit difficult to say that the pattern jury

24   instruction incorporates the law about the Fourteenth

25   Amendment.  I don't see anything in the pattern instruction

1    that would suggest that.

2         **MR. POINTER:**  I would just say in terms of poverty or

3    wealth there hasn't been any evidence that has gone to the jury

4    about anyone's poverty or wealth.

5         **THE COURT:**  There has been.  Mrs. Nieto testified

6    about her employment and her current employment.  Not a lot,

7    but there was evidence about it.

8         All right.  I will make a further revision, but I will

9    move over some of the portions of 40 into 37 to clarify that.

10        **MS. BAUMGARTNER:**  Thank you, Your Honor.

11        **THE COURT:**  All right.  That's everything on my

12   checklist for the instructions.  Let me kind of more open-ended

13   go back.

14        Mr. Pointer, do you have any objections not previously

15   raised to the final instructions which I presented to the

16   parties this morning?

17        **MR. POINTER:**  Your Honor, the issues that I had

18   actually have been addressed by the Court during the course of

19   this conference.

20        **THE COURT:**  Thank you.

21        Mr. Baumgartner, do you have any objections not previously

22   discussed to the final instructions?

23        **MS. BAUMGARTNER:**  Not to the instruction, but to the

24   verdict form.

25        **THE COURT:**  Let's move to that next.

1          The jury verdict form then.  Just one moment.  Let me --

2   so we are going to remove the wrongful death section, which is

3   on page 4.

4              **MR. POINTER:**  Yes.  And page 5, question 14.

5              **THE COURT:**  Yes.  And we talked about 16 already.

6          Ms. Baumgartner, what other issues should we discuss with

7   about the verdict form?

8              **MS. BAUMGARTNER:**  First of all, Your Honor, I believe

9   that the only basis on which the jury could arrive at Question

10  2 is if they answer "yes" to any of the defendants in Question

11  1 because I think as a matter of law if the use of force was

12  reasonable, they don't get to the Fourteenth Amendment claim.

13             **THE COURT:**  So you would suggest a -- "if *no*, then go

14  to Question 3."

15             **MS. BAUMGARTNER:**  Right.  Similar to what is after

16  Question 2:  "If you answered *yes* to any of these defendants,

17  answer the question as to those defendants, that or those

18  defendants."

19             **THE COURT:**  Any objection to that modification,

20  Mr. Pointer?

21             **MR. POINTER:**  Submitted, Your Honor.

22             **THE COURT:**  We will make that change.

23             **MS. BAUMGARTNER:**  I -- I'm also -- with respect to

24  Question 5, right, there was again no expert testimony about --

25  or further testimony from the experts about the continuation of

1    the shooting.  And so I'm not quite sure what the factual or

2    legal issues --

3         THE COURT:  The reason that I think there is evidence

4    to support the instruction is not the expert testimony but the

5    witness testimony, both from the officers, the evidence of the

6    number of shots fired, and I'm not finding that there were 59

7    shots fired.  Let's say there was evidence of 48 shots.  There

8    was 48 casings found.  That a reasonable jury could find that

9    48 shots or 59 shots or anything in that neighborhood with a

10   pause in between could be a basis for the jury to say yes, even

11   absent Mr. Clark saying something about it.  And the reason for

12   the questions on this page is to help a determination of

13   qualified immunity.

14        MS. BAUMGARTNER:  I understand, Your Honor.

15        THE COURT:  So one might guess the plaintiffs would

16   like to have no questions on that page and to not have the jury

17   provide that information.

18      Is that right, Mr. Pointer?

19        MR. POINTER:  The Court is very clairvoyant.  Yes.  I

20   would prefer that there was no interrogatory questions on this

21   verdict form.  That's my stance.

22        THE COURT:  So if I'm going to ask the question,

23   that's the way I'm going to ask it and the reason that I would

24   ask it.

25      All right.  Ms. Baumgartner, sticking with you, any other

1    not previously-raised objections?

2         **MS. BAUMGARTNER:**  Not in the few minutes I've had,

3    Your Honor.  I have taken a look at these things.  Nothing else

4    pops out at me.

5         I believe there is a possibility that as I'm going through

6    this at lunch there may be some other very minor issues, but

7    I'm hoping that we have addressed them all.

8         **THE COURT:**  Very good.

9         Mr. Pointer, do you have any other objections?

10        **MR. POINTER:**  No, Your Honor.

11        **THE COURT:**  Very well.

12        What I will do then is we will make a further revision to

13   the instructions consistent with our conversation here.  I've

14   given you the most important homework of considering -- looking

15   at the language of the Fourteenth Amendment and the case law

16   that can help us get that exactly right to the best of our

17   ability.

18        We will also make revisions to the verdict form and get

19   that back to you, and we will have a further conversation at

20   the end of today that will guide us to getting a final version

21   prepared for reading tomorrow morning.

22        We are in recess until 1:30.  Thank you very much.

23             (Luncheon recess was taken at 12:03 p.m.)

24   **AFTERNOON SESSION**                                    **1:39 p.m.**

25        **THE CLERK:**  Remain seated and come to order.  Court is

1    again in session.

2         **THE COURT:**  Good afternoon, everyone.  You may remain

3    seat.  I understand our witness is ready.

4         **MS. BAUMGARTNER:**  Yes, Your Honor.

5         **THE COURT:**  Our jurors are ready.  We will have a

6    redraft of the jury instructions and verdict form coming for

7    you in a few minutes which we'll slide you amid examination.

8    I'm not expecting you to do more than one thing at once.  Once

9    the evidence is concluded, we will give you a break to review

10   that, and maybe a half hour after that we can reconvene for a

11   final read-through and further argument on the instructions and

12   jury verdict.

13        Let's bring in our jurors.

14        (Proceedings were heard in the presence of the jury:)

15        **THE COURT:**  If the defendants will call their next

16   witness, please.

17        **MS. BAUMGARTNER:**  Defendants call Don Cameron.

18        **THE COURT:**  Mr. Cameron is coming forward.  He is

19   another of the type of proffered witnesses who are allowed to

20   testify about their area of skill and expertise.

21        Mr. Cameron, if you come on up, we will swear you in.

22            **DON CAMERON**, **DEFENDANTS WITNESS, SWORN**

23        **THE CLERK:**  Please be seated.  Please state your full

24   name for the record.

25        **THE WITNESS:**  My name is Don, Stuart, S-T-U-A-R-T,

1    Cameron, C-A-M-E-R-O-N.

2                        **DIRECT EXAMINATION**

3    **BY MS. BAUMGARTNER:**

4    **Q.**    Good afternoon, Mr. Cameron.

5    **A.**    Good afternoon.

6    **Q.**    What do you do for a living?

7    **A.**    I train police officers through Cameron Consulting.

8    **Q.**    Where do you train them?

9    **A.**    I'm an adjunct faculty member at the Sacramento Public

10   Safety Training Center; Napa Valley Police and Correctional

11   Academy; and I'm a contractual instructor for the Contra Costa

12   County Sheriff's Department Law Enforcement Training Center.

13   **Q.**    Can you estimate how many police officers in the State of

14   California you have trained during your career?

15   **A.**    Well, I've been doing it for 48 years.  Somewhere around

16   40-, 45,000.

17   **Q.**    Do you also train instructors?

18   **A.**    Yes, I do.

19   **Q.**    Tell us a little bit about that.  What kind of instructors

20   do you train?

21   **A.**    Well, basically I teach the physical skills.  I teach

22   arrest control tactics, firearms, use of impact weapons, and

23   obviously the classroom backup that does the justification for

24   the type of training I do.  I certify --

25   **Q.**    Can you move the mic a little closer.  We've been having

1   issues with that.

2   **A.**    Okay.

3       I certify arrest and control instructors, which is

4   basically use of hands, handcuffing, that type of thing.  I

5   certify firearms instructors.  I certify impact weapon

6   instructors or the night sticks that the police officers carry,

7   and I certify ground control instructors, so if an officer goes

8   down on the ground, how they function, very much like mixed

9   marshal arts.

10  **Q.**    Can you estimate how many instructors you've trained?

11  **A.**    Boy, several thousand.

12  **Q.**    Do you know how many police officers the instructors that

13  you have certified have trained?

14  **A.**    Boy, they train their own agencies.  They teach in the

15  academies.  They teach in in-service programs.  I'm sure tens

16  of thousands.

17  **Q.**    We've had a little bit of discussion here already about

18  POST.  Can you very briefly tell us what POST is and your

19  involvement with POST?

20  **A.**    Sure.  POST is an acronym that stands for the California

21  Commission on Peace Officers Standards and Training.  Basically

22  it's a regulatory commission that certifies police training in

23  the state, certifies instructors, sets the standard as far as

24  how many hours have to be taught in each subject.  The subjects

25  have to be taught.  And then each of the various academies

1     throughout California have basically the same curriculum.

2         So if you were an officer from San Diego and an officer

3     from Eureka, for example, you would have the same training in

4     the academy that you went to.

5         An academy can do less hours -- can't do less hours than

6     what POST says, but they can do more hours.  They can't change

7     the curriculum, but they can add to the curriculum.  So

8     basically it makes the training standard throughout the state.

9     Q.   Does POST have committees?

10    A.   Right.  POST has subject matter expert committees.

11    Q.   What do they do?

12    A.   Well, POST identifies people throughout state that have

13    specific expertise in a particular area.  They then bring those

14    people together for a session to sit down and look at the

15    learning domains, which are functionaries of law enforcement.

16        The subject matter experts either check off a learning

17    domains being correct the way it is, add to a learn domain,

18    totally rewrite a learning domain, or create a learning domain,

19    so subject matter expert are the ones that basically work on

20    writing the learning domains.

21    Q.   Have you sat on any POST committees?

22    A.   Yes, ma'am.  I have been sitting on POST subject matter

23    expert committees since the early 1980s.

24    Q.   Have you sat on any committees that have to do with the

25    use of force?

1    **A.**    Yes, ma'am.  The end of September, of last year obviously,

2    we just finished almost a total of rewrite of LD20, which is

3    the classroom session on use of force.

4    **Q.**    Does that LD20 also address use of lethal force?

5    **A.**    Yes, ma'am, it does.

6    **Q.**    Did any of the changes that were being made to LD20 since

7    September have anything to do with the use of lethal force?

8    **A.**    No, ma'am.  That pretty much stayed the same.

9    **Q.**    Okay.  How -- have you been in other POST committees

10    besides this one that just changed LD20?

11    **A.**    Right.  I finished in April of 2014 a rewrite on LD33

12    which is the physical aspect of law enforcement.  It's called

13    "Arresting and Control."

14         In December of 2012, I sat on the LD37 committee which is

15    handling persons with disabilities.

16         And I've also sat on firearms committees for POST which is

17    LD35, and crowd control, which is LD24.

18    **Q.**    How many times have you testified as an expert on police

19    practices?

20    **A.**    Several hundred.

21    **Q.**    Other than your job teaching police officers and

22    instructors, have you had other work experience related to

23    being a police officer?

24    **A.**    Yes, ma'am.  I was a police officer with the Berkeley

25    California Police Department from 1966 through '72, and then in

1    '72 I went to the Bay Area Rapid Transit District Police

2    department.  I worked there until 1981, and then I decided I

3    wanted to teach full time because I was teaching part time when

4    I was a working police officer, so then I went out and started

5    teaching full time, and I have been doing it ever since.

6    **Q.**   What would you be doing today if you weren't here

7    testifying?

8    **A.**   I'd be teaching.

9          **MR. POINTER:**  Objection, Your Honor.  Speculation.

10          **THE COURT:**  Overruled.

11    **BY MS. BAUMGARTNER:**

12    **Q.**   Teaching who?

13    **A.**   I would be teaching this week out at the Contra Costa

14    Sheriff's County Department, and towards the end of the week,

15    the Napa Valley Police Academy.

16    **Q.**   Have you published at all in the area of police practices?

17    **A.**   Yes, ma'am.

18    **Q.**   What have you published?

19    **A.**   The Weaponless Defense Instructors Manual, the Impact

20    Weapons Instructor Manual.  I have written articles on vehicle

21    extractions, done some videos.  I guess they are called disks

22    now, but . . .

23    **Q.**   Okay.  Have you -- do you have any certificates related to

24    law enforcement?

25    **A.**   Yes, ma'am, I do.

1   **Q.**    What do you have?

2   **A.**    I have a basic intermedia advanced and supervisory POST

3   certificate.  I'm an FBI, Federal Bureau of Investigation,

4   firearms instructor.  I'm a Federal Bureau of Investigation

5   SWAT instructor.  I'm approved by POST to teach the areas that

6   I talked about for instructors.

7   **Q.**    And can you think of anything else about your background

8   that informs your police practices opinions in this matter?

9   **A.**    No, ma'am.

10          **MS. BAUMGARTNER:**  Your Honor, I would like to have

11   this witness declared an expert under 702.

12          **THE COURT:**  Would the Nietos' counsel prefer to ask

13   questions now or to defer until cross-examination?

14          **MR. POINTER:**  We will defer until cross-examination.

15          **THE COURT:**  I find Mr. Cameron is qualified under Rule

16   702 to testify about police practices as relevant within this

17   case and within the confines of what he has previously

18   disclosed to the Nietos.

19          **MS. BAUMGARTNER:**  Thank you.

20   **Q.**    Let's talk a little bit about training, about use of

21   force.  Does your training regarding use of force necessarily

22   include training regarding avoiding use of force?

23   **A.**    Certainly.

24   **Q.**    And does your training about use of lethal force involve

25   training regarding means of which to avoid using lethal force?

1    **A.**    Yes, ma'am.  Usually with firearms training system.

2    **Q.**    Okay.  What is the firearm training system?

3    **A.**    Firearms training system is basically an interactive video

4    with props, things that officers can use for cover.  They can

5    use batons, they can do a variety of things, and they're

6    presented with scenarios that you can branch off from so the

7    operator of the machine can, in some cases, branch off into

8    different areas so you can give the officer a no-shoot

9    situation.  You can give them a shoot situation.  You can give

10   them a no-shoot situation with a foot pursuit that changes into

11   a shooting situation.  So pretty much you control it.  But it's

12   how you train the officers when they should fire and when they

13   shouldn't fire.

14   **Q.**    Do you participate in providing that training?

15   **A.**    I do, yes, ma'am.

16   **Q.**    Is that training POST approved?

17   **A.**    Yes, ma'am, it is.

18   **Q.**    I want to -- before I get to your opinions specifically

19   related to the use of lethal force, I wanted to ask a couple

20   other questions about tactical issues.

21   **A.**    All right.

22   **Q.**    Did you review materials prior to issuing your opinions in

23   this matter?

24   **A.**    Yes, ma'am, I did.

25   **Q.**    What did you review?

1  **A.**   I reviewed deposition testimony from the officers, from

2  witnesses, transcripts of interviews, training manuals from

3  San Francisco Police Department.

4  **Q.**   Did you have an understanding of what the radio call was

5  with respect to what the officers were responding to on that

6  day?

7  **A.**   Yes, ma'am.

8  **Q.**   Just so we understand, what was your understanding of what

9  that radio call was generally?

10  **A.**   It was a man with a gun.

11  **Q.**   Have you seen a map of the area in which the officers

12  responded?

13  **A.**   Yes, ma'am, I have.

14      **MS. BAUMGARTNER:**   Your Honor, I would like to put up

15  the map.

16      **THE COURT:**   You may.

17  **BY MS. BAUMGARTNER:**

18  **Q.**   Does this map look something like one of the maps you've

19  seen about where the officers responded on March 21, 2014?

20  **A.**   Yes.   Obviously a little bit bigger, but, yes, it is.

21  **Q.**   All right.   Do you have an understanding of how close to

22  the subject the officers drove up to before they stopped their

23  car?

24  **A.**   I'm thinking somewhere around 15 to 20 yards.   Perhaps a

25  little closer.

1    **Q.**   Now, hypothetically, if, in fact, the officers -- that

2    this was the basic scene that the officers faced when

3    responding to a man-with-a-gun call and they stopped 30 yards

4    away, would that be consistent with their training on how to

5    approach a subject who may be armed?

6    **A.**   Certainly.  In other words, I want to be close enough to

7    be able to see the person's hands and body and torso, but I

8    don't want to be so close that I close the reactionary gap

9    which basically gives them an advantage.

10   **Q.**   Tell us about the reactionary gap.  What do you mean by

11   that?

12   **A.**   The reactionary gap is simply the spacing I have between

13   myself and an individual, particularly if I have a

14   man-with-a-gun call.  I want to be, again, close enough to see

15   them to see if they actually have a gun to try and control them

16   vocally, but I don't want to be so close that I can't react to

17   what they're doing.

18   **Q.**   Now, if an officer was down by where this map shows the

19   park gate and was able to see a person with the same red jacket

20   that the radio dispatch had described up at the location where

21   it says "Nieto," would it be consistent with an officer's

22   training to stop their police car down by the park gate?

23        **MR. POINTER:**  Objection, Your Honor.  Incomplete

24   hypothetical.

25        **THE COURT:**  Overruled.

1    **THE WITNESS:**  It wouldn't be consistent with the

2    training.  It would be very difficult for me to vocally control

3    a person from there.  I can't really see the definition of the

4    hands and the body from that location.  So tactically that

5    would be a poor position for me to take.  I also would afford

6    the person a much easier escape route.

7    **BY MS. BAUMGARTNER:**

8    **Q.**    Okay.  Does POST teach officers that there is a particular

9    measurement of distance to stop when a subject is walking down

10   a road like this towards them and they've had a call that that

11   man has a gun?

12   **A.**    No, ma'am.  Just talking about the reactionary gap and not

13   wanting to get too close so I'm susceptible.  Be close enough

14   that I can control a person verbally and visually.

15   **Q.**    Do you believe 30 yards is too close?

16   **A.**    No.  I think that's fine.

17   **Q.**    Are officers taught that if they are approaching a subject

18   who may be armed on a road such as this that is fairly empty,

19   that they should sit in their car and talk to the person over

20   the loud speaker?

21   **A.**    No, ma'am.

22   **MR. POINTER:**  Objection, Your Honor.  This exceeds

23   anything that he has in his report, what they should do in

24   terms of in the patrol car, communicate.

25   **THE COURT:**  Counsel, can you direct me to where in the

1    report you're referring?

2          **MS. BAUMGARTNER:**  Well, there is a connection where he

3    talks about warnings, Your Honor.

4          **THE COURT:**  Page?

5          **MS. BAUMGARTNER:**  I'm sorry.  Page 4 on Exhibit 158.

6          **THE COURT:**  I'm just looking at his report.  Page 4 of

7    the report?

8          **MS. BAUMGARTNER:**  Yes.

9          **THE COURT:**  Under the section "Clark's opinions"?

10         **MS. BAUMGARTNER:**  Right.  He set forth that, and then

11   he talked later about his opinions related to that.  He spoke

12   generally -- let's see.  I think it falls under each of the

13   opinions on page 5, the general opinion.

14         **THE COURT:**  All right.  I'm going to sustain the

15   objection and ask you to reapproach it stating those opinions

16   and then illustrating them rather than working up to them.

17         **MS. BAUMGARTNER:**  All right.

18         **THE COURT:**  Or tie it clearly.  Get a foundation as to

19   what opinions he rendered in the case.

20         **MS. BAUMGARTNER:**  Okay.

21         **THE COURT:**  So I know how it ties in to those

22   opinions.

23         **MS. BAUMGARTNER:**  I will work the other direction

24   then, Your Honor.

25   **Q.**   Okay.  So I want to pose some hypothetical questions to

1    you, Mr. Cameron, and to get your opinions on those, and then

2    we'll talk about the details.

3         So assume hypothetically that two officers in a marked

4    police car hear a call of a man with a gun on his hip wearing a

5    red jacket, 6'1", 200 pounds, and the officers respond, and as

6    they're driving up a road like this, they see a man meeting the

7    description wearing a red jacket far up the road ahead of them,

8    and they drive up and stop 30 yards away.

9         Do you have an opinion about whether that comports with

10   their training?

11   **A.**   Yes, ma'am, I do.

12   **Q.**   And what is that opinion?

13   **A.**   That they would have been trained to do that.

14   **Q.**   Now, assume further that the officers in that situation

15   then each get out of their car with their guns drawn and have

16   them at a low ready.  Do you have an opinion about whether that

17   comports with their training?

18   **A.**   Yes, ma'am.

19   **Q.**   What is that opinion?

20   **A.**   It does.

21   **Q.**   Now, assume further that the officers then see -- say to

22   the man walking down the road towards them "show me your

23   hands."  Do you believe, based on their training -- what is

24   your opinion about whether that comports with their training?

25            **MR. POINTER:**  Objection, Your Honor.  That goes beyond

1  the scope of his report.

2         THE COURT:  Overruled.

3         THE WITNESS:  That's what they'd be trained to do, to

4  be able to see the hands.  That's what's going to draw a weapon

5  or attack you.

6  BY MS. BAUMGARTNER:

7  Q.  Does that opinion still hold if the man has his hands down

8  by his side and is not otherwise moving them?

9  A.  You'd still want to see the hands.

10  Q.  So having them down by someone's side, even if they're not

11  hidden, it is still appropriate to say "show me your hands"?

12  A.  Yes, ma'am, it is.

13  Q.  If the man has something in one hand, either like a bag or

14  a foil-wrapped burrito, does that change your opinion?

15         MR. POINTER:  Objection, Your Honor.  This exceeds the

16  scope of his report about warnings.  This has nothing to do

17  with warnings.  This is about orders that she's talking about.

18  His report dealt with is it an appropriate warning that was

19  given or not as opposed to whether or not this is an

20  appropriate command.  It's about warnings.

21         THE COURT:  I'm going to sustain the objection, and

22  also I'm not clear about which opinion was being changed.  The

23  question was "does that change your opinion."  My concern is

24  that that would be going outside the scope of a

25  previously-disclosed opinion if he offers a new one.

1    **BY MS. BAUMGARTNER:**

2    **Q.**   Let me ask this.   Given the scenario where there is a man

3    walking down the road, his hands are not anywhere except by his

4    side, do you have an opinion about what it would be reasonable

5    to say to that man before you use lethal force?

6    **A.**   Well, I'd say "show me your hands" or "put your hands up

7    over your head."

8    **Q.**   Are officers trained that they have to make any particular

9    statement to a subject in that particular scenario?

10   **A.**   No.   It's --

11          **MR. POINTER:**   Objection, Your Honor.   Again, it

12   exceeds the scope of his report.   That opinion is about whether

13   it was an appropriate warning not about what the order should

14   have been.

15          **THE COURT:**   Overruled.

16          **THE WITNESS:**   The officers pretty much use the

17   commands that have worked for them in the past.

18   **BY MS. BAUMGARTNER:**

19   **Q.**   I'm sorry.   What was that?

20   **A.**   They use the commands that would have worked for them in

21   the past.

22   **Q.**   Now, assume further that based on the hypothetical that

23   I've given you to date, that the man then says back to the

24   officers, "No, show me your hands," and then reaches for his

25   hip, his right hip, and pulls out a black firearm-looking

1    object.  Do you have an opinion about whether the officers' use

2    of lethal force in that particular situation would comport with

3    their training?

4    **A.**    That would comport with their training, the use of lethal

5    force.

6    **Q.**    Why?

7    **A.**    Well, you have basically a deadly force threat.  You have

8    what appears to be a firearm pointing towards the officers,

9    coming from an area on the man's person.

10   **Q.**    Are officers taught that they need to wait to see the gun

11   shoot at them or anything like that before they use lethal

12   force?

13   **A.**    No.  Because the best you'd ever be able to do is a tie,

14   and you can't win in a tie.

15   **Q.**    Explain more what you mean by a "tie"?

16   **A.**    In other words, I can't wait to see the gun come up and

17   the gun to fire because once it's fired, then I'm playing

18   catchup, and if the bullet happens to hit me or my partner,

19   then we can't react to that.

20   **Q.**    Now, assume in that situation that the man continues to

21   raise the object that he has just pulled out of a holster and

22   stretches out his arms and points them at the officers and the

23   officers see a red laser sight.  In your opinion, would

24   using -- what would your opinion be about use of lethal force

25   in that particular scenario?

1    **A.**    That that would be an appropriate use of lethal force.

2    **Q.**    Why?

3    **A.**    Well, a laser sight is a precursor to a round going off.

4    It's just pinpointing where the round is going to go.   Wherever

5    the laser goes, the round goes.

6    **Q.**    Now, assume for a moment that this use of lethal force

7    occurred in those -- in that particular scenario but the

8    officers did not go over the loud speaker and make any warning

9    beforehand.   Would that still be an appropriate use of force,

10   in your opinion?

11   **A.**    Yes, ma'am.

12         **MR. POINTER:**   Objection, Your Honor.   Exceeds the

13   scope of his expert report.   The expert report was about

14   appropriate warnings, not -- he didn't offer an opinion about

15   different ways of communicating.   It was whether or not the

16   warnings -- the commands that were given by the officers were

17   appropriate warnings.

18         **MS. BAUMGARTNER:**   Your Honor, he testified that the

19   use of force was reasonable and all of the elements that go

20   into that, and we've had testimony that -- a suggestion, at

21   least, that perhaps it was not reasonable because they did not

22   go over the loud speaker.   I think that this is within that

23   parameter.

24         **THE COURT:**   In rebuttal to Mr. Clark's testimony, the

25   objection is overruled.   You may proceed.

1    BY MS. BAUMGARTNER:

2    **Q.**   So in this situation, would it still be appropriate for

3    the officers to use lethal force even though they had not

4    yet -- or they had not yet -- not yet.  Sorry -- they had not

5    used their loud speaker system to speak to the subject?

6    **A.**   No.  Once -- once the individual's actions are consistent

7    with the actions that are going to point a gun at an officer

8    where an officer can be killed, it's too late to go on a loud

9    speaker and make any communication that way.

10   **Q.**   And would it be against their training to not use the loud

11   speaker before getting within 30 yards of the subject?

12   **A.**   No, ma'am.

13   **Q.**   Why not?

14   **A.**   Just I want -- like I say, I want to be close enough so

15   that I can visually control you and I can verbally control you.

16   There is no reason for me to use a loud speaker.

17   **Q.**   Have you taught officers that it's dangerous to stay in a

18   car when they are potentially encountering an armed subject?

19   **A.**   Yes, ma'am.

20   **Q.**   Why?

21   **A.**   Well, the engine block will stop a round but a windshield

22   won't if somebody shoots at it.  I'm also confined in the front

23   seat of the car, particularly the way the cars are designed now

24   with the computers in there.  I have very little movement.  I

25   have very little areas to escape.  So officers are taught in a

1    situation where a gun might be present or a gun is present to

2    immediately exit the patrol car.  If there is cover available

3    other than the door, they try to seek that cover if they can

4    move there safely or they use the car door for cover.

5    **Q.**   We've had a little bit of discussion about using a car

6    door for cover.  Have you taught police officers that car door

7    keeps them safe?

8    **A.**   Well, it's more concealment than it is cover, and

9    obviously the answer is it depends on the type of round that

10   the individual is shooting because some rounds won't go through

11   a car door.  Other rounds will very easily go through a car

12   door.  So it's not the best piece of cover available, but if

13   there's nothing else, you've to to be there.

14   **Q.**   Do you have any understanding of whether police car doors

15   are commonly filled with ballistic material?

16   **A.**   Most aren't.  I think you can special order them or you

17   can do it yourself, but from my experience, most aren't.

18   **Q.**   We were offered some discussion about containment and

19   perimeter.  In a situation such as this where the officers have

20   a call of a man with a gun they've not yet spoken to the person

21   that appears to be meeting the description nor do they have any

22   indication that the man has used the gun in any way, in your

23   opinion, would a use of lethal force be inappropriate if the

24   officers have not attempted containment or perimeter?

25   **A.**   No, ma'am.  It would still be appropriate given the same

1  scenario.

2  **Q.**   Why would a containment or perimeter not be tactically

3  required before using lethal force in this particular scenario?

4          **MR. POINTER:**  Objection, Your Honor.  There is nothing

5  in his report that goes to containment of perimeters.

6          **THE COURT:**  Overruled.

7          **THE WITNESS:**  Again, if I had a suspect that was

8  inside of an enclosed area or even in an open area that wasn't

9  acting out by producing a firearm, then certainly we could set

10  up a perimeter and we could try and contain the individual, but

11  the individual has to be cooperative for that to occur.  They

12  can't be drawing a gun.

13  **BY MS. BAUMGARTNER:**

14  **Q.**   So, in other words -- all right.  Never mind.

15      And you used the word "cooperative."  In your training of

16  police officers, how do you define "cooperative"?

17  **A.**   Well, by definition it means the person's doing what you

18  tell them to do, so if I say "show me your hands" and you show

19  me your hands, that's great.  If I say, "okay, put them up over

20  your head" and you do that, then you're cooperative.  Anything

21  that you do above and beyond that is not being cooperative.

22  **Q.**   Again, using the hypothetical here where the officers say

23  "show me your hands" and the man reaches into his holster and

24  pulls a gun out, would you consider that to be cooperative?

25  **A.**   No, ma'am.

1    **Q.**   Would you expect the police officers at that point to

2    create a containment and a perimeter?

3    **A.**   No, ma'am.

4    **Q.**   What would you expect the officers to do?

5    **A.**   To react with lethal force.

6    **Q.**   Now, let's talk about officers' training with respect to

7    when they stop shooting at a subject who is pointing a gun at

8    them.  What are officers trained about how -- when it is that

9    they should cease firing?

10    **A.**   Basically when there is no longer a threat.  So if the

11    person drops the weapon, if the person goes down on the ground

12    and then there is no threat, the officers stop firing.

13    **Q.**   Does going down on the ground necessarily mean that there

14    is no threat?

15    **A.**   Oh, no.  In other words, many shooters will go to a prone

16    position because they become basically a smaller target, so if

17    I still had a gun pointed at the officers from a prone position

18    on the ground, then the officers would still fire.

19    **Q.**   How are officers supposed to assess whether the person in

20    a prone position on the ground is -- continues to be a threat?

21    **A.**   Well, basically the threat is presented by the person and

22    the weapon that they have.  So if the weapon is no longer

23    pointed in their direction and the person is no longer looking

24    towards them, then that would be where an officer would cease

25    firing.

1    **Q.**    So, again, hypothetically, assuming that the first two

2    officers were firing in this given scenario from 30 yards away

3    and they saw the man pointing the gun at them go down into a

4    prone position, lift his head, and point the gun at them again,

5    in your opinion, would it be consistent with their training to

6    use -- to continue to shoot at him?

7    **A.**    Yes, ma'am, it would be.

8    **Q.**    Would it matter to you whether the officers had to reload

9    their weapons, in other words, had shot more than 13 shots in

10   terms of your opinion about the fact that this was consistent

11   with their training?

12   **A.**    No, ma'am.  If the threat still presented itself, then the

13   officer needs to reload the gun.  That's what they're trained

14   to do.

15   **Q.**    Is the number of shots in and of itself something that the

16   officers are trained, to, for example, count?

17          **MR. POINTER:**    Objection, Your Honor.  Beyond the scope

18   of his expert opinion as contained in his expert report.

19          **THE COURT:**    Counsel, can you direct to me where that

20   issue is raised?

21          **MS. BAUMGARTNER:**    Again, it just goes to the general

22   opinion about reasonableness, Your Honor.

23          **THE COURT:**    That's sustained.

24   **BY MS. BAUMGARTNER:**

25   **Q.**    So hypothetically, again, in this particular scenario

1  about the call and being 30 feet away and the man going prone

2  on the ground, would it be consistent with the officers'

3  training if they -- if the sergeant on the passenger's side

4  sees the man's head go down and the gun go down on the

5  ground -- would it be consistent with their training to stop

6  firing at that point?

7  **A.**    Yes, ma'am, it would.

8  **Q.**    Why is that?

9  **A.**    Because there's no longer a perceived threat.

10  **Q.**    So hypothetically, even if one of the officers, the

11  officer on the driver's side, didn't actually see that action,

12  would it be consistent with his training to cease firing if the

13  sergeant said cease firing?

14  **A.**    Yes, ma'am.

15  **Q.**    Why?

16  **A.**    Well, number one, he is a sergeant and, number two, he has

17  a better perspective of what's occurring and he is seeing

18  something that would indicate we no longer need to use lethal

19  force.

20  **Q.**    There was some testimony earlier that -- let's see if I

21  can get the scenario straight -- that prior to encountering

22  this man on the roadway, that the officer should have

23  designated one of the officers as the shooting officer and told

24  the other officers at the scene to hold fire until he basically

25  told them to do so.  Is that something that police officers are

1    trained in?

2            **MR. POINTER:**  Objection, Your Honor.  Beyond the scope

3    of his expert report.

4            **THE COURT:**  Overruled in rebuttal to Mr. Clark.

5            **THE WITNESS:**  No.  They would never be trained to do

6    that.  You have to perceive the threat yourself.  I can't say

7    well, you're going to be the shooter and I see a threat and I

8    wait for you to shoot and you don't see the threat.  I mean, so

9    that would be contrary to all the training officers are given.

10   **BY MS. BAUMGARTNER:**

11   **Q.**  Now, we've also had testimony that in fact the other

12   officers should wait to shoot until they have perceived that

13   the designated shooting officer has been injured.  Is that

14   consistent with the officers training?

15   **A.**  No, ma'am.

16           **MR. POINTER:**  Objection.  Misstates the prior

17   testimony.

18           **THE COURT:**  Overruled.

19           **THE WITNESS:**  No, ma'am.  That would be ludicrous.

20   I'm sorry.  But that simply to wait until another officer is

21   injured before I take any action, no.  They're not trained that

22   way at all.

23   **BY MS. BAUMGARTNER:**

24   **Q.**  Now, I want to address the second car that arrived.  Are

25   officers trained that they necessarily need to discuss their

1  exact roles as they're approaching a scene where there's been

2  shots fired?

3  **A.**    No, ma'am.  That's the basis of all training.  I mean, you

4  go through tactical scenarios.  You go through the firearms

5  training systems.  You talk about tactics so that you don't

6  have to spend time communicating.  That's wasting valuable time

7  to stop or negate a threat.

8  **Q.**    As an instructor, would you be critical if two officers

9  who had not worked together before didn't verbalize who was

10  going to be a contact officer and who was going to be a cover

11  officer as they were driving towards a call with a man with a

12  gun in this scenario?

13  **A.**    I'd criticize them.

14          **MR. POINTER:**  Objection, Your Honor.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  I'd criticize them if they did that.

17  You're just wasting time.  Officers go through a lot of

18  training, and they basically know their role, particularly if

19  it's in a shooting situation.

20  **BY MS. BAUMGARTNER:**

21  **Q.**    Let's again talk about the second car.  So assume, again

22  hypothetically, that the officers have received a call over the

23  radio about a man with a gun in a red jacket.  They see, as

24  they approach the scene, a man in a red jacket standing in

25  front of the first police car that's way up the road, and as

1    they drive around a gate and are approaching, they hear shots

2    fired and call over the radio that shots are fired.  What do

3    you train them that they should do in that particular

4    situation?

5    A.    Well, obviously, depending on what their location is, they

6    want to find out where the shots are coming from, they want to

7    seek cover, and they want to protect themselves, so they would

8    basically draw their firearms.

9    Q.    Would it be consistent with their training to drive

10   towards where the shots are being fired if there is only one

11   other police car up there?

12   A.    Yes, ma'am.

13   Q.    Would it be consistent with their training to stop and

14   pick up or bring into their car other police officers who are

15   running up the road?

16   A.    Bring them to their car?

17   Q.    Or stop and coordinate with them before they continue

18   driving up the road?

19   A.    No, ma'am.  That would be again wasting time.

20   Q.    So again assuming the scenario that the officers hear

21   shots fired, they park offset from the other police car, and

22   they both get out with their guns drawn.  Is that consistent

23   with the officers training?

24   A.    Yes, ma'am, it is.

25   Q.    Now, assume again that the driver on the right-hand side

1   sees the man on the ground prone and sees a red light flash

2   across his eyes.  What would you expect the officer to do in

3   that particular situation?

4   **A.**    Basically to shoot at the individual that has the light

5   pointed at him.

6   **Q.**    Would you also expect him to take cover behind his car?

7   **A.**    I would hope he does.

8   **Q.**    And would that action of using lethal force in that

9   situation -- would that be consistent with his training?

10  **A.**    Yes, ma'am, it would.

11  **Q.**    Now, assume that the driver of the second car can't see

12  the driver of the first car, and he runs around or goes around

13  the first car to check on that driver.  It appears to him that

14  the driver is uninjured, and he then looks up and sees the

15  prone man pointing a gun-shaped object at him and he sees a

16  flash of light across the muzzle of the gun.  What would you

17  expect the officer to do based on his training in that

18  scenario?

19  **A.**    Again, he would use lethal force.

20  **Q.**    Would it change your opinion to know that there was no

21  glass broken or sounds of bullets hitting metal in that

22  situation?

23  **A.**    No, ma'am.

24  **Q.**    Why not?

25  **A.**    Well, when rounds go off, they're very loud, and you're

1   probably not going to hear breaking glass.  You're not going to

2   hear rounds hitting the metal or steel of the car.  I mean,

3   you're simply going to hear the reports from the gun being

4   fired.

5   **Q.**   Are officers trained that they should wait until they hear

6   a bullet actually hitting their car in some way before they use

7   lethal force?

8   **A.**   No, ma'am.

9         **MR. POINTER:**  Objection, Your Honor.  Same objection.

10  Beyond the scope of anything written in his report.

11        **THE COURT:**  Overruled.

12        **THE WITNESS:**  No, ma'am.  That would be too late.

13  **BY MS. BAUMGARTNER:**

14  **Q.**   So let's talk generally about orders given in this

15  situation.  Would you ever train an officer to say "freeze" to

16  a subject 30 yards up the road who has his hands down his side

17  and may be armed?

18  **A.**   No.  I would say "show me your hands."

19  **Q.**   Is there a reason you wouldn't say "freeze" or you

20  wouldn't teach officers to say "freeze"?

21  **A.**   It's just not something that I train.

22  **Q.**   Do you think that having a subject in that position

23  actually freeze with his arms down -- what is the goal of the

24  police officer when he approaches a subject that might be

25  armed?

1           **MR. POINTER:**  Objection, Your Honor.

2           **MS. BAUMGARTNER:**  Let me ask it that way --

3           **MR. POINTER:**  Exceeds the scope of his expert report.

4           **THE COURT:**  Overruled.

5           **MR. POINTER:**  And is vague and ambiguous.

6           **THE WITNESS:**  Basically to control the person

7    visually, verbally, and to isolate the hands so I can see the

8    hands.  If the hands are down by the side, they're basically

9    closer to the waistband, and if that's where I know the gun has

10   been reported to be then I would want the hands where I can see

11   the hands.  I want the hands to open up.

12   **BY MS. BAUMGARTNER:**

13   **Q.**   What do you teach officers about warnings prior to using

14   lethal force, generally speaking?

15   **A.**   Well, to -- if it's possible or feasible for them to give

16   a warning, then they should give whatever warning they decide

17   to use.  There is no standard warning that is recommended by

18   POST or recommended by the court system, just what the officer

19   feels is not adequate warning.

20   **Q.**   So warnings don't have particular language associated with

21   them necessarily?

22   **A.**   No.  There is no accepted standardized warning that the

23   officers need to give.

24   **Q.**   In this situation where somebody says "show me your hands"

25   and the person says back, "no, show me your hands," and starts

1  to pull out a gun, do you believe in the officers' training

2  that a warning has been given?

3  A.   Well, I think by saying "show me the hands," you've given

4  them a warning, that you want to see the hands.  You don't want

5  to see anything else.  And then when the gun comes out, you've

6  got to react to it.

7  Q.   Do you believe that the words "or I'll shoot" is required

8  as part of a warning?  Is that what you teach the officers?

9  A.   No, ma'am.

10  Q.   In the situation that we have here, do you believe that

11  the officers are taught that any more warning is needed

12  other -- when they've said "show me your hands," the suspect

13  says "no, show me your hands" and starts to reach for a gun,

14  are the officers taught that it's feasible to give more

15  warnings in that particular situation?

16  A.   No, ma'am.

17  Q.   Why not?

18  A.   Simply once the person's made a movement to produce a

19  firearm, talking is over.  You've got to react to it.

20  Q.   Are you familiar with the San Francisco Police Department

21  General Order 5.02?

22  A.   Yes, ma'am, I am.

23  Q.   Do you know what it says about use of lethal force?

24  A.   Yeah.  An officer can use lethal force to protect

25  themselves or protect another person from a threat of death or

1    serious bodily injury.

2    **Q.**   Do you know if it uses the word "reasonable"?

3    **A.**   It uses "reasonable," yes.  "Reasonable and necessary," I

4    believe.

5    **Q.**   The learning domain that we've talked about that talks

6    about the use of force, do you remember if it has a particular

7    scenario about what "imminent" means in terms of an imminent

8    threat that justifies use of lethal force?

9    **A.**   Yes, ma'am.  Sometimes "imminent" and "immediate" are

10   interchanged, but they're not the same.  "Immediate" means that

11   it's right now.  "Imminent" means that there's a possibility

12   it's going to be, and that's the way it's defined.

13   **Q.**   So officers are taught that it doesn't have to be this

14   exact second, but it could be happening soon; is that fair to

15   say?

16   **A.**   Yes, ma'am.

17   **Q.**   In this particular situation where the officers believed

18   that a -- that there has been a call with a man with a gun and

19   he reaches towards a holster and pulls it out, are officers

20   taught that that is within the definition of imminent?

21   **A.**   I think it would be imminent and immediate.

22   **Q.**   And what are officers taught with respect to their use of

23   lethal force in that particular situation?

24   **A.**   That they would be justified in using lethal force.

25   **Q.**   Hold on just a minute.  Thank you.

1    (Pause in Proceedings.)

2    **BY MS. BAUMGARTNER:**

3    **Q.**   Have officers been taught -- in your experience, have

4    officers been taught anything about forcing the use of lethal

5    force?

6    **MR. POINTER:**  Objection, Your Honor.  It exceeds the

7    scope of his expert report, any opinion contained within it.

8    **MS. BAUMGARTNER:**  This is related to Mr. Clark's

9    testimony.

10    **THE COURT:**  Is there a particular part of the report

11    that assesses it?

12    **MS. BAUMGARTNER:**  Again, this has to do with general

13    opinion about the reasonableness and the approach and

14    confrontation.

15    **THE COURT:**  All right.  Overruled.  Keep it brief.

16    You may answer, Mr. Cameron, if you remember the question.

17    **BY MS. BAUMGARTNER:**

18    **Q.**   Did you understand the question?

19    **A.**   Obviously we talk to the officers where you try and create

20    a scenario where you try to use deadly force.  That's something

21    the officers do.  They are trained that.  They have an actual

22    threat and they have to react to the threat.

23    **Q.**   Is there anything about the scenario that we've talked

24    about so far that the officers violated any training about

25    forcing a deadly confrontation?

1    **A.**    No, ma'am.

2    **Q.**    Why not?

3    **A.**    Simply they responded to a man-with-a-gun call.  They

4    tried to get cooperation from the individual, and the

5    individual chose to produce a firearm.

6         **MS. BAUMGARTNER:**  I have no further questions,

7    Your Honor.

8         **THE COURT:**  Thank you.

9         Examination by the plaintiffs.

10        **MR. POINTER:**  Thank you.

11                        <u>**CROSS-EXAMINATION**</u>

12   **BY MR. POINTER:**

13   **Q.**    Mr. Cameron, when you train officers to tell a person

14   "show me your hands," you also train the officers to expect

15   movement of the hands; correct?

16   **A.**    Right.

17   **Q.**    That in and of itself, movement of the hands, isn't a

18   basis upon which the officers could use deadly force; correct?

19   **A.**    That's correct.

20   **Q.**    Now, Mr. Cameron, you prepared a -- an expert report

21   containing the opinions that you have expressed in this case;

22   correct?

23   **A.**    Yes, sir, I did.

24   **Q.**    Attached to that expert report, you listed all the times

25   you've given sworn testimony as it relates to over the last

1    four years; is that right?

2    **A.**    Yes, sir.  I think it's actually a little more than four

3    years but generally.

4    **Q.**    Well, it was certainly since 2011 up to December 15 of

5    2015; is that right?

6    **A.**    Correct.

7    **Q.**    And in that report, you list that you have given expert

8    testimony 20 times on behalf of the defendant, City and County

9    of San Francisco; is that true?

10   **A.**    Without looking at the report, but I believe if you say

11   it, it's true.

12   **Q.**    That would mean you've given expert testimony on behalf of

13   the defendants, City and County of San Francisco, on average of

14   five times a year; is that right?

15   **A.**    Approximately.

16   **Q.**    And in each one of those cases where you were giving sworn

17   testimony on behalf of the City and County of San Francisco,

18   you were paid for that work that you did; right?

19   **A.**    Yes, sir, I was.

20   **Q.**    And it's also true that in each one of those cases where

21   you were giving paid, sworn testimony on behalf of the

22   defendants, City and County of San Francisco, there was an

23   expert that was on the other side of the case who was giving

24   opinions opposite of yours; is that right?

25        **MS. BAUMGARTNER:**  Objection, Your Honor.  Overbroad

1    and compound.  Is he going to go through each 20?

2            **THE COURT:**  Overruled.

3            **THE WITNESS:**  Yes.  Generally there is an expert on

4    the other side.

5    **BY MR. POINTER:**

6    **Q.**    And that expert had an opinion that was opposite of yours,

7    meaning you were saying the force or whatever it is that the

8    officers did was okay; correct?

9    **A.**    Normally, yes, sir.

10   **Q.**    And the expert on the other side was saying that the force

11   or whatever the officers did was incorrect; is that true?

12   **A.**    Well, normally.  I'm not privy to the experts on the other

13   side's testimony so I don't know.

14   **Q.**    Well, that expert -- strike that.

15           Now, you were asked some questions about the City and

16   County of San Francisco's policies.  Do you remember those

17   questions?

18   **A.**    I do.

19   **Q.**    Those policies in and of itself are not the law; right?

20   **A.**    No, sir.

21   **Q.**    In fact, you would agree that the law is to be given by

22   Your Honor and not through the City and County of

23   San Francisco's policies; right?

24   **A.**    I totally agree with that.

25           **MR. POINTER:**  Thank you.  No further questions.

1        **THE COURT:**  Further examination from the defense?

2        **MS. BAUMGARTNER:**  No, Your Honor.

3        **THE COURT:**  Mr. Cameron, we are going to take a

4   five-minute recess.  If you can stick around.

5        And, Ladies and Gentlemen of the jury, if you have any

6   questions, you may write them during that period.  If you do

7   not, we will excuse the witness.  We will be in recess for five

8   minutes.  Thank you.

9                      (Recess taken at 2:28 p.m.)

10                   (Proceedings resumed at 2:35 p.m.)

11        (Proceedings were heard out of presence of the jury:)

12        **THE COURT:**  We have heard from the jurors that they

13   have no further questions from Mr. Cameron.  Mr. Cameron, you

14   are excused.  Does the defense have any other witnesses to

15   call?

16        **MS. BAUMGARTNER:**  No, Your Honor.  The defense rests.

17        **THE COURT:**  Let's wait for the jurors to hear that

18   exciting development.  Let's call them in.

19        (Proceedings were heard in the presence of the jury:)

20        **THE COURT:**  Everyone may be seated, please.

21        Do the defendants have any further exhibits, evidence, or

22   witnesses to introduce in their defense?

23        **MS. BAUMGARTNER:**  No, Your Honor.  Defendants rest.

24                      (Defense rests.)

25        **THE COURT:**  All right.  Ladies and Gentlemen of the

1    Jury, we have reached a second milestone in the case, and

2    that's the close of the defendants' evidence, as suggested a

3    little earlier today.  That will conclude our presentation for

4    today with a request to return tomorrow at 9:00 a.m.  At that

5    time I will give you the final jury instructions, the statement

6    of the law that you will be applying during your deliberations.

7    Then the attorneys will give their closing arguments,

8    interpreting the evidence you've heard and suggesting how you

9    might apply the law to the facts of the case.  And then you'll

10   begin your deliberations.

11       One of the things you'll do is, assessing the timing of

12   the deliberations -- we will talk more about that tomorrow --

13   but I would assume for purposes of planning, we would keep the

14   same schedule during your deliberations, 9:00 to 4:00.  The

15   tighter parameters of when you take a lunch break and when you

16   take breaks is something you can determine.  That would be my

17   rough plan for tomorrow and as long as it's necessary to get

18   the case resolved.

19       Thank you for your continued attention.  Remember not to

20   deliberate or to investigate the case and not to discuss it

21   with anyone.  We will see you tomorrow at 9:00.  Thank you.

22       (Proceedings were heard out of presence of the jury:)

23           **THE COURT:**  All right.  Counsel, I will have coming to

24   you in just a moment a revised version of the jury verdict form

25   and final jury instructions.  I want to highlight a few things

1    which I changed just so your attention is drawn to them

2    immediately and then of course you want a chance to review all

3    of them.  And this follows our discussion from earlier this

4    morning.

5         On the verdict form for the Fourteenth Amendment claim, I

6    did change the language in the final clause to read "unrelated

7    to a legitimate law enforcement objective" to track the

8    language more precisely that's in the jury instruction for that

9    same claim.  So the objective there was just to be consistent

10   between instruction and verdict form as to the Fourteenth

11   Amendment.

12        **MS. BAUMGARTNER:**  I'm sorry.  Can you repeat that,

13   Your Honor?

14        **THE COURT:**  Yes.  This is in the instruction for the

15   Fourteenth Amendment -- excuse me -- for the verdict form for

16   the Fourteenth Amendment.  I changed the verdict form to track

17   the language precisely with the instruction.

18        **MS. BAUMGARTNER:**  Thank you, Your Honor.

19        **THE COURT:**  That's the only part of the verdict form

20   that was not something we discussed.

21        In the instructions, in the "Claims and Defenses" section,

22   the final paragraph, I made mention of the third claim no

23   longer being part of the case, so you want to review that

24   carefully to see if you agree.

25        In the section on the Fourteenth Amendment, I did review

1    carefully the *Moreland* and *Porter* cases and the *Hayes* case and

2    the *City of Anaheim* case, and what I've drafted is to remove

3    the language about deliberateness, in other words, to remove

4    the option there.  To back up, our options were either to take

5    it out, leave it as is, or add some further explanation as to

6    the alternative.

7         My view as of the moment is to take it out, finding that

8    the facts of the case presented and the case law from those

9    cases, that's the instruction that is the most appropriate fit

10   to the facts of this case.  So the final sentence now reads --

11   and you'll have a chance to read this yourself -- "in the

12   circumstances of this case, a use of force shocks the

13   conscience only if the officers had a purpose to harm the

14   decedent for reasons unrelated to legitimate law enforcement

15   objectives."

16        My suggestion is we return at 3:15 for a final review of

17   those -- that's about half an hour -- final review of the

18   instructions and verdict form and any other issues we need to

19   take up before the final conference tomorrow.

20        **MR. POINTER:**  Yes, Your Honor.  I would like to direct

21   the Court to a particular case to further inform our discussion

22   about the Fourteenth Amendment.

23        **THE COURT:**  What is that?

24        **MR. POINTER:**  That is the Kosakoff, K-O-S-A-K-O-F-F,

25   vs. City of San Diego.  And it's a Westlaw cite at this point.

1    2010 WL 1759455 at 11 through 12.  And they discuss some of

2    this.

3         THE COURT:  All right.  I'll take a look at that, and

4    we will return to see you at 3:15.

5         MS. BAUMGARTNER:  I think the Court has done the

6    research.  There are other cases on this issue, but --

7         THE COURT:  There are many other cases than the ones I

8    just cited, but I will take further argument at 3:15.

9         MS. BAUMGARTNER:  Okay.  A couple of administrative

10   matters, Your Honor.  First of all, I don't know if we have

11   time limits on the opening statement.

12        THE COURT:  Very good question.  Yes.  How much time

13   do you contemplate?

14        MS. BAUMGARTNER:  I contemplate about an hour.

15        THE COURT:  And Mr. Pointer, how long do you

16   contemplate?

17        MR. POINTER:  I had about an hour and fifteen to an

18   hour and a half.  That's closing and rebuttal.

19        THE COURT:  All right.  You have two hours and fifty

20   minutes remaining total in the trial, and you have asked for a

21   punitive damage phase to come with evidence from four

22   witnesses, instruction, some things to follow.  So if you

23   actually took that much time, there would be very little time

24   for a punitive damage phase, but if -- and I suspect that you

25   can get it done very persuasively in an hour, but if you need

1    an hour and fifteen minutes, I will give you an hour and

2    fifteen minutes for the two parts.  You will go first and then

3    the defendants.

4              **MR. POINTER:**  Right.

5              **THE COURT:**  I will give you that much time, but I

6    think an hour is probably a good fit for the evidence in the

7    case.  That would allow us to be done before lunchtime for the

8    jurors to begin their deliberations.

9              **MR. POINTER:**  Just so I'm clear, you are giving me an

10   hour and fifteen minutes for closing and rebuttal?

11             **THE COURT:**  Total.

12             **MS. BAUMGARTNER:**  One other issue.  I have believe the

13   audience will be full.  I anticipate the audience will be full.

14   I'm wondering if we can reserve the front row here in front of

15   the bar for my colleagues and other members of my team so that

16   they would have space in the courtroom rather than having to

17   line up whatever time they might have to line up.

18             **THE COURT:**  The front row right there behind you?

19             **MS. BAUMGARTNER:**  Correct.

20             **THE COURT:**  I have no objection to that.  I think

21   there will be quite a bit of demand, but I do plan to do it in

22   this courtroom for continuity of the jury and you presenting

23   the closing arguments and for the familiarity of the technology

24   and the lawsuit, so "yes" is the answer to that.

25             **MS. BAUMGARTNER:**  Thank you, Your Honor.

1      **THE COURT:**  Any other questions?

2      **MR. POINTER:**  None at this time, Your Honor.

3      **THE COURT:**  See you at 3:15.

4                    (Recess taken at 2:44 p.m.)

5                (Proceedings resumed at 3:30 p.m.)

6      **THE COURT:**  All right.  Back on the record.  Good

7  afternoon.  The jurors are not present.  Parties are not

8  present, and counsel are.

9      We have a revised jury verdict form and final jury

10 instructions, which I have presented to you.  Let's start with

11 the jury verdict form itself.

12     Mr. Pointer, any further objections or comments on the

13 revised jury verdict form?

14     **MR. POINTER:**  One section, Your Honor.  I don't think

15 I had any additional.  I want to make sure.

16     Submit, Your Honor.

17     **THE COURT:**  All right.  Any objections or comments

18 from the defense?

19     **MS. BAUMGARTNER:**  Yes.  I believe some of the

20 instructions are a bit incorrect.

21     **THE COURT:**  On the verdict form first.

22     **MS. BAUMGARTNER:**  Yes.  On the verdict form in terms

23 of what to do next.

24     **THE COURT:**  Which ones?

25     **MS. BAUMGARTNER:**  So I think that with respect to

1    Question 1, it should be "If you answered *yes* as to any

2    defendant, proceed to Question 2 as to that or those defendants

3    only."  I think that last phrase should be added.

4         **THE COURT:**  One second.  All right.

5         **MS. BAUMGARTNER:**  I also think it should say "If your

6    answers to Questions 1 are all *no*, answer no further questions,

7    and please sign and date the form and return it to the

8    courtroom deputy" because if there are -- if they're all *no*,

9    we're done.

10        **THE COURT:**  You're certainly right that there is no

11   reason to inquire into damages.  The question is whether there

12   is any reason to inquire into the qualified immunity issues?

13        **MS. BAUMGARTNER:**  No.  Because it's the two-part test

14   for qualified immunity.  If they answered all those questions,

15   the first part is over, and there are no further questions that

16   need to be answered.

17        **THE COURT:**  I think you're right.

18      Mr. Pointer, does that make sense to you?

19        **MR. POINTER:**  Yeah.  Actually it does.

20        **THE COURT:**  Our first stipulation.  Any other issues?

21        **MS. BAUMGARTNER:**  Yep.  That also changes the answer

22   to 2, the directions following answer 2.  I think it should

23   say, "If you answered *yes* as to any defendants, answer

24   Questions 3" -- so I would take either Question 1 or 2 out

25   because this is following Question 2, and, again, Question 2 is

1    only to be answered if there is a *yes* in Question 1.

2         THE COURT:  Yes.

3         MS. BAUMGARTNER:  Answer Questions 3 to 5.  That's

4    fine.  "If your answers to Question 2" -- so take out 1 -- and

5    "are all *no*, answer no further questions and sign and date the

6    form."  And it's only "If any of your answers to Question 2 are

7    *yes*, answer Questions 3 through 5."

8         THE COURT:  And if it's *yes*, it's not just -- I'm

9    thinking out loud.  It's not just 3 through 5.  They are

10   actually going to continue on after 3 through 5.

11        MS. BAUMGARTNER:  My suggestion is we add an

12   instruction after 5 or direction, I should say, to not be

13   confused with jury instruction that then after 5 says answer

14   Part B.

15       I then think with respect to the damages portion in the

16   middle of the page on page 4, I think you should say, "If your

17   answer is *no*," I would say "Skip Question 7 and proceed

18   directly to Question 8," just to be double sure.

19        THE COURT:  I'm sorry.  Which line are you on?

20        MS. BAUMGARTNER:  Where it starts on line 11.

21        THE COURT:  Yes.

22        MS. BAUMGARTNER:  I would add the *no* in parens, skip

23   Question 7 and proceed directly to Question 8, just to clarify.

24       I also have a concern about --

25        MR. POINTER:  Before we move on just while we are in

1    that section, it appears then that under Part B, the second

2    sentence is unnecessary then because they wouldn't be answering

3    Part B.

4           **THE COURT:**  I think you're right.

5           **MS. BAUMGARTNER:**  Oh, right.  That's true.  Thank you.

6       I also believe it's unnecessary and potentially

7    problematic to have eight jurors do math that we can all do

8    based on the form, and therefore I would eliminate Question 10,

9    and we can do that math.  Just in case, God forbid, there

10    should be an extra zero, something could happen with respect to

11    that math, I think that it would make sense for us to do the

12    math afterwards, if necessary.

13           **THE COURT:**  Any objection?

14           **MR. POINTER:**  I'll submit, Your Honor.

15           **THE COURT:**  I will adopt that suggestion.

16       Any others?

17           **MS. BAUMGARTNER:**  Not on the verdict form.

18           **THE COURT:**  All right.  We will make those changes and

19    get a further revision out to you in a little while.

20           **MS. BAUMGARTNER:**  Thank you.

21           **THE COURT:**  How about on the instructions?

22       Mr. Pointer, let me start with you on the -- jump right to

23    the Fourteenth Amendment issue where I made a revision, and

24    this is on page 10 and 11.  I don't see the *Kosakoff* case,

25    which is 2010 Westlaw 1759455, as being factually on point.  At

1    page 11 of that opinion, it reflects the situation there was

2    steadily deescalating up to the moment of the shooting, and

3    there was a 15-minute slowdown and a chase situation where the

4    officers had time to deliberate, and that's what was the key

5    facts of that case.

6        The facts in this case don't have a deescalation of

7    anything like that duration or a deescalation at all.  The

8    evidence at trial is either a neutral situation or an

9    escalation, not a deescalation, so I don't think that is

10   instructive as to there being a different stand than purpose to

11   harm, which the Court applied.

12       **MR. POINTER:**  I would just respond, Your Honor, that

13   it appears just from my review of some of the cases that the

14   courts have found that there was appropriate time or, I should

15   say, a time for officers to deliberate even after a -- even

16   after a situation that's in a high-speed chase and other things

17   that we may at first blush say that they did not have time to

18   consider and deliberate their actions but have actually been

19   found to have time to deliberate, even after a situation where

20   it is escalating and/or is coming after a standoff or during a

21   standoff, and so that's why I submitted that to the Court.

22       **THE COURT:**  You're right that there are cases, and

23   this is one of them where after escalation there is a period of

24   deescalation and that gives the officers time to deliberate.  I

25   don't see the facts of this case, the one before the jury,

1  having that component of deescalation.  There had been a period

2  after the testimony about Mr. Nieto pulling a gun and there was

3  some minutes that passed or some circumstances changed that

4  might be deescalation, but there is no testimony of him pulling

5  a gun and then there being some deescalation from there.  It

6  was very quickly from there to shooting and death.

7       And even if you kind of back further up and you say well,

8  let's view the circumstances from when the officers got to the

9  gate and then moved up the hill towards him, was that a

10  deescalation?  No.  I also don't think that was a deescalation.

11  That was an escalation of the situation.

12       The best argument would be that was still enough time to

13  deliberate and it should lead to a different instruction.  But

14  I don't -- still don't see that as being a deescalation from

15  there.

16       **MR. POINTER:**  Well, I would just only add -- and I'll

17  submit on this -- that one of the components here is whether or

18  not the officers were forced, as the Court has just

19  indicated -- whether the officers were forced to have to make

20  this split-second decision based upon some of the context in

21  which it's being made, i.e., there is innocent bystanders

22  around in the way and/or are about to be confronted by the

23  person that has the instrumentality that the officers are

24  responding to, to the weapon.  Here we don't have that.  The

25  best that we have based upon the record is that there are

1    people in the periphery, all of which the officers didn't see

2    so they weren't responding to having to stop somebody before

3    they injured somebody else.  This is officers who essentially,

4    from my stylization of our interpretation of the facts, put

5    themselves in a position, rushed to it, and then in the course

6    of the confrontation that they sought out, then elected to use

7    deadly force.  That's why I think this case can be

8    distinguished in terms -- it wasn't a deescalation in terms of

9    there was ten minutes to talk to somebody, but it wasn't

10   necessarily in the context of the officers being forced to do

11   something because the person whom they ultimately shot was on

12   the way to do something else.  This was a guy who was casually

13   walking down a hill.

14           **THE COURT:**  Ms. Baumgartner, do you have any further

15   comments to this particular instruction?

16           **MS. BAUMGARTNER:**  Yes, Your Honor, a couple of them.

17      First of all, I've noted that all of the other

18   instructions include the phrase "proved by a preponderance of

19   the evidence" and this one does not, and therefore I think to

20   be consistent, that we should add such a claim requires it to

21   be -- I believe Refugio and Elvira Nieto to be by a

22   preponderance of the evidence that the officers used force,

23   etc.

24      I also think the instruction should be more clear and say

25   "use of force shocks the conscience only if the force was

1  unreasonable and the officers had a purpose to harm."  In other

2  words, even though we've directed to that in the verdict form,

3  I think the instruction should follow that.

4          THE COURT:  "Only if the force was unreasonable and

5  the officers had" --

6          MS. BAUMGARTNER:  Yes.

7          THE COURT:  Any objection to that?

8          MR. POINTER:  Yes, Your Honor.  I think that the

9  sentence as is includes essentially and incorporates the

10  reasonableness of the officers' conduct by its very definition.

11  If it's unrelated to a legitimate law enforcement objective,

12  then it's unreasonable.  So it's over-emphasizing, highlighting

13  the term and then -- so, anyway, I think it's repetitive and

14  unnecessary to include that term in there again since it's

15  already in there.

16          THE COURT:  I think it is consistent with the law to

17  have it say the force was unreasonable.  You're right that it

18  would seem unlikely that the jury could determine that it met

19  the purpose to harm test and was reasonable, but I also think

20  it tracks the law and it tracks the verdict form if we had the

21  words added there so I intend to add them.

22      All right.  So that will be -- I'll make amendments to

23  that section.

24      Mr. Pointer, any other -- do you have any other objections

25  to the revised final jury instructions?

1    **MR. POINTER:**  One second, Your Honor.

2    I would just say that that last phrase -- and I know we're

3    kind of wordsmithing it at this point.

4    **THE COURT:**  It would be important wordsmithing.

5    **MR. POINTER:**  Yes.  Absolutely.  It seems to me -- I'm

6    trying to figure out how to incorporate this in, but the

7    purpose of the harm is about inflicting force beyond that which

8    is required by a legitimate law enforcement objective, and I

9    guess the word that I'm focusing in on and why I mention that

10   is the "beyond" part because even though the officers -- it

11   incorporates in the text -- in the context of this case you

12   have what appears to be two volleys of shots, and so the

13   "beyond" piece is important for me and in terms of for the jury

14   evaluating the case because what we're talking about is maybe

15   if the jury decides the first volley of shots were okay, they

16   still need an understanding and should be able to make a

17   decision based upon whether the second volley of shots was

18   okay.  So it's beyond that which was -- which is unrelated to a

19   legitimate law enforcement objective.  So I'd like the word

20   "beyond" to be placed in there and then --

21   **THE COURT:**  Where do you think the word "beyond"

22   should be added?

23   **MR. POINTER:**  So only if the officers -- let me go

24   back.  Currently the sentence stands "A use of force," right?

25   That's how it starts currently.  "A use of force" --

1     **THE COURT:**  Right now it reads, "In the circumstances

2     of this case, a use of force shocks the conscience only if the

3     force was unreasonable and the officers had a purpose to harm."

4     **MR. POINTER:**  Somewhere right before it gets into that

5     second clause.  Unfortunately I'm not sitting in front of a

6     computer.

7     **THE COURT:**  I think that I'm going to take out the

8     quotation mark around "purpose to harm."  That's the only place

9     that we have something like that, and I think it draws -- given

10    that we've had some other words defining it, I think it brings

11    too much attention to the stand over any other.

12    **MR. POINTER:**  Yeah.  So, you know, it seems to me that

13    it could read, "In the circumstances of this case, a use of

14    force shocks the conscience if the officers inflicted force

15    beyond that which is required by a legitimate law enforcement

16    objective."

17    **THE COURT:**  And where are you crafting that language

18    from?  Is there a case that says that?

19    **MR. POINTER:**  I'm sorry.  Say that again.

20    **THE COURT:**  Is there a case that says that language,

21    the "beyond" --

22    **MR. POINTER:**  I believe this was pulled -- this

23    language is included in the jury instructions that we proposed

24    to Your Honor.  We cited a number of different cases, but one

25    of which was 712 F.3d 446 at 453, which is a Ninth Circuit case

1    of 2013.

2              **MS. BAUMGARTNER:**  What's the name of the case?

3         **MR. POINTER:**  Let me see real quick.  I'm sorry.  I'm

4    kind of working from my phone here on our previous

5    instructions.  I'm going to go back to my phone here.

6              **THE COURT:**  It's *AD vs. California Highway Patrol*.

7         **MS. BAUMGARTNER:**  I don't have that case with me here

8    in the courtroom.

9         **MR. POINTER:**  Right.  I would just say that because

10   obviously when we wrote the instruction, we don't highlight the

11   instruction by which portion we pull from cases, but we did use

12   authorities *Wilkinson vs. Torres*, *Porter*, which I understand

13   the Court has already considered and looked at, *Lee vs. City of*

14   *Los Angeles* and then *AD vs. Margraf*, which is a Northern

15   District case of 2009, which actually -- that one is the actual

16   jury instruction that we're citing to, which is Docket No. 84,

17   page 5.

18             **THE COURT:**  Well, I can only take them one at a time.

19      The *AD* case -- the Court did apply the purpose-to-harm

20   standard.  That's in the current draft of the instructions.

21             **MR. POINTER:**  Can I give the Court *the Lee* case?

22             **THE COURT:**  You can.

23             **MR. POINTER:**  250 F.3d 668 at 685, which is a Ninth

24   Circuit 2001 case.

25             **THE COURT:**  My quick research in that one is that case

1  has been overruled.  I'll take a look at that one and review

2  your other authorities.  I want to make sure we capture any

3  other issues in the final instructions.

4      Are there any other objections or comments to the

5  revisions to the final jury instructions?

6          MR. POINTER:  None from us.

7          MS. BAUMGARTNER:  Yes, Your Honor.

8          THE COURT:  Go ahead.

9          MS. BAUMGARTNER:  So one of the problems in drafting

10  jury instructions in a case like this where we have four

11  defendants and the two plaintiffs is the singular versus the

12  plural issues.  I have a number of places where I'm questioning

13  whether it's appropriate, starting with section -- or the

14  Section 1983, Claim No. 20 on page 9 in the last paragraph.  I

15  actually think that it should be reverted to the singular.  "If

16  you find a plaintiff has proved each of these elements" and "if

17  you find that a plaintiff has proved all of these elements, the

18  plaintiff is required to prove," and then again, on the third

19  line down, there's a "plaintiffs" that should be "plaintiff."

20  And then there's more making it singular later.

21          THE COURT:  I'm sorry.  Just to back up.  The first

22  reference to "plaintiff" you made was page 9, line 7?

23          MS. BAUMGARTNER:  No.  Line 15.

24          THE COURT:  Line 15.

25          MS. BAUMGARTNER:  So I think that the "plaintiffs"

1    referenced in that paragraph should be singular, and then of

2    course you have other language changes, and then I also think

3    that because of the multiplicity of defendants on the very last

4    line -- well, it starts on the prior line, one or more of these

5    elements against any defendant, your verdict should be for that

6    defendant on those claims; in other words, making that, you

7    know, referencing that as well.

8        And I assume that a written version of this is going to

9    the jury so --

10        **THE COURT:**  Yes.

11        **MS. BAUMGARTNER:**  -- I would suggest that on the

12    causation one, "you have deprived the plaintiff" and then you

13    have "plaintiffs" with the apostrophe after the "S."  It should

14    be before the "S."

15        On the next instruction, Instruction 22 in the first

16    paragraph, second to the last line -- is Your Honor there?

17        **THE COURT:**  I am.

18        **MS. BAUMGARTNER:**  "Prove by a preponderance of the

19    evidence that each officer used excessive force when he shot

20    Alejandro Nieto"; in other words, talking about each individual

21    defendant.

22        And then on the third paragraph down that starts "in

23    determining," it should be "in determining whether an officer

24    used excessive force."

25        Then we're going to the damages section.

1          **THE COURT:**  Yes.

2          **MS. BAUMGARTNER:**  Damages proof.  The second sentence

3    continues to reference wrongful death or the second paragraph

4    continues to reference wrongful death and does not reference

5    the Fourth Amendment.

6          **THE COURT:**  Good catch.

7          **MS. BAUMGARTNER:**  And it's also plural "plaintiffs" in

8    that sentence as opposed to "a plaintiff."  So I don't think

9    this instruction -- I also think that this instruction doesn't

10   clearly identify which damages are available under the Fourth

11   Amendment versus the Fourteenth Amendment, so I think given the

12   time I had, I didn't have a chance to redraft this entirely,

13   but I think that it should indicate that under the Fourth

14   Amendment what is available is Mr. Nieto's pain and suffering

15   prior to losing consciousness.  Of course we have no idea when

16   that might have been, but I'm not even going to go there at

17   this point.

18         So I think that we -- that this section needs to be

19   changed slightly.  I haven't had a chance to redraft it, you

20   know.  Given another ten minutes I could.  But I think that it

21   needs to deal with that.

22         The next section that I have comments on again is a plural

23   versus singular issue.  On page 12, punitive damages.  And,

24   again, I think it should say, "if you find for a plaintiff in,"

25   the first paragraph there, and then the third paragraph it's --

1    instead of saying "find that the defendants' conduct," it

2    should be "a defendant's conduct."  And I believe those were

3    all the things that I found in -- yeah.  I just think it's

4    better for the jury to be -- to not have any potential issues

5    about plural or singular.

6            **THE COURT:**  I agree wholeheartedly.

7            **MR. POINTER:**  Your Honor --

8            **THE COURT:**  Yes.

9            **MR. POINTER:**  -- reviewing this punitive damage

10   instruction, it actually alerted me to the punitive damage

11   instruction in the verdict form.  It does not include the word

12   "oppressive" wherein it talks about was any of the defendants'

13   conduct malicious.  It should say "oppressive or."

14           **THE COURT:**  Good suggestion.  All right.  The section

15   needing the most work then is the damages proof section, 24.

16   And I agree with the proposition that it doesn't line up with

17   the verdict form, and it also does not easily line up with the

18   facts of the case.

19           **MS. BAUMGARTNER:**  Or the law, actually.

20           **THE COURT:**  Well, the standard is -- I'm not sure that

21   conflicts with the law.  How does that conflict with the law,

22   which portion?

23           **MS. BAUMGARTNER:**  Because it doesn't clarify which

24   damages are available for which section; right?  So if we take

25   out wrongful death and add the Fourth Amendment, then it's

1    unclear which -- legally speaking which damages are available

2    under the Fourth Amendment and which damages are available

3    under the Fourteenth Amendment.  That's my concern.

4         **MR. POINTER:**  It seems as if we could delineate which

5    damages are for which cause of action starting with the Fourth

6    Amendment, maybe some type of heading, and then inserting a

7    definition or other factors for conscious pain and suffering.

8         **THE COURT:**  I'm sorry to interrupt.  I think this is

9    helpful, and I appreciate your -- I know you've got preparation

10   to do for your closing arguments.  I think we can improve that

11   section.  I'd like to have you take a first stab at it

12   together, and if -- 10 minutes seems fast to me, but if you can

13   work on it for 10 minutes or 20 minutes -- the alternative is

14   to have you file something, a little longer period of time, in

15   writing.  Which is your preference?

16        **MS. BAUMGARTNER:**  I would rather get it done now,

17   Your Honor.  I don't think we are going to be in much dispute.

18   We both know what should be instructed.  It's just how to draft

19   it.

20        **THE COURT:**  We're running a little longer than I

21   claimed.  Why don't you work on that section.  I'm going to

22   work on the other part.

23        **MS. BAUMGARTNER:**  I just wanted to point out that, of

24   course, now that the City is no longer a defendant, I don't

25   know how that will affect closing arguments, but I think that

1    it may, and I just wanted to be clear about that, that the City

2    is no longer a defendant, and we had this, to me, confusing

3    situation about representatives of the City and County and

4    various things like that, and I think that that should be made

5    clear to the jury, that the City is no longer a defendant.

6         **THE COURT:**  I don't know that there is anything in the

7    instruction that would confuse them on that.  The caption

8    doesn't have them --

9         **MS. BAUMGARTNER:**  No.  My concern is that the

10   argument -- the argument should not imply -- let me put it this

11   way.  The argument should not imply that the City is now

12   responsible or a --

13        **THE COURT:**  There is a motion in limine about that,

14   which I think I granted.  So, yes.  Fair notice.  I'll come

15   back in 13 minutes.

16        **MS. BAUMGARTNER:**  Thank you.

17                    (Recess taken at 3:57 p.m.)

18              (Proceedings resumed at 4:27 p.m.)

19        **THE COURT:**  Good afternoon.  Back on the record.

20      Thank you for your quick drafting.  I've received a Word

21   version of the damages proposal.  I've inserted that into the

22   document understanding that was agreed upon?

23        **MS. BAUMGARTNER:**  Yes.  Now that I've read it in this

24   format, there is one correction, which is on page 11 --

25        **THE COURT:**  Yes.

1          **MS. BAUMGARTNER:**  -- it says -- the phrase "in

2     determining Refugio and Elvira Nieto's loss," it should clarify

3     that's under the Fourteenth Amendment.

4          **THE COURT:**  I'm sorry.  Line number?

5          **MS. BAUMGARTNER:**  Line number 27.  It should say,

6     "under the Fourteenth Amendment," because otherwise it gets

7     confusing about whether that applies to the Fourth Amendment

8     damages or the Fourteenth Amendment, and it only applies to the

9     Fourteenth Amendment.

10         **THE COURT:**  So your suggestion is "In determining

11    Refugio and Elvira Nieto's loss under the Fourteenth Amendment"

12    should be added?

13         **MS. BAUMGARTNER:**  Yes.

14         **THE COURT:**  Any objection?

15         **MR. POINTER:**  No, Your Honor.

16         **THE COURT:**  I'll add that.  All right.

17         The other changes to the instructions were intended to be

18    consistent with what were discussed shortly ago.  I have not

19    gone over them twice to check if we got each of the

20    "plaintiff/plaintiffs."  I will go over that this evening, but

21    I will represent I did not make any other material changes to

22    any other sections that are intended to be a new statement of

23    law which was in it before.  The damages section is the part

24    that we changed.

25         So with that disclaimer, Mr. Pointer, do you have any

1    further suggestions or objections?

2            MR. POINTER:  Just the objections I previously stated.

3            THE COURT:  Do the defendants have any further

4    objections or interests not previously stated?

5            MS. BAUMGARTNER:  Nothing further, Your Honor.

6            THE COURT:  Thank you.

7        And on the verdict form, we again tried to be -- implement

8    each of the changes discussed.  We have fit everything on the

9    first page with the new directions about "go here after there."

10            MS. BAUMGARTNER:  I don't think we've gotten a copy of

11    that, Your Honor.

12            THE COURT:  Then you're in the dark.  One moment.

13    I'll tell you about it before you see it.  At the back of page

14    3 we have now continued to Part B on page 4.  That was

15    suggested.  In the punitive damages section, paragraph 10, we

16    added the word "oppressive" as suggested by the plaintiffs.  We

17    took out the conclusion paragraph about total damages as

18    suggested by the parties.

19            MR. POINTER:  Are we waiting to address the Court

20    about this?

21            THE COURT:  We are waiting to give you a chance to

22    read it.  Have you had a chance to review it?

23            MR. POINTER:  I was reviewing it, and I just noticed

24    something on page 2, but let me finish going through the

25    document.

1      Okay.  Number 2, the instructions after the listing of the

2  officers' names --

3          **THE COURT:**  Yes.

4          **MR. POINTER:**  -- it seems to me that the jurors, if

5  they answer 1 to -- let me back up.

6      Question No. 1, if any of the jurors answer "yes" to that,

7  it essentially tells them to proceed to Question No. 2.  It

8  seems to me that even if they answer "no" to No. 2, that they

9  still should because they answered "yes" to No. 1 -- that they

10 should still proceed to answer a damage question, which would

11 be about Mr. Nieto's -- whether or not he experienced conscious

12 pain and suffering, and then they should proceed to No. 7.  It

13 shouldn't be that --

14         **THE COURT:**  I agree.  Good work, Mr. Pointer.

15         **MR. POINTER:**  Thank you.  So do I have to come up with

16 the language?  That's why I check my stuff all the time.  If

17 you come up with a problem, better have a solution.

18         **THE COURT:**  Exactly.

19         **MS. BAUMGARTNER:**  And it would be "and answer

20 question" --

21         **MR. POINTER:**  It seems --

22         **MS. BAUMGARTNER:**  -- questions 6 and 7.

23         **THE COURT:**  Right.  The question is whether we need to

24 break the damages part into different parts.

25         **MR. POINTER:**  I think a sub-heading makes sense here.

1    So 6 and 7 should come under the Fourth Amendment -- yeah.

2         **MS. BAUMGARTNER:**  So actually I think that what we can

3    say is in the directions under 1, we could say --

4         **MR. POINTER:**  It seems like if you want to keep the

5    flow, then they can deliver their answer, whatever that may be

6    to 1, tell them to go to 2, and then in 2 there needs to be

7    kind of "choose your own adventure" kind of --

8         **THE COURT:**  We need more options at the end of 2.

9         **MR. POINTER:**  If you answer "yes" to 2, then you

10   proceed to essentially 3 through 5.  If you answered "no" to

11   No. 2 but "yes" to No. 1 -- or maybe it should read the

12   opposite.  If you answered "yes" to No. 1 but "no" to No. 2,

13   then you proceed to the damages for conscious pain and

14   suffering.

15        **MS. BAUMGARTNER:**  So I think, actually, since the

16   damages are, in fact, separate, that we should actually put the

17   damages section for the Fourth Amendment under Question 1 and

18   give directions accordingly and then direct to Question 2 and

19   then put the damages under Question 2 accordingly.

20        **THE COURT:**  Where should we put Questions 3 through 5?

21   At the very end?

22        **MS. BAUMGARTNER:**  Yeah.  Perhaps --

23        **THE COURT:**  Nowhere.

24        **MR. POINTER:**  That sounds like a good option right

25   there.

1        **MS. BAUMGARTNER:**  Well, then, again, I --

2        **THE COURT:**  No.

3        **MS. BAUMGARTNER:**  It's hard to do this on the fly, but

4   it seems to me that -- it seems to me that actually they do

5   have to answer questions 3 through 5 if they answer "yes" to

6   any question in 1.

7        **THE COURT:**  Right.

8        **MS. BAUMGARTNER:**  Right.  So yeah.  I --

9        **THE COURT:**  We could move them immediately after 1.

10        **MR. POINTER:**  3 through 5 you're saying?

11        **THE COURT:**  Yes.

12        **MS. BAUMGARTNER:**  So then the direction would be "If

13   you answered 'yes' to any of the questions" -- any of the --

14   "as to any defendant in Question 1, do the following.

15   Answer" --

16        **THE COURT:**  Keep going.

17        **MS. BAUMGARTNER:**  "Answer these questions and answer

18   Questions 3 through 5."  In other words, answer these damages

19   questions and answer questions 3 through 5; right?

20        **THE COURT:**  Yes.

21        **MS. BAUMGARTNER:**  And then, again, and also answer

22   Question 2 as it relates to that or those defendants.  Then we

23   go to Question 2.  "If you answered 'yes' to any of these

24   defendants" -- they'll already -- will they already have

25   answered then Questions 3 through 5?  Yes.  They will already

1  have answered Questions 3 through 5, so we can get rid of that.

2          THE COURT:  And the damages questions that go with the

3  Fourth Amendment claim are numbers --

4          MS. BAUMGARTNER:  6 and 7.

5          MR. POINTER:  Yes.

6          THE COURT:  And 8 and 9 go with the Fourteenth

7  Amendment, and unfortunately -- not "unfortunately," but 10

8  goes with both.

9          MS. BAUMGARTNER:  Oh, is there one that goes with

10  both?

11          MR. POINTER:  Right.  Punies.

12          MS. BERS:  That's the total.

13          MS. BAUMGARTNER:  No.  We took out the total.

14          MS. BERS:  Good.

15          MS. BAUMGARTNER:  Yes.  Then we would need also answer

16  yes -- "If you answered 'yes' to any question in 1 or 2, answer

17  this question," essentially is what it would have to say.  It's

18  much easier --

19          THE COURT:  Mr. Pointer, do you want to reduce it to

20  one claim?

21          MR. POINTER:  No.  But I'll definitely -- I'll take

22  all the yeses I can get on this form tomorrow, I'll tell you

23  that.

24          THE COURT:  All right.  I think I -- that's a problem

25  that we need to fix, and I think I need to put it in writing --

1          **MS. BAUMGARTNER:**  I agree, Your Honor.

2          **THE COURT:**  -- to see how the pieces fit together.

3     But we have an agreement on the framework that the Question 6

4     and 7 go with the Fourth Amendment.  Questions 8 and 9 go with

5     the Fourteenth Amendment.  Question 10 goes with both, comes at

6     the end for sure.

7          **MR. POINTER:**  Are we contemplating essentially

8     breaking the form into the Fourth and Fourteenth and then

9     everything that flows under the Fourth would be under there and

10    then the -- except for the interrogatory questions, which if

11    they don't answer questions under Fourth, they wouldn't get to

12    them anyway.

13         **THE COURT:**  Correct.  If they say "no" to everything

14    on the first question, that is unchanged.  We are done.  There

15    is no reason for any of the analysis.  If they say "yes," then

16    we are going to get the interrogatories and they are going to

17    go to the Fourteenth Amendment claim and go to damages if they

18    have said "yes" to 1 or 2 or both.  I think that's the flow.

19    So --

20         **MS. BAUMGARTNER:**  Can I make a suggestion, just

21    because we are getting very late at the end of the day and

22    everybody wants to go home -- is perhaps Your Honor can submit

23    something this evening.  If we have -- we can show up 15, 20

24    minutes early tomorrow, go over it, and if there are any

25    changes, deal with it then.

1          **THE COURT:**  That's a good plan.  We will issue a

2     revision later this evening.

3          **MS. BAUMGARTNER:**  Just to prepare, if, in fact, we are

4     going to make any changes tomorrow morning, I would like to

5     show the verdict form to the jury, and so if we could -- we'll

6     bring a flash drive or something so that we could transfer the

7     verdict form, if that works for Your Honor.

8          **THE COURT:**  When you say "transfer," transfer -- onto

9     your computer?

10          **MS. BAUMGARTNER:**  Correct.

11          **MR. POINTER:**  We all have the same --

12          **THE COURT:**  We will need electronic copies in order to

13     be able to show it to the jury.  Can you read them out of ECF,

14     or you are saying you need a word processing version of it?

15     PDF version is fine.

16          **MS. BAUMGARTNER:**  PDF is fine.  Trying to pull it off

17     ECF doesn't really work.

18          **THE COURT:**  All right.  That will be our objective.

19          **MS. BAUMGARTNER:**  One last matter.  We have not yet

20     looked at whatever computer the jury would have to determine

21     how to instruct them on listening to the audio, so I don't know

22     when that will be available.

23          **THE CLERK:**  I'm waiting to hear back.  From what I

24     understand, you just have a CD?

25          **MS. BAUMGARTNER:**  There is a CD.  Just a CD.

1          **THE COURT:**  We've used one before where it's -- it

2    will just play.

3          **MS. BAUMGARTNER:**  Right.  But we need to give

4    instructions on how to change the balance so that they can hear

5    one channel or both together.

6          **THE CLERK:**  Okay.

7          **MS. BAUMGARTNER:**  In order to give those instructions,

8    we actually have to do it on that computer because we don't

9    know where all the buttons are.

10          **THE CLERK:**  I will follow up with IT.

11          **THE COURT:**  This was an issue that came up at the

12    pretrial conference a long time ago and that would have been a

13    better time to deal with it.  We will deal with it as we can

14    tomorrow morning.

15          **MS. BAUMGARTNER:**  Would it make sense for my IT person

16    to be here or my paralegal or somebody to be here earlier to do

17    that?  Does that work.

18          **THE COURT:**  Probably, but we need the coordination of

19    people who aren't here to say yes.  We will make that call.

20    That's all we can do.

21          **MS. BAUMGARTNER:**  If there is some possibility of

22    doing it earlier, if we can know, and we will send somebody to

23    make that happen.

24          **THE COURT:**  My courtroom deputy will let you know if

25    we get a further response.  We will see you tomorrow.  We are

1    in recess.

2                    (Proceedings adjourned at 4:42 p.m.)

1

2

3                         <u>CERTIFICATE OF REPORTER</u>

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Saturday, May 29, 2021

8

9    *Pamela Batalo Hebel*

   _____
10   Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25